**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| REGAN MILLER,<br><br>  *Plaintiff*,<br><br>  v.<br><br>CITY OF MANASSAS PARK,<br>MARIO LUGO, FRANK WINSTON,<br>TREVOR REINHART, CARL DORR, and<br>LASZLO PALKO,<br><br>  *Defendants*. | Case No. 1:21-cv-00456<br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

NOW COMES Regan Miller ("Officer Miller") who, by and through its undersigned counsel hereby files this action against the City of Manassas Park, Virginia ("Defendant Manassas Park"), Mario Lugo ("Defendant Lugo"), Frank Winston ("Defendant Winston"), Trevor Reinhart ("Defendant Reinhart"), Carl Dorr ("Defendant Dorr"), and Laszlo Palko ("Defendant Palko," and together with Defendant Manassas Park, Defendant Lugo, Defendant Winston, Defendant Reinhart, and Defendant Dorr, are collectively, "Defendants") and alleges and avers as follows:

### NATURE OF THE ACTION

1.      This action arises out of extraordinary efforts taken by the City of Manassas Park, through its officers and officials, to terminate Plaintiff Regan Miller's employment with the City of Manassas Park (VA) Police Department, and later to file criminal charges maliciously and improperly against Plaintiff Regan Miller without probable cause, and to conspire to these things to damage his professional reputation in the law enforcement community, retaliate against him for

asserting his due process rights, and generally to force him out of his employment as a First Lieutenant with the City of Manassas Park (VA) Police Department.

2.      The causes of actions to set forth herein seek to compensate Officer Miller for the damages he sustained through the actions of the City of Manassas Park and those participating individuals named above as defendants.

**PARTIES**

3.      Plaintiff Regan Miller is an adult citizen and resident of the Commonwealth of Virginia.

4.      Defendant Manassas Park is an incorporated city within Prince William County, Virginia. Defendant Manassas Park has the right to exercise the powers and privileges conferred upon its charter or delegated to it, in accordance with the Constitution or the laws of the Commonwealth of Virginia. Section 3.7(8) of the Manassas Park charter places the control and supervision of the Manassas Park police force under either the Mayor or the City Manager of Manassas Park. Section 3.7(10) of the Manassas Park charter places control of the Chief of Police and the police officers and employees of the police force under the control and supervision of the City Manager or Mayor of Manassas Park.

5.      Defendant Lugo was at all times relevant to this Complaint a resident of the Commonwealth of Virginia and a duly sworn officer holding the rank of Captain or Chief of the Manassas Park Police Department ("MPPD") and acting under the color of law, to wit, under color of the statues, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia and/or the City of Manassas Park.

6.      Defendant Winston was at all times relevant to this Complaint a resident of the state of Maryland and a duly sworn officer holding the rank of Lieutenant or Captain of the MPPD and

acting under the color of law, to wit, under color of the statues, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia and/or the City of Manassas Park.

7.     Defendant Reinhart was at all times relevant to this Complaint a resident of the Commonwealth of Virginia and a duly sworn officer holding the rank of Captain or Major of the MPPD and acting under the color of law, to wit, under color of the statues, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia and/or the City of Manassas Park.

8.     Defendant Dorr was at all times relevant to this Complaint a resident of the Commonwealth of Virginia and a duly sworn officer holding the rank of Lieutenant of the MPPD and acting under the color of law, to wit, under color of the statues, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia and/or the City of Manassas Park.

9.     Defendant Palko was at all times relevant to this Complaint a resident of the Commonwealth of Virginia and is employed as the City Manager for the City of Manassas Park.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's federal claims in this action pursuant to 28 U.S.C. § 1331, because the subject matter of Plaintiff's claims arises under the Fourth and Fourteenth Amendments of the United States Constitution and are brought pursuant to 42 U.S.C. §§ 1983 and 1985.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because Defendants committed the violations within the jurisdiction of the Commonwealth of Virginia and the Federal Judicial District of the Eastern District of Virginia.

## FACTUAL ALLEGATIONS

**A.   Background.**

12.   Plaintiff Regan Miller was hired by MPPD in June 2007 to serve as a sworn law enforcement officer.

13.   Before he was hired by MPPD, Officer Miller had approximately nine (9) years of law enforcement experience, working as a sworn law enforcement officer in other jurisdictions in the northern Virginia area.

14.   Before and during the actions leading to the wrongful treatment as described herein, Officer Miller performed his duties on behalf of MPPD and its citizens with distinction, and regularly received commendations and awards for his professionalism and service.

15.   Officer Miller rose through the MPPD ranks serving as an Officer, Detective – where Officer Miller served on the Federal Bureau of Investigation ("FBI") task force – Sergeant, and at the time of his wrongful termination, First Lieutenant.

16.   Officer Miller took great pride in his work as a law enforcement officer and nobly served in accordance with controlling laws, guidelines, and policy, and expected the same from his colleagues.

**B.   The Badge Incident.**

17.   In March 2016, Officer Miller was asked to design commemorative police badges in celebration of the presidential inauguration on January 20, 2017.

18.   Officer Miller dutifully undertook this extracurricular task without compensation and while maintaining his duties as a sworn law enforcement officer.

19.   The inauguration badge designs created by Officer Miller were approved, and Officer Miller then coordinated their production directly with the badge manufacturer, Collinson

Enterprises in Crofton, Maryland ("Collinson"). Collinson is the copyright owner of the badges it produces and offers the badges for sale on its website.[1]

20.    To memorialize his achievement, Officer Miller ordered an extra set of badges to display in his home. Officer Miller purchased the badges with his personal funds and his acquisition, ownership, and display of the badges did not run afoul of any controlling laws or policies.

21.    After collecting the inauguration badges, Officer Miller created a shadowbox display which he hung in his basement alongside other law enforcement related memorabilia Officer Miller had lawfully collected.

22.    One month before the inauguration, on December 16, 2016, and while on vacation leave in Florida, Officer Miller received a phone call from Defendant Lugo, who at the time was serving as Captain and was Officer Miller's superior. Defendant Lugo demanded that Officer Miller turn over the inauguration badges he had purchased for himself. Officer Miller explained that the badges were purchased with his own funds, were for display purposes only, and questioned what policy or law his actions had violated. Defendant Lugo offered no response to Officer Miller's queries and in subsequent text messages falsely stated that Officer Miller was not authorized to own the badges.

23.    Officer Miller then spoke with an attorney and confirmed that Defendant Lugo had no grounds to force Officer Miller to turn over the badges. Officer Miller expressed the same to Defendant Lugo via text message on or about December 19, 2016. In that text message to

---

[1] The sale of some badges on the Collinson website requires proof of membership with the organization, including certain law enforcement agencies/departments.

Defendant Lugo, Officer Miller notified Defendant Lugo that he had consulted with an attorney concerning the matter.

24.     Without authority, Defendant Lugo continued to demand that the badges be turned over. In an attempt to defuse the situation, on December 27, 2016, Officer Miller notified Defendant Lugo that he would return the badges to Collinson. Approximately one (1) hour later, Defendant Lugo emailed Officer Miller and stated, "You were directed to return the badges to the department; not the company. Please return the badges asap with the receipt." On the following day, Officer Miller again asked what basis Defendant Lugo had to demand he turn over badges to the department. Defendant Lugo failed to respond.

25.     On January 2, 2017, Officer Miller turned over the badges and the receipt, as ordered by Defendant Lugo, by placing the items in Defendant Lugo's MPPD mailbox.

26.     Officer Miller continued to press Defendant Lugo to explain what basis he had to force Officer Miller to turn over the badges. After several unsuccessful attempts to discuss the matter with Defendant Lugo, on March 13, 2017, Officer Miller emailed, John Evans ("Evans"), the MPPD Chief of Police at the time. In his email to Evans, Officer Miller expressed frustration over the situation and Defendant Lugo's lack of responsiveness. Officer Miller also articulated that if a valid reason for Defendant Lugo's demand was not presented, he planned to file a grievance with the Fraternal Order of Police ("FOP") to recoup his badges.

27.     On March 13, 2017, Evans responded to Officer Miller's email and cc'd Defendant Lugo. Shortly thereafter, Defendant Lugo sent an email which falsely alleged that on December 16, 2016, Defendant Lugo advised Officer Miller of the reasons why he needed to return the badges and Officer Miller was "advised several times" that he was not authorized to purchase the badges.

28.     On March 20, 2017, Officer Miller met with Evans who expressed that Defendant Lugo was angry about Officer Miller's decision to seek advice from an attorney and Officer Miller's expressed intent to file a grievance through FOP. Through Evans, Defendant Lugo claimed that he could not return Officer Miller's badges because he had allegedly distributed them to other officers. Evans ordered Officer Miller to resolve the issues with Defendant Lugo and subsequently gave Officer Miller permission to repurchase the badges from Collinson.

29.     In April 2017, Officer Miller met with Defendant Lugo. During the meeting, Defendant Lugo maintained that Officer Miller's purchase of the badges were "illegal."

30.     Following the meeting with Defendant Lugo in April 2017, Officer Miller was warned by individuals within MPPD, including Defendant Reinhart, that Defendant Lugo was seething about the badge issue and had both openly and privately threatened Officer Miller. At the time, Defendant Lugo was being groomed to replace Evans as the MPPD Chief of Police and Officer Miller was ominously warned by colleagues to retain an attorney if/when Defendant Lugo ascended to Chief.

**C.     Defendant Winston's Car Accident.**

31.     In December 2017, Officer Miller discovered that Defendant Winston had been involved in an unreported car accident while driving his assigned MPPD police vehicle home from his shift at the MPPD station on or about November 22, 2017.

32.     Officer Miller also learned that the black unmarked squad car driven by Defendant Winston was towed to Finish Line Towing ("FLT"), in Manassas, Virginia, where it was placed in a locked garage with a tarp placed over it.

33.     Per MPPD policy, officers involved in a department-issued automobile accident are required to immediately report the accident to the MPPD on-duty supervisor.

34.     Officer Miller was the MPPD on-duty supervisor on November 22, 2017.

35.     Defendant Winston failed to report the accident to Officer Miller or to "FLEET," which is the division tasked with car maintaining and repairing the MPPD motor patrol vehicles and squad vehicles.

36.     Promptly after learning about the automobile accident, Officer Miller made an inquiry to FLEET about Defendant Winston's unreported accident. FLEET attempted to find the destroyed squad car but were unable to locate it. FLEET then contacted Defendant Lugo and told him that they learned about the accident through Officer Miller.

37.     After making the inquiry, Defendant Lugo called Officer Miller and demanded to know how he learned of Defendant Winton's accident and who else knew about it. Upon information and belief, Defendant Lugo helped Defendant Winston cover-up the accident and was concerned about his own exposure.

38.     During the phone call with Defendant Lugo, Defendant Lugo ominously warned Officer Miller that he had better call Defendant Winston to see if he was okay and stop asking questions about the car accident. Officer Miller did not place a call to Defendant Winston.

39.     Upon information and belief, Defendant Lugo told Defendant Winston that Officer Miller had knowledge of the automobile accident.

40.     Upon information and belief, Defendant Winston was not disciplined for his failure to adhere to MPPD policy.

41.     Upon information and belief, Defendant Winston and Defendant Lugo are close friends and had a shared dislike of Officer Miller as a result of Officer Miller's reporting of the Defendant Winston's automobile accident and Defendant Lugo's wrongful order to return the inauguration badges.

**D.      Retaliatory Acts Directed at Officer Miller – Squad Car and ATF e-Trace Account.**

42.      In the ensuing months, Defendant Lugo took continued and punitive measures against Officer Miller in an effort to get him to resign.

43.      In December 2017, Officer Miller was required to exchange his MPPD issued Sport Utility Vehicle for a Ford Interceptor, the smallest vehicle in the MPPD motor fleet. At 6'0" 250 pounds, Officer Miller was one of the largest officers on the MPPD force and the use of the Ford Interceptor while wearing his equipment posed a health and safety risk to Officer Miller. Officer Miller's requests to be moved back to his SUV or larger sedan were ignored.

44.      Out of concern for Officer Miller's safety, his superior, Captain Kevin Hampton also made separate requests to Defendant Lugo and Defendant Reinhart for a change of vehicle, but his e-mails were ignored.

45.      On February 14, 2018, while still on duty, Officer Miller needed to run an urgent gun check as part of a legitimate investigation but found that he was unable to access his ATF e-Trace account (which is an online system that allows participating law enforcement agencies to submit firearm traces to the Bureau of Alcohol, Tobacco, and Firearms). At the time, Defendant Lugo was the account manager for the ATF system. When Officer Miller questioned Defendant Lugo about his inability to access ATF e-Trace, Defendant Lugo feigned ignorance. Subsequently, Officer Miller contacted the ATF, who informed Officer Miller that Defendant Lugo had in fact revoked Officer Miller's account privileges a week earlier, on February 6, 2018. The ATF further told Officer Miller that only Defendant Lugo had the authorization to restate Officer Miller as a user.

46.      Officer Miller then made a request to Defendant Lugo to have his credentials to the ATF system restored. Defendant Lugo waited until March 6, 2018 to reinstate Officer Miller, and

despite demand, never explained why he removed Officer Miller as a user from the ATF system or why he lied about doing so.

**E.      Retaliatory Acts Directed at Officer Miller – the Accurint Account.**

47.      On May 21, 2018, Officer Miller was denied access to his Accurint account by Defendant Lugo. Accurint is the most widely accepted locate-and-research tool available to government, and a vital resource for law enforcement patrol investigations. At the time, Officer Miller was working on active patrol investigations and his access to Accurint was essential.

48.      Despite denying Officer Miller's access, Defendant Lugo authorized access to other officers of lower rank in patrol.

49.      Upon information and belief, Defendant Lugo's continued removal of Officer Miller from necessary law enforcement search systems was done to frustrate Officer Miller's ability to perform his job to the point where Officer Miller would resign.

50.      Defendant Lugo also took active measures to stymie Officer Miller's professional growth by denying Officer Miller's access to programs such as the Federal Bureau of Investigation National Academy ("FBINA").

51.      FBINA is a professional course of study that serves to improve the administration of justice in police departments and agencies, both at home and abroad, and also serves to raise law enforcement standards, knowledge, and cooperation worldwide through instruction in law enforcement and related subjects, including law, behavioral science, forensic science, understanding terrorism, terrorism mindsets, leadership development, communication, and health/fitness. Access is limited and requires submission by a law enforcement department supervisor.

52.      MPPD's informal policy gave priority to those officers who were the rank of Lieutenant or higher. As of July 26, 2018, Officer Miller's rank was First Lieutenant.

53.     Officer Miller frequently expressed his desire to participate in the FBINA program.

54.     Officer Miller submitted his FBINA application directly to Defendant Lugo but received no response. Defendant Lugo represented to Officer Miller that his FBINA application was submitted.

55.      Despite Defendant Lugo's continued assurances that the FBINA application was submitted, Officer Miller later learned that Defendant Lugo never submitted his application.

56.     However, during that same time Defendant Lugo successfully submitted FBINA applications for other officers who had less experience and who were a lower rank than Officer Miller, including Defendant Winston, who at the time was a Sergeant.

57.     Upon information and belief, Defendant Lugo purposefully withheld Officer Miller's FBINA application to bolster Defendant Winston's credentials and thereby making him a more attractive candidate for promotion, and/or under the mistaken belief that the progressively hostile actions taken against Officer Miller would result in his resignation.

58.     Defendant Lugo's scheme worked, and Defendant Winston was promoted to Lieutenant on or about November 26, 2018.

**F.      Retaliatory Acts Directed at Officer Miller – Public Confrontation.**

59.     On October 30, 2018, Defendant Lugo publicly accosted Officer Miller after Defendant Lugo learned that Officer Miller helped to support a law enforcement officer in a neighboring jurisdiction with a grievance appeal and FOIA request.

60.     The assistance Officer Miller offered to his fellow law enforcement officer did not violate any applicable law, regulation, or policy.

**G.      Retaliatory Acts Directed at Officer Miller – Publicly Accused of Being a "Rat."**

61.     Shortly thereafter, in November 2018, Defendant Lugo improperly, and without a factual basis, announced to several MPPD officers that Officer Miller had "ratted" on one of his

fellow officers. Specifically, Officer Miller was falsely accused of reporting an officer's use of an MPPD van for a personal vacation to Florida.

62.    Upon belief and information, Defendant Lugo knowingly made the false statement in retaliation for Officer Miller helping an officer with her grievance, and to blacklist Officer Miller with other officers, thereby making his marginalization more acceptable.

**H.    The First Failed Administrative Investigation Against Officer Miller.**

63.    In 2018, although Evans remained the Chief of Police, his retirement was imminent, and for all intents and purposes, by the start of 2019 Defendant Lugo had assumed the authority and responsibility reserved for the Chief of Police.

64.    On January 9, 2019, Officer Miller was approached by Defendant Reinhart (one of Officer Miller's superiors) and was questioned about an alleged complaint lodged against a Sergeant under Officer Miller's command. Defendant Reinhart informed Officer Miller that he was starting an investigation into the matter.

65.    In response to Defendant Reinhart's investigatory questions, Officer Miller acknowledged that on or about November 7, 2018, an officer reported witnessing the Sergeant make a rude comment to a driver during a traffic stop. In response, Officer Miller said he would look into it the matter.

66.    At the time, Officer Miller's unit was understaffed and overworked, and as a result, Officer Miller failed to immediately follow up on the allegation. Officer Miller readily admitted his mistake to Defendant Reinhart and inquired as to the nature of the complaint. Defendant Reinhart refused to give Officer Miller any further details.

67.    As a result of Defendant Reinhart's investigation, on January 23, 2019, Officer Miller was issued a Written Reprimand. Despite demand, Officer Miller was never presented with

evidence of the alleged wrongful conduct and the Written Reprimand does not cite any. The Written Reprimand is attached hereto as **Exhibit 1**.

68.     Based upon Officer Miller's knowledge of prior policy violations committed by other MPPD officers, the investigation and written reprimand was unusually harsh and out of line with normal disciplinary practice.

69.     Based upon the excessive nature of the allegations, Officer Miller submitted for an FOP appeal form.

70.     On March 4, 2019, Officer Miller appealed MPPD's decision to issue the January 23, 2019 Written Reprimand.

71.     In response to Officer Miller's appeal, his Written Reprimand was reduced on March 6, 2019 to a notice for corrective action, which is a non-disciplinary action. In fact, the notice of corrective action specifically stated that "This record is NOT a disciplinary action. This form should not be utilized if the supervisor determines that a situation exists which requires disciplinary action." (Emphasis added.) The March 6, 2019 notice for corrective action is attached hereto as **Exhibit 2**.

72.     A major reason for reducing a disciplinary sanction and issuing a notice for corrective action is to eliminate the stain or stigma of a Written Reprimand, which impacts employment advancements and mobility.

73.     Before a law enforcement agency hires an applicant to fill a law enforcement position, a background investigator conducts a thorough investigation of the applicant. This includes, requesting and reviewing the applicant's personnel file from his/her most recent place of employment.

74.     Despite issuing Officer Miller a notice for corrective action, the Written Reprimand remained in Officer Miller's personnel file and upon information and belief, has been wrongfully submitted to background investigators who have requested Officer Miller's file. Such action was done purposefully by Defendant Palko, Defendant Lugo, and Defendant Reinhart in order to negatively impact Officer Miller's ability to find gainful employment with another law enforcement agency.

## I.     Discovery of Undisclosed Pay Raises.

75.     In 2018, MPPD officers were notified that an annual pay increase was not approved by Defendant Manassas Park. However, Officer Miller learned that certain MPPD officers and personnel loyal to Defendant Lugo had in fact received discreet salary increases.

76.     Officer Miller learned about the undisclosed pay raises through several MPPD coworkers. Although Officer Miller's coworkers expressed anger and resentment, all were afraid to speak up out of fear of reprisal.

77.     On or about May 6, 2019 Officer Miller filed a Freedom of Information Act ("FOIA") request for MPPD salary information.

78.     The FOIA request was submitted to Defendant Manassas Park, who reported the substance of the request to Defendant Lugo and other members of MPPD's command staff, and also identified Officer Miller as the requesting party.

79.     On or about May 8, 2019, Officer Miller received a response to the FOIA. The FOIA confirmed Officer Miller's suspicions and revealed that multiple MPPD officers in the Investigative Services Division ("ISD") and K-9 unit, including Defendant Reinhart, and Defendant Lugo's brother-in-law, Brian Sproule, had received undisclosed pay raises.

80.     At the time, the ISD and K-9 divisions were under the control of Defendant Lugo, and upon information and belief, Defendant Lugo was responsible for making the request for distribution of the undisclosed pay raises.

81.     Defendant Lugo's request was submitted to Defendant Palko for approval. Without justification, Defendant Palko approved the undisclosed pay request and the payroll change forms were processed.

82.     Officer Miller's discovery of the undisclosed pay raises reflected negatively upon Defendant Lugo, Defendant Palko and also Defendant Reinhart. Officer Miller's exposure of the undisclosed pay raises angered the Defendants and further incited and emboldened the Defendants to take more drastic action to remove Officer Miller.

83.     On or about June 18, 2019, Officer Miller attended an event hosted by Defendant Manassas Park honoring several first responders. The guest list included many influential members of the City of Manassas Park community and included Defendant Lugo, Defendant Winston, Defendant Reinhart, and Defendant Palko. Prior to the event, City Attorney Dean Crowhurst warned Officer Miller not to speak about the FOIA or the undisclosed pay raises.

84.     The undisclosed pay raises violated the City of Manassas Park Employment Policies and Practices ("Employment Polices"), including Section 1513.

85.     Defendant Manassas Park had knowledge of the undisclosed pay raises but upon information and belief, failed to conduct a meaningful investigation and/or failed to discipline the offender(s), including Defendant Lugo and Defendant Palko.

**J.     Defendant Lugo's Ascension to Police Chief and the "Anonymous" Survey.**

86.     In April 2019, Evans publicly announced his retirement from MPPD. At the time of Evans' announcement, it was widely assumed that Defendant Lugo would be named as the next Chief of Police.

87.     During rollcall in April 2019, Defendant Winston commented publicly that Defendant Lugo's first act as Chief of Police would be to "get rid of six people."

88.     On April 22, 2019, MPPD officers were required to attend a mandatory meeting. During the meeting, MPPD officers were required fill out an "anonymous" survey. The survey asked, among other things, if the officer would recommend family/friends to work at MPPD.

89.     In response to the mandatory survey, Officer Miller truthfully wrote that he would not recommend family/friends to work for MPPD because of a lack of leadership and leadership's failure to take corrective action for serious and sustained violations of policy. Moreover, Officer Miller identified that MPPD was plagued by incidents of hypocritical decision making, nepotism and favoritism.

90.     After completing the required survey, Officer Miller delivered his responses to a City Human Resources representative who marked Officer Miller's survey. Upon information and belief, the HR representative tracked Officer Miller's responses and delivered them to Defendant Lugo and Defendant Palko.

91.     On April 23, 2019, Defendant Lugo was appointed to Chief of Police of MPPD.

**K.     The Second Failed Administrative Investigation Against Officer Miller.**

92.     On or about April 14, 2019 Officer Nancy Climaco was assigned to Officer Miller's squad.

93.     Officer Climaco was a new hire, but prior to joining MPPD had previously served as a law enforcement officer for Manassas City Police Department ("MCPD").

94.     From the onset of her employment at MPPD, Officer Climaco was cited for infractions associated with her employment-related shortcomings. Most notably, Officer Climaco had persistent issues related to tardiness and insubordination.

95.     As Officer Climaco's immediate supervisor, Officer Miller often fielded complaints from colleagues related to Officer Climaco's shortcomings. Officer Miller was also primarily responsible for reprimanding and/or counseling Officer Climaco when she failed to adhere to policy and guidelines.

96.     Days after Officer Miller received a response to his May 2019 FOIA request, Defendant Reinhart began questioning officers about claims that Officer Miller was speaking poorly of Officer Climaco.

97.     In early May 2019, and prior to written notice of allegations of wrongdoing, Defendant Reinhart confronted Officer Miller about his dealings with Officer Climaco. Specifically, Defendant Reinhart asked Officer Miller if he had been inquiring to MCPD about Officer Climaco or if he was speaking negatively about Officer Climaco. Officer Miller truthfully answered "no" to both questions.

98.     Thereafter, Defendant Reinhart aggressively confronted Officer Miller on two (2) additional occasions. Both times Defendant Reinhart asked Officer Miller if he ever spoke negatively about Officer Climaco and both times Officer Miller truthfully said he had not.

99.     During the final confrontation, Defendant Reinhart accused Officer Miller of lying and told Officer Miller that he better just admit the allegations since "speaking negatively" about another officer is not against policy. Officer Miller again refuted the claims.

100.    In a futile attempt to build a case against Officer Miller, in May and June 2019, Defendant Reinhart contacted other MPPD and MCPD officers to question them about Officer Miller.

101.     During one such attempt, Defendant Reinhart questioned MCPD Officer Ben Dillard. Despite Officer Dillard denying knowledge of any comment made by Officer Miller about Officer Climaco, Defendant Reinhart persisted and tried to coerce a statement from him.

102.     On or about June 11, 2019 a written notice of investigation was delivered to Officer Miller. The notice included allegations that Officer Miller was insubordinate, participated in "Unbecoming Conduct," lied about his conduct with respect to Officer Climaco, and failed to comply with policy related to directives. The June 11, 2019 notice is attached hereto as **Exhibit 3**.

103.     Defendant Reinhart's allegations included in the June 11, 2019 notice were not supported by any evidence, including evidence gathered from his unofficial, pre-notice investigation.

104.     Officer Miller vehemently denied the allegations included in the June 11, 2019 notice.

105.     Undeterred by the lack of evidence, during the administrative investigation Defendant Reinhart demanded that several officers, including Officer Miller, Officer Andrew Bussell, Officer Bryce Carter, and Officer Emilie Kellogg, turn over their personal cell phones for inspection or risk termination. Officer Miller protested Defendant Reinhart's directive but was forced to comply.

106.     Defendant Reinhart's meritless search of personal cell phones did not substantiate the allegations made in the June 11, 2019 notice.

107.     Upon information and belief, Defendant Reinhart's actions to unlawfully search Officer Miller's cell phone were supported and encouraged by Defendant Lugo.

108.     On or about July 12, 2019, Officer Climaco quit MPPD.

109.    After a two (2) month investigation, on August 12, 2020, Officer Miller received a disciplinary action form. The allegations of Officer Miller's untruthfulness, insubordination, performance of duty, discredit to the department, and "Unbecoming Conduct" were found uncredible and were not sustained. However, Officer Miller was cited for not taking an active role in a police pursuit and for allegedly failing to use properly use equipment, and Officer Miller was issued a Record of Employee Conference form. The August 12, 2020 disciplinary action form is attached hereto as **Exhibit 4**. The Record of Employee Conference form is attached as **Exhibit 5**.

110.    The August 12, 2019 Record of Employee Conference form is a notice of corrective action, not a notice of disciplinary action. It specifically states, "This record is NOT a disciplinary action. This form should not be utilized if the supervisor determines that a situation exists which requires disciplinary action." **Ex. 5**.

111.    On or about October 20, 2020 Officer Climaco called Officer Miller and told him that she never initiated a complaint against him, and that Defendant Reinhart attempted to pressure her into making false and/or misleading statements against Officer Miller. Officer Climaco represented that she was forced to resign from MPPD because of the "toxic" environment and had subsequently been "blackballed" by Defendant Lugo and Defendant Reinhart for refusing to go along with their scheme against Officer Miller. As a result, Officer Climaco told Officer Miller that she was unable to find employment in law enforcement despite applying to several local departments.

**L.    The Third Failed Administrative Investigation Against Officer Miller.**

112.    On July 2, 2019, Officer Miller was the on duty supervising officer. During Officer Miller's shift, MPPD received a call from a victim who reported that the theft of three (3) firearms and his automobile.

113.    Officer Andrew Bussell responded to the call and once he was on-scene, he promptly began the investigation. Officer Bussell interviewed the victim who identified the perpetrator as "Josh." The victim described "Josh" as a 6'3" black male with a beard and a thin build. Outside of that vague physical description, the victim was unable to provide Officer Bussell with any other identifying information.

114.    Despite lacking basic information about "Josh" such as a last name, date of birth, or address, Officer Bussell contacted Officer Miller to request a suspect search using the Law Enforcement Information Exchange ("LInX").

115.    LInX is search engine utilized by law enforcement agencies and is designed to enhance information sharing between local, state, and federal law enforcement agencies. LInX provides participating law enforcement agencies with secure access to regional crime and incident data and the tools needed to process it, enabling investigators to search across jurisdictional boundaries to help solve crimes and resolve suspicious events.

116.    Officer Miller was one of two (2) MPPD officers who served as a Security/Systems administrator for LInX.[2] In his role as a LInX administrator, Officer Miller was trained on the system and frequently ran searches for other MPPD officers in to assist them with their investigations. During that time, Officer Miller served as the MPPD department LInX trainer and trained all new MPPD users on the LInX functionality.

117.    Defendant Lugo assigned Defendant Winston as a LInX Security/Systems administrator in or about February 2019.

---

[2] The other LInX-authorized user during periods relevant to this Complaint was Defendant Winston.

118.    Defendant Lugo did not tell Officer Miller that he had made Defendant Winston a LInX administrator, and despite Officer Miller's role as the MPPD department LInX trainer, was not asked to train Defendant Winston.

119.    Although theft is considered a "property crime," stolen firearms investigations have a heightened sense of urgency because of the possible threat to the community. As a result, Officer Miller used the limited information Officer Bussell provided to promptly run LInX searches for the suspect.

120.    Officer Bussell and Officer Miller jointly reviewed suspect search results in Officer Miller's office. Officer Miller's searches generated several possible leads but none that completely matched the limited description given by the victim.

121.    In his report, Officer Bussell stated that "[c]hecks of multiple law enforcement databases did not reveal any information that would be useful in identifying Josh." The July 2, 2019 "Josh" incident report is attached hereto as **Exhibit 6**.

122.    At the end of his shift in the early morning hours of July 3, 2019, Officer Miller digitally signed off on the Incident Approval Log related to the stolen property, in compliance with his duties as a supervisor.

123.    On July 9, 2019, a Fairfax County (VA) police officer located the stolen car and firearms and subsequently detained the perpetrator. Only then was it discovered that "Josh's" real name was Lennon Francis. *See* **Ex. 6**, pp. 8-9.

124.    The property theft case was closed by arrest less than a week after the crime was committed. Upon information and belief, neither the stolen firearms nor the stolen car was used to perpetrate any crimes between July 2, 2019 and July 9, 2019; and Lennon Francis did not commit any additional crimes for which he was charged between July 2, 2019 and July 9, 2019.

125.    Despite the positive result of the investigation, Defendant Lugo launched yet another investigation into Officer Miller's conduct.

126.    Upon information and belief, Defendant Lugo's decision to launch this third investigation was not prompted by a complaint or notification of wrongdoing by any officer or third-party. Rather, upon information and belief, Defendant Lugo initiated this investigation on his own.

127.    Upon information and belief, Defendant Lugo used his position of authority to organize, direct, or otherwise encourage a group of MPPD officers and City of Manassas Park employees to participate in sham administrative and criminal investigations against Officer Miller for the intended purpose of removing Officer Miller, and others like him, from employment.

128.    Upon information and belief, Defendant Lugo targeted Officer Miller because Defendant Lugo resented the outcome of the badge incident in 2016 and further felt that Officer Miller's refusal to back down amid pressure to comply with illegal or inappropriate requests posed a threat to Defendant Lugo's position.

129.    Upon information and belief, Defendant Lugo sought out subordinates who did not question his authority. Officer Miller's history of using policy and procedure to ensure fairness was seen as a threat to Defendant Lugo, who, on information and belief, wanted subordinates to accept his authority, even when it was contradicted by policy, procedure, or the law.

130.    On July 23, 2019, Defendant Winston emailed LInX representative Catherine Miller (no relation to Officer Miller), to say that he discovered an internal issue during a recent LInX audit and asked Ms. Miller to contact him on his cell phone, (xxx) zzz-8261. The July 23, 2019 email from Defendant Winston is attached hereto as **Exhibit 7**.

131.    Upon information and belief, during the phone call with Ms. Miller, Defendant Winston sought information about LInX queries made by Officer Miller on March 29, 2019. Specifically, Defendant Winston was focused on whether or not the LInX queries run by Officer Miller on March 29, 2019 contained a reference to any other officer from MPPD.

132.    In response to Defendant Winston's inquiry, Ms. Miller responded by email on July 23, 2019, and stated "[i]f the user was running a query for another person within the department he should at least include that in the justification field such as "Homicide – for Det. Smith". The email thread beginning with Ms. Miller's response on July 23, 2019 is attached as **Exhibit 8**.

133.    In fact, Officer Miller had run LInX queries for Defendant Winston on March 29, 2019 (discussed below) and upon information and belief, Defendant Winston wanted to be certain those queries from March 29, 2019 could not be traced back to him.

134.    On the evening of July 23, 2019, Defendant Winston forwarded the July 23, 2019 email from Ms. Miller to Defendant Reinhart and Defendant Lugo.

135.    On August 5, 2019, Defendant Lugo forwarded Defendant Reinhart a third Internal Affairs investigation letter. Despite the alleged serious nature of the third Internal Affairs investigation against Officer Miller, Defendant Lugo dated the letter for August 12, 2019. On that same day, Defendant Reinhart forwarded Defendant Winston a copy of Officer Miller's 2019 Employee Evaluation Form. Defendant Reinhart had no legitimate reason for sending Officer Miller's performance evaluation to Defendant Winston, and Defendant Winston had no valid reason for possessing Officer Miller's performance evaluation.

136.    On August 12, 2019, the same day that Officer Miller was served with the findings of the second investigation, Defendant Winston served Officer Miller with a letter which stated that "[Defendant Lugo] received a complaint concerning [Officer Miller's] conduct and

performance as a supervisor. Specifically, it has been alleged that [Officer Miller] failed to divulge pertinent information regarding an ongoing investigation by one of your officers on or about March 29, 2019." Further, the letter states that "it has been alleged that [Officer Miller] may have violated or misused the LInX on or about July 7, 2019." The August 12, 2019 letter is attached hereto as **Exhibit 9**.

137.    The allegations included in the August 12, 2019 letter were false, and/or unsubstantiated, and upon information and belief, Defendant Lugo and Defendant Reinhart knew them to be so.

138.    The August 12, 2019 letter indicated that Defendant Reinhart would be investigating the matter.

139.    Officer Miller questioned Defendant Winston about what wrongful actions were being alleged and questioned the dates. Defendant Winston feigned ignorance and despite being deeply involved in the investigation against Officer Miller, claimed that he did not know anything about the matter. Later, Defendant Winston agreed that the dates did not look accurate and called Defendant Lugo. Defendant Lugo told Defendant Winston that the dates were fine and to leave the letter as is.

140.    On August 28, 2019, Defendant Reinhart delivered an amended August 12, 2019 letter to Officer Miller. The amended August 12, 2019 letter included handwritten dates, believed to be the handwriting of Defendant Reinhart, which altered the dates reflected on the original letter. Defendant Reinhart changed the date of the alleged complaint concerning supervision from March 29, 2019 to "July 23" (or possibly, "July 2-3," the date of the "Josh" incident) and changed the date of the alleged LInX misuse from July 7, 2019 to "March 29," the date of the "Foster" incident

discussed below. The reason for the incorrect dates were not divulged to Officer Miller, despite demand. The amended August 12, 2019 letter is attached hereto as **Exhibit 10**.

141.     According to the amended August 12, 2019 letter, Officer Miller was accused of the following:

a.     Defendant Lugo allegedly received a complaint concerning Officer Miller's conduct and performance as a supervisor for actions on or about "July 23" (or possibly, "July 2-3") in violation of MPPD General Orders and City Policy 201, I, A (1&2); 201, I, B (1); 601, II, E (4); and 602, I, A; and

b.     Officer Miller allegedly violated or misused LInX or about "March 29" by disseminating confidential policy information in violation of 201, V, R, (1 & 2) *See* Ex. 10, pg. 1.

142.     Despite demand, neither a complaint nor the identity of any alleged complainant related to the "July 23" or "July 2-3" (*i.e.*, the Josh incident) claims were disclosed. Upon information and belief, no complaint was ever logged against Officer Miller and Defendant Lugo used this illusory complaint as pretext to initiate another unwarranted investigation and wrongfully audit Officer Miller's LInX activity.

143.     The amended August 12, 2019 letter does not include the source of Officer Miller's alleged misuse of the LInX system or what prompted an audit of Officer Miller's searches dating back to at least March 29, 2019.

144.     Upon information and belief, it is not the practice of MPPD to audit LInX accounts unless a knowing and wanton violation has been committed or specific claims of misconduct have been filed through proper channels. To date, and despite demand, Officer Miller has not been

provided information concerning what prompted MPPD to perform the LInX audit or the scope of the original LInX audit.

145.    Upon information and belief, Defendant Lugo ordered the LInX audit without cause or justification.

146.    Upon information and belief, Defendant Reinhart and Defendant Winston were aware of Defendant Lugo's misuse of the investigation.

147.    On August 29, 2019, Defendant Lugo notified Officer Miller that due to the ongoing investigation, and in accordance with General Order 109 III, Officer Miller was suspended from his duties as a law enforcement officer. The August 29, 2019 letter is attached hereto as **Exhibit 11**.

148.    The allegations included in the August 29, 2019 letter were false, and/or unsubstantiated, and upon information and belief, Defendant Lugo knew them to be so.

149.    Officer Miller stridently opposed the false allegations made against him and contained in the amended August 12, 2019 letter and the August 29, 2019 letter.

150.    Manassas Park Police General Order 109 III authorizes the removal of an officer from active duty if they are "deemed to be a substantial and immediate threat to the welfare of the Department or the public, or who refuses to obey a lawful direct order form a superior officer." The allegations raised in the amended August 12, 2019 letter do not amount to behavior which is subject to removal from active duty. General Order 109 is attached hereto as **Exhibit 12**.

151.    General Order 109 III (D)(5) requires that "[u]pon an immediate relief from duty, it is the responsibility of the superior officer making personal notice to take the following steps… Submit a written report in memorandum form to the Chief of Police or ranking command officer,

prior to the next day, detailing the facts leading to the superior officer's decision and actions taken."

152.    As the superior officer making personal notice, Defendant Lugo, or alternatively Defendant Reinhart, had an obligation to submit a written report detailing the facts which led to the decision to relieve Officer Miller of his active duties on or before August 30, 2019. To date, no report has been furnished and it is believed that Defendant Lugo, or alternatively Defendant Reinhart, failed to adhere to the requirements of General Order 109 III (D)(5).

153.    The investigation focused on a LInX search entry that Officer Miller had made on March 29, 2019, related to "Victoria Foster."

154.    On March 29, 2019, Officer Miller made approximately eight (8) queries of "Victoria Foster." Those queries included other identifying information including the phone number (xxx) zzz-4809.

155.    The LInX Rules of Use Agreement identifies "Unauthorized use" as requests, dissemination, sharing, copying or receipt of LInX information.

156.    The amended August 12, 2019 letter notified Officer Miller of his alleged misuse of the LInX system in violation of General Order 201, V, R (1 & 2). General Order 201, V, R (1 & 2) concerns the dissemination of confidential police information, and specifically, prohibits a member from revealing information outside the department.

157.    To date, no information or evidence has been offered which demonstrate that Officer Miller disseminated confidential police information.

158.    As part of the administrative investigation, Defendant Winston was tasked with collecting information from LInX. According to Defendant Winston, the results of the searches were as follows:

a.    The phone number (xxx) zzz-4809 had been queried three (3) times:

    i.    On 3/29/2019 by Regan Miller for a Homicide;

    ii.    On July 23, 2019 by Catherine Miller (no relation to Officer Miller) for a review for possible misuse at MPPD request; and

    iii.    On August 29, 2019 by Frank Winston for IA investigation for Capt. Reinhart.

b.    The name "Victoria Foster" was queried seven (7) times within the LInX Region:

    i.    On 9/19/2012 by Baltimore City PD for a Homicide;

    ii.    On 11/10/2015 by St. Mary Co. SO for "63430-15";

    iii.    On 6/5/2017 by St. Mary Co. SO for Death Investigation;

    iv.    On 3/5/2019 by Maryland State PD for Forgery Mail Fraud;

    v.    On 3/29/2019 by MPPD for a Homicide;

    vi.    On 7/23/2019 by LInX for Review for possible misuse; and

    vii.    On 8/29/2019 by MPPD for IA 19-05.

159.    Despite having the information, Defendant Winston purposefully neglected to include that on March 30, 2019 and April 5, 2019, the Capital Wireless Information Net ("CAPWIN") had also queried Victoria Foster.

160.    CAPWIN is a local, DC-metro-area-based search system for law enforcement agencies and other first responders which collects local law enforcement queries related to, among other things, calls for service.

161.    Defendant Winston willingly participated in the investigation against Officer Miller and during the investigation. Defendant Winston knew that Officer Miller was alleged to have misused the LInX system on March 29, 2019 to conduct searches of "Victoria Foster" and/or the phone number "(xxx) zzz-4809."

162.    In fact, Defendant Winston knew that Officer Miller had not misused the LInX system on March 29, 2019 to conduct searches of "Victoria Foster" because Defendant Winston was the officer who had asked Officer Miller to perform the LInX query related to Victoria Foster on March 29, 2019.

163.    On March 29, 2019, at approximately 5:41 pm, Defendant Winston entered MPPD dispatch and took a call for service from Michael Taylor. The caller claimed that his sister, Victoria Foster had been stabbed and may be dead, but Mr. Taylor was unable to provide details on Ms. Foster's specific whereabouts.

164.    Defendant Winston was able to get a cell phone number for Ms. Foster and attempted to call her. Ms. Foster answered her phone but hung up on Defendant Winston.

165.    Defendant Winston then asked Officer Miller to run LInX queries to try to locate information about Victoria Foster. After several unsuccessful attempts to find meaningful information, Defendant Winston contacted AT&T Global Legal Demand Center and requested a phone ping on Ms. Foster's cell phone. The phone ping requested by Defendant Winston on March 29, 2019 is attached hereto as **Exhibit 13**.

166.    At the same time that Defendant Winston was investigating the Victoria Foster matter, Officer Miller was responding to an unrelated burglary and therefore was not involved in any part of the Victoria Foster investigation other than the LInX search.

167.    Based upon the phone ping response, Defendant Winston determined that Ms. Foster's location was in Prince William County, VA, which is outside MPPD's jurisdiction. Defendant Winston then called Prince William County Police Department ("PWCPD") and requested a wellness check for Victoria Foster[3] at the location discovered through the phone ping.

---

[3] Various spellings of the name "Victoria" or "Vicki" Foster were used. For purposes of this Complaint, all of the various spellings of Ms. Foster's name are intended to refer to the same person.

168.    As included in an Incident-Detail Report from PWCPD, Defendant Winston actively participated in the call for service, and the PWCPD notes indicate that Defendant Winston requested that responding officers from PWCPD call his cell phone, (xxx) zzz-8261. PWCPD Incident-Detail Report from March 29, 2019 is attached hereto as **Exhibit 14**.

169.    In response to Defendant Winston's request, on March 29, 2019, PWCPD Officer Ricardo Martins contacted and spoke with Defendant Winston about the Victoria Foster wellness check.

170.    On March 29, 2019, Defendant Winston called the phone number (xxx) zzz-4809 and spoke with Victoria Foster.

171.    At the time Defendant Winston was investigating Officer Miller's alleged misuse of the LInX system on March 29, 2019, Defendant Winston knew that Officer Miller had conducted the Victoria Foster search legitimately, and on Defendant Winston's behalf.

172.    The LInX queries conducted by Defendant Winston on or about August 29, 2019 and related to the investigation against Officer Miller should have included reference to the wellness check conducted by PWCPD for Victoria Foster and the Incident-Detail Report of the same. Defendant Winston either knowingly provided incomplete information to prevent publication of the wellness check or knowingly excluded the incident from his investigation.

173.    Upon information and belief, the CAPWIN search queries on March 30, 2019 and April 5, 2019 were related to PWCPD's call for service, phone ping and/or the Incident-Detail Report.

174.    Upon information and belief, Defendant Lugo and Defendant Reinhart had knowledge that Officer Miller's LInX searches were performed for Defendant Winston but

concealed their knowledge of the March 29, 2019 events to wrongfully validate or otherwise sustain the false allegations against Officer Miller.

175.     Upon information and belief, Defendant Lugo and Defendant Reinhart specifically tasked Defendant Winston with collecting information related to LInX searches and the events from March 29, 2019 to prevent discovery of Defendant Winston's active participation and LInX search results.

176.     Defendant Winston willingly participated in the ruse and purposefully excluded and/or failed to disclose information which would have been relevant to exonerating Officer Miller, including Defendant Winston's failure to turn over the phone ping documentation which was in his email. *See* **Ex. 13**.

177.     On or about September 12, 2019, Defendant Winston contacted PWCPD to ask if the department had information related to the homicide of "Vicky" or "Victoria Foster" on March 20, 2019. Upon information and belief, Defendant Winston purposefully gave PWCPD incorrect identifying information, including the date of the incident, to conceal the legitimacy of Officer Miller's March 29, 2019 LInX queries. September 12, 2019 response email from PWCPD is attached hereto as **Exhibit 15**.

178.     On October 15, 2019, Officer Miller received a letter from Defendant Lugo that notified Officer Miller of his termination (the "Termination Letter"). The October 15, 2019 termination letter is attached hereto as **Exhibit 16**.

179.     The findings in the Termination Letter were false, misrepresented and/or unsubstantiated, and upon information and belief, Defendant Lugo knew them to be so at the time he submitted the letter to Officer Miller.

180.    The Termination Letter says, in part, that as a result of "[Officer Miller's] actions, [Defendant Lugo] hereby impose the following disciplinary actions: Termination – (Level 8). Effective Immediately." *See* **Ex. 16**, p. 5.

181.    According to the Termination Letter, Defendant Lugo's decision to terminate Officer Miller improperly factored in the employee counseling forms dated March 6, 2019 and August 2, 2019[4]; however, the employee counseling forms are expressly <u>NOT</u> a disciplinary action and are not to be used if a supervisor determines that a situation exists which requires disciplinary action. *See* **Exs. 2, 5**.

182.    As a result of the Termination Letter, Officer Miller was immediately removed from his "paid leave" status and his employment was terminated.

183.    Section 1402(B)(2) of the City of Manassas Park Employment Policies and Practices states that law-enforcement procedures are identified in the MPPD General Orders.

184.    The Termination Letter did not contain language that acknowledged or suggested that the disciplinary action imposed by Defendant Lugo was a recommendation. Contrary to controlling General Orders and without authority, the Termination Letter was a direct action.

185.    It was Defendant Lugo's intention to affect the termination unless evidence to the contrary was presented within five (5) calendar days, as required under General Order 109 (IX)(A)(4)(a).

186.    However, Defendant Lugo had no authority to unilaterally terminate Officer Miller.

187.    General Order 109 (IX) and (X), require Officer Miller's termination to be implemented by the City Manager and/or the Mayor, and not by Defendant Lugo.

---

[4] Although the form is dated August 2, 2019, Officer Miller was not provided a copy until August 12, 2019.

188.    General Order 109 (X)(G), specifically states that "Dismissal is <u>recommended</u> by the Chief of Police and <u>implemented</u> by the City Manager and/or Mayor." (emphasis added).

189.    In accordance with General Order (109)(X)(G)(2), Defendant Manassas Park, and specifically Defendant Palko, were required to provide Officer Miller with a pre-termination due process hearing.

190.    At no time was Officer Miller afforded the required pre-termination notice or an evidentiary hearing prior to being terminated on October 15, 2019.

191.    Defendant Lugo used false allegations against Officer Miller to initiate and encourage a criminal investigation against Officer Miller which Defendant Lugo orchestrated in connection with Defendant Reinhart, Defendant Winston, Defendant Lugo, and Defendant Palko.

192.    Officer Miller notified Defendant Reinhart of his intent to "grieve" his termination on October 21, 2019.[5] In response, Defendant Reinhart wrongfully told Officer Miller that he could not grieve his termination.

193.    On October 22, 2019, Defendant Reinhart sent out an email to all officers and staff with MPPD informing them that Officer Miller was "no longer a member of MPPD."

194.    Despite several attempts to thwart Officer Miller's ability to grieve his termination, Officer Miller submitted written notice of his demand for a grievance hearing on October 24, 2019.

195.    On November 4, 2019, Defendant Lugo responded to Officer Miller by wrongfully and without authority sustaining Officer Miller's termination. Defendant Lugo also wrongfully claimed that Officer Miller had no further rights to challenge the termination. November 4, 2019 letter from Defendant Lugo is attached hereto as **Exhibit 17**.

---

[5] The term "grieve" refers to the act of filing a grievance via the Fraternal Order of Police.

196.     Upon information and belief, Defendant Lugo and Defendant Reinhart purposefully made false statements concerning Officer Miller's right to grieve or otherwise challenge his termination to prevent further inquiry into the meritless allegations and deficient investigation used to justify Officer Miller's wrongful termination.

197.     The reasons Defendant Lugo used to support the termination of Officer Miller reflected negatively on Officer Miller's honesty, integrity, and capacity to serve as a law enforcement officer, and negatively impacted his standing in the local law enforcement community.

198.     Following issuance of the Termination Letter, Officer Miller was continuously and intentionally denied his procedural rights to appeal and/or grieve the termination decision. In a letter dated November 8, 2019 and addressed to Defendant Palko, Officer Miller's counsel recounted Defendant Reinhart and Defendant Lugo's repeated attempts to deny Officer Miller of his procedural rights to grieve or otherwise appeal the wrongful termination decision made by Defendant Lugo. The November 8, 2019 letter is attached hereto as **Exhibit 18**.

199.     Officer Miller's October 15, 2019 termination and repeated denial of his procedural rights to appeal and/or grieve his termination were done in violation of MPPD General Orders, and the Law-Enforcement Officers Procedural Guarantee Act, codified at VA. CODE Ann. §§ 9.1-500, *et seq.* (the "Police Bill of Rights). Defendant Lugo and Defendant Reinhart's actions were intentional, willful, and wanton, and in disregard of Officer Miller's rights.

200.     On October 18, 2019, Defendant Reinhart requested the March 29, 2019 MPPD access report from Cyd Ball, MPPD's Division chief. The access report shows which physical locations of the MPPD headquarters each officer has accessed. Notably, the access report showed that on March 29, 2019 at 5:41pm Defendant Winston accessed "201A – E911 Dispatch,"

approximately three (3) minutes later, at 5:44pm Officer Miller also accessed "201A – E911 Dispatch.[6]" October 18, 2019 email is attached hereto as **Exhibit 19**, the access report is attached hereto as **Exhibit 20**.

201.     The November 8, 2019 letter from Officer Miller's counsel placed Defendant Palko on notice of intentional and malicious procedural violations committed by Defendant Lugo and Defendant Reinhart. Upon information and belief, Defendant Palko failed to investigate those matters or to discipline either Defendant Lugo or Defendant Reinhart for their violations.

202.     After many attempts by Officer Miller to file a grievance or otherwise appeal his wrongful termination decision, a meeting was scheduled for November 22, 2019.

203.     During the post-termination meeting, Officer Miller admitted to running a search for Victoria Foster in LInX but was unable to recall which department member requested the information.

204.     Officer Miller maintained, and continues to maintain, that his March 29, 2019 LInX searches were for law enforcement purposes.

205.     No evidence has been produced that show Officer Miller's March 29, 2019 LInX searches were not for law enforcement purposes.

206.     In or about December 2019, an administrative investigation was performed at the request of Defendant Palko and on behalf of Defendant Manassas Park. As part of that investigation, Defendant Palko asked Valerie Dingler, Defendant Manassas Park's head of Human Resources, to conduct interviews with MPPD officers on-duty on March 29, 2019. Defendant Palko also requested LInX information related to the March 29, 2019 searches.

---

[6] According to the access log, Officer Miller arrived for work at MPPD just ten (10) minutes prior at 5:34pm.

207.    The administrative investigation was deficient and was limited to interviewing twelve (12) MPPD officers who accessed the MPPD police station on March 29, 2019, including Defendant Winston and Defendant Dorr. Each officer was asked the same seven (7) questions, none of which reference or named "Vicky" or "Victoria Foster."

208.    Defendant Winston falsely answered "No" to each of the seven (7) questions. Defendant Winston's HR questionnaire is attached hereto as **Exhibit 21**.

209.    Upon information and belief, Defendant Reinhart failed to conduct similar interviews as part of the third administrative investigation against Officer Miller.

210.    At no time during the administrative investigation was Officer Miller interviewed.

211.    Upon information and belief, the scope of the investigation was purposefully limited at the request of Defendant Palko.

212.    Despite having access to additional information that would have exonerated Officer Miller, including the name and phone number of Victoria Foster, access to email records which included reference to "Victoria Foster," and the phone ping, Defendant Palko failed to investigate.

213.    The administrative investigation produced no evidence which demonstrated that Officer Miller's LInX searches on March 29, 2019 were not conducted for law enforcement purposes.

214.    On December 3, 2019, Valarie Dingler sent Defendant Palko an email with the results of the HR investigation. In her email, Ms. Dingler indicated that Allegation #1, which related to the "Josh" incident, should be marked as "unfounded." December 3, 2019 email from Valarie Dingler is attached hereto as **Exhibit 22**.

215.    On or about December 16, 2019 Defendant Reinhart emailed Ms. Miller (LInX Representative) to request information related to any agency query of (a) the phone number (xxx)

zzz-4809; (b) Victoria Foster; and (c) Victoria Foster, 40-60 age, xxx-zzz-4809, Dumfries. Further, Defendant Reinhart requested information about whether any other agency used the "justification field" with Homicide and the security audit log for all of Officer Miller's LInX activity between January 2019 – June 2019. Defendant Reinhart identified that he needed the information to conduct follow-up for "the attorneys regarding the LInX misuse and [Officer] Miller."

216.    In the email to Ms. Miller, Defendant Reinhart greatly exceeded the scope of the internal affairs investigation.

217.    In response to Defendant Reinhart's email, Ms. Miller forwarded Defendant Reinhart several documents including, (a) a Manassas Park Email Inquiry Word document; (b) a Manassas Park Query Log for Officer Miller dating to January 1, 2019; and (c) a MPPD log of all uses of the justification code "Homicide" in LInX searches from 2007 to 2019. The December 16, 2019 email is attached hereto as **Exhibit 23**. The Manassas Park Email Inquiry Word document is attached hereto as **Exhibit 24**. The Manassas Park Query Log for Officer Miller is attached hereto as **Exhibit 25**. The MPPD log of all uses of the justification code "Homicide" is attached hereto as **Exhibit 26**.

218.    Ms. Miller's inclusion of both the Manassas Park Query Log for Officer Miller dating to January 1, 2019, and a MPPD log of all uses of the justification code "Homicide" in LInX searches from 2007 to 2019, were seemingly gratuitous and not in response to Defendant Reinhart's request.

219.    The "Homicide" search log shows that since April 22, 2012, MPPD officers have used "Homicide" as a justification code approximately 2,275 times. Of those queries, Officer

Miller used "Homicide" as a justification code 244 times. Defendant Winston used "Homicide" as a justification code 80 times.

220.    The December 16, 2019 Manassas Park Email Inquiry Word document showed that CAPWIN ran a search for "Vicky" or "Victoria Foster" on March 30, 2019 and April 5, 2019. *See* **Ex. 24**, p. 2.

221.    On December 16, 2019, Defendant Reinhart specifically asked Ms. Miller about the searches of Victoria Foster by CAPWIN. December 16, 2019 email is attached hereto as **Exhibit 27**,

222.    The Manassas Park Query Log for Officer Miller forwarded to Defendant Reinhart on December 16, 2019 evidence that Officer Miller began his March 29, 2019 LInX searches related to Victoria Foster at approximately 5:47pm. *See* **Ex. 25**, p. 4.

223.    As of December 16, 2019, Defendant Reinhart was in possession of the March 29, 2019 MPPD access log which evidences that Defendant Winston entered MPPD dispatch at 5:41pm and Officer Miller entered dispatch at 5:44pm. *See* **Ex. 20**, p. 23.

224.    Officer Miller maintained that on March 29, 2019 he ran LInX searches for another law enforcement officer. As of December 16, 2019, Defendant Reinhart had information which showed that Officer Miller and Defendant Winston were in close proximity approximately three (3) minutes prior to Officer Miller conducting the LInX searches.

225.    On December 20, 2019, Defendant Reinhart asked Cyd Ball to forward Defendant Palko a copy of Defendant Reinhart's additional findings. The December 20, 2019 email is attached hereto as **Exhibit 28**, Defendant Reinhart's additional findings, dated December 19, 2019 are attached hereto as **Exhibit 29**.

226.     In his additional findings letter, Defendant Reinhart purposefully failed to include refence to CAPWIN's search queries of Victoria Foster on March 30, 2019 and April 5, 2019. *See* **Ex. 29**, p. 1.

227.     Defendant Reinhart's letter also included false, unsupported, and misleading information related to LInX searches that Officer Miller queried in 2012 related to Dwayne Skiles and Joaquin Rams.

228.     Prior to submission of the December 19, 2019 letter, Defendant Reinhart failed to investigate or otherwise inquire into the Skiles or Rams matters. In fact, even a cursory review of the cases would have revealed that Skiles was a resident of Manassas Park at the time of his death, and Officer Miller performed the Skiles query in connection with the FBI Violent Crimes Task Force investigation; Officer Miller also performed the Rams search for the FBI task force while assisting PWCPD and Manassas City Police Department investigation of a multiple homicide suspect.

229.     Officer Miller performed both the Rams and Skiles searches at the request of the FBI for legitimate law enforcement purposes.

230.     On or about January 16, 2020, Defendant Palko sent Officer Miller a letter which outlined his findings (the "City Letter"). The City Letter is attached hereto as **Exhibit 30**.

231.     The findings included in the City Letter were false, and/or unsubstantiated, and upon information and belief, Defendant Palko knew them to be so.

232.     The City Letter explored two (2) Allegations against Officer Miller. Allegation #1 was related to Officer Miller's alleged lack of supervision in the Josh incident, and Allegation #2 concerned Officer Miller's alleged misuse of LInX in the Foster incident.

233.    The City Letter specifically stated that Officer Miller's employment was terminated on October 15, 2019 upon receipt of the letter from Defendant Lugo, due to Officer Miller's alleged violation of Section 1513 of the City of Manassas Park Employment Policies and Procedures, specifically, "Violating City policies and procedures, department or work unit rules, or applicable federal, State or local laws and regulations governing public employees." *See* **Ex. 30**, p. 1.

234.    In the City Letter, Defendant Palko concluded that Officer Miller properly assisted Officer Bussell with his investigation, that there was little information to accurately identify a suspect related to the July 2, 2019 incident, and Officer Miller properly signed the report at the end of his shift. *See* **Ex. 30**.

235.    Notwithstanding the foregoing and in defiance of Valerie Dingler's recommendation, Defendant Palko sustained Allegation #1.

236.    Defendant Palko's decision to sustain Allegation #1 (the Josh incident) was based, in part on easily identifiable misinformation and it overlooked evidence, including evidence showing that Officer Miller and Officer Bussell handled the Josh incident properly. Defendant Palko's City Letter also cites to errors/missing information from September 7, 2019 and September 13, 2019. *See* **Ex. 30**, p. 3. However, Officer Miller was placed on administrative leave on August 29, 2019 and therefore could not have submitted Incident Approval Logs in September 2019.

237.    Defendant Palko's decision to sustain Allegation #2 (the Foster incident) was based almost exclusively on the administrative investigations conducted or overseen by Defendant Lugo, Defendant Palko, Defendant Winston, and Defendant Reinhart.

238.    In the City Letter, Defendant Palko confirmed that the phone number queried on March 29, 2019 belonged to Victoria Foster. Despite having this information, Defendant Palko failed make any independent inquiry into Ms. Foster's identity or reason for her inclusion as a

search term in LInX and instead relied on the substance and veracity of the administrative investigations conducted or overseen by Defendant Lugo, Defendant Palko, Defendant Winston, and Defendant Reinhart. *See* **Ex. 30**, p. 7.

239.    To further support his ultimate finding of Officer Miller's "misuse" of the LInX system, Defendant Palko relied upon additional and unsubstantiated accusations related to LInX queries run by Officer Miller in 2012 and related to the Skiles and Rams investigations (*See* City Letter, **Ex. 30**, p. 8). Officer Miller had no notice of these additional queries and was not given the opportunity to defend against these previously undisclosed and patently false allegations.

240.    Defendant Palko did not have access to the LInX system and relied on Defendant Winston and Defendant Reinhart to provide him with the information related to the 2012 queries.

241.    Defendant Reinhart's allegations related to the 2012 queries were erroneous and Defendant Palko's reliance upon them was unjustified.

242.    According to the City Letter, the reason for Officer Miller's termination was because of alleged activities related to Allegation #2. *See* **Ex. 30**, p. 8.

243.    Defendant Palko's findings presented no evidence that the LInX search Officer Miller conducted on March 29, 2019 was for an unlawful or illegitimate purpose.

244.    The City Letter does not contain other necessary and required information including, "[a] statement advising the member that termination is subject to the member's procedural guarantees or the member's right to file a grievance," as required by General Order 109 (X)(G)(5)(d).

245.    On or about January 29, 2020, Officer Miller submitted an appeal and request for a panel hearing. Attorney Dean Crowhust, on behalf of Defendant Manassas Park, acknowledged receipt of Officer Miller's appeal on January 31, 2020.

246.    The panel hearing represented the first time that Officer Miller's grievance would receive an independent review by non-interested parties. All prior steps in the grievance process were exclusively administered by Defendant Lugo, Defendant Reinhart, and/or Defendant Palko.

**M.    Defendants' Filing of False and Wrongful Criminal Charges Against Officer Miller.**

247.    On August 29, 2019, and upon information and belief, again in October 2019, Defendant Reinhart had made unsuccessful attempts to persuade the Prince William County Commonwealth Attorney to bring criminal charges against Officer Miller. Specifically, Defendant Reinhart approached former Assistant Commonwealth Attorney Bradley Marshall with information gained from administrative investigations for the express purpose of having criminal charges filed against Officer Miller.

248.    Mr. Marshall refused Defendant Reinhart's requests to approve criminal charges against Officer Miller.

249.    Just six (6) days after Officer Miller requested a panel hearing, on February 4, 2020, Defendant Reinhart and Defendant Lugo again attempted to bring criminal charges against Office Miller under newly appointed Commonwealths' Attorney Amy Ashworth.

250.    On February 11, 2020, Defendant Reinhart submitted a letter to Anthony Kostelecky, Assistant Commonwealth's Attorney, to endorse and/or bolster a criminal case against Officer Miller. In the letter, Defendant Reinhart falsely claimed that Officer Miller conducted the searches on March 29, 2019, "with no legitimate lawful purpose." Defendant Reinhart maliciously referenced the 2012 LInX searches related to the Skiles and Rams investigation and again falsely accused Officer Miller of conducting the searches for "no legitimate law enforcement purpose." Defendant Reinhart's February 11, 2020 email is attached as **Exhibit 31**, Defendant Reinhart's letter to the Assistant Commonwealths Attorney is attached hereto as **Exhibit 32**.

251.     According to the February 11, 2020 letter, the Commonwealth Attorney's office "approved one (1) charge for violation of 18.2-152.5, Computer invasion of privacy." *See Id*.

252.     Defendant Reinhart accused Officer Miller of wrongdoing without investigating the 2012 matters and recklessly levied the claims against Officer Miller in order to fabricate a "documented pattern of behavior" for purposes of securing criminal charges against Officer Miller.

253.     As of February 11, 2020, Defendant Reinhart knew that the March 29, 2019 searches were conducted for Defendant Winston and were for legitimate law enforcement purposes.

254.     Upon information and belief, Defendant Reinhart used the same fabricated, unsubstantiated, and/or misrepresented facts to get the CA's office to approve criminal charges against Officer Miller. The 2012 allegations were used to support the criminal charge against Officer Miller despite the fact that prosecution of the 2012 search queries (the ones Officer Miller legitimately performed while assigned to the FBI Violent Crimes Task Force) were beyond the statute of limitations.

255.     Soon after exercising his right for a panel hearing, on February 10, 2020, Attorney Dean Crowhust informed Officer Miller that Defendant Manassas Park was seeking criminal charges against Officer Miller for computer trespass.

256.     Upon information and belief, Defendant Reinhart received encouragement and support from Defendant Lugo and Defendant Palko to seek criminal charges against Officer Miller.

257.     Upon information and belief, Defendant Reinhart and Defendant Lugo selected Defendant Dorr to file a criminal complaint against Officer Miller. Defendant Dorr was selected for his loyalty to Defendant Lugo and went forward with the sham criminal complaint despite knowledge that Officer Miller had not misused the LInX system.

258.    The NCR/LInX terms of service include language which states, "[t]he information obtained from the NCR LInX by itself does not constitute probable cause." Relevant portion of the NCR/LInX terms of service are attached hereto as **Exhibit 33**.

259.    On or about February 11, 2020 Defendant Dorr completed an Incident Report and Confidential Supplement for a criminal complaint against Officer Miller, and on February 12, 2020, Defendant Dorr swore out a criminal complaint against Officer Miller for violation of VA. CODE § 18.2-152.3, Computer Fraud (the Incident Report and complaint are collectively referred to as the "Criminal Complaint"). The Criminal Complaint is attached hereto as **Exhibit 34**.

260.    At the time that Defendants filed the Criminal Complaint, and in accord with the February 11, 2020 letter, Defendants were only approved to bring one (1) charge against Officer Miller for violation of VA. CODE § 18.2-152.5 (invasion of privacy) – and did not have approval to bring a charge under § 18.2-152.3 (computer fraud).

261.    After the Criminal Complaint was filed, Officer Miller was required to go to MPPD headquarters to be served a copy of the criminal summons. Officer Miller complied and was subsequently detained at MPPD headquarters.

262.    Officer Miller was wrongfully arrested and released on a summons.

263.    Officer Miller was compelled to appear to defend himself against the criminal charges wrongfully levied against him.

264.    Defendant Dorr initiated the Criminal Complaint against Officer Miller on behalf of the Defendants.

265.    The information Defendant Dorr used to procure the criminal charges and secure the Criminal Complaint against Officer Miller purposefully included false and misleading information, which was obtained by, or at the request of Defendants. The false and/or misleading

allegations against Officer Miller were purposefully presented in a way to secure criminal charges against Officer Miller and did not accurately represent the facts and information in possession of the Defendants at the time the criminal charges and Criminal Complaint were obtained.

266.     On February 18, 2020, Defendant Dorr sent the narrative of the Criminal Complaint to MPPD Officer Melissa Boorman, an apparently disinterested party.

267.     Throughout February 2020, Defendant Dorr, Defendant Reinhart, Defendant Winston, and Defendant Lugo exchanged documents related to the various Administrative Investigations against Officer Miller.

268.     On March 9, 2020 and as a result of the filing of the Criminal Complaint, Officer City Attorney Dean Crowhurst suggested, and Officer Miller's counsel agreed to suspend Officer Miller's panel hearing pending resolution of the criminal matter.

269.     Upon information and belief, Defendant Lugo, Defendant Reinhart, Defendant Winston, and Defendant Palko encouraged Defendant Dorr to initiate the Criminal Complaint against Officer Miller.

270.     Defendant Lugo promoted Defendant Dorr to Lieutenant in July 2019 and thereafter transferred Defendant Dorr from Patrol to ISD approximately ten (10) days before Defendant Dorr swore out the Criminal Complaint.

271.     Upon information and belief, Defendant Dorr did not independently investigate matters referenced in the Criminal Complaint; rather, Defendant Dorr was fed the administrative investigation records by Defendant Reinhart, Defendant Winston and Defendant Lugo to cobble together information for the Criminal Complaint.

272.     The administrative investigation documents and letters used by Defendant Dorr in crafting the Criminal Complaint included the August 12, 2019 letter, August 29, 2019 letter, the Termination Letter, and the City Letter.

273.     Defendant Dorr is not a Security/System Administrator for LInX and therefore does not have personal access to that system.

274.     The Criminal Complaint cites to LInX search information which would have required administrator login to access.

275.     An authorized person with LInX credentials would have had to access LInX searches for Defendant Dorr.

276.     Upon information and belief, Defendant Dorr did not conduct an independent investigation of the LInX system or perform any LInX searches.

277.     In the Criminal Complaint, Defendant Dorr alleges that Officer Miller's alleged misuse of the LInX system was discovered as a result of the administrative investigation that was launched on August 12, 2019. *See* **Ex. 34**, p. 4.

278.     In the Criminal Complaint, Defendant Dorr alleges that "[i]t is not an authorized use of LInX for a User to conduct a query for any personal reason." *See* **Ex. 34**, p. 6.

279.     At the time Defendant Dorr swore out the Criminal Complaint, he had no knowledge of facts which suggested that Officer Miller conducted LInX queries on March 29, 2019 for non-law enforcement purposes.

280.     At the time Defendant Dorr swore out the Criminal Complaint, he did not possess evidence that Officer Miller conducted LInX queries on March 29, 2019 for non-law enforcement purposes.

281.    At the time Defendant Dorr swore out the Criminal Complaint, he had no knowledge of facts which suggested that Officer Miller had the intent to obtain information from LInX on March 29, 2019 for non-law enforcement purposes.

282.    At the time Defendant Dorr swore out the Criminal Complaint, he did not possess evidence which suggested that Officer Miller had the intent to obtain information from LInX on March 29, 2019 for non-law enforcement purposes.

283.    At no time did Defendant Dorr conduct an independent investigation of claims included in the Criminal Complaint and against Officer Miller.

284.    Defendant Dorr did not independently interview individuals named in the Criminal Complaint, including Officer Miller.

285.    Defendant Dorr did not have access to the administrative investigations or Officer Miller's personnel file.

286.    To gather information and documents related to Officer Miller's administrative investigations and Officer Miller's personnel file, Defendant Dorr would have needed to receive access from Defendant Lugo, Defendant Reinhart, Defendant Winston and/or Defendant Palko.

287.    Upon information and belief, Defendant Lugo, Defendant Reinhart, and Defendant Winston provided substance to the Criminal Complaint.

288.    Upon information and belief, the Criminal Complaint was filed, in part, to intimidate and/or retaliate against Officer Miller for asserting his right to grieve his termination.

289.    Officer Miller's court date was originally scheduled for April 30, 2020 but was delayed to July 2, 2020 due to COVID-19.

290.    On May 27, 2020, Officer Miller's counsel hired Vindicatus, LLC, a private investigator service, to investigate the facts surrounding the "Vickie Foster" incident. As part of

his efforts, the private investigator called (xxx) zzz-4809, the phone number associated with Officer Miller's March 29, 2019 LInX queries. The person who answered identified herself as Vicky Foster. The private investigator's Vindicatus Report is attached hereto as **Exhibit 35**.

291. Ms. Foster confirmed that a call for service was placed on the evening of March 29, 2019, and by her brother, Michael Taylor. Mr. Taylor suffers from mental illness and believing that her sister had been stabbed and/or possibly dead, called MPPD. *See* **Ex. 35**, p. 7-8.

292. Ms. Foster also confirmed that she received a call from an MPPD officer, believed to be Defendant Winston.

293. Following PWCPD's welfare check of Ms. Foster on March 29, 2019 at 7:27 pm, Officer Martins (of PWCPD) called (xxx) zzz-8261 and engaged in a 2 minute and 23 second phone call. *See* **Ex. 35**, p. 21.

294. On March 29, 2019 phone number (xxx) zzz-8261 was the MPPD-issued cellphone and phone number for Defendant Winston. *See* **Ex. 35**, p. 20.

295. The phone call between Officer Martins and Defendant Winston related to Ms. Foster and the welfare check. Officer Martins contacted Defendant Winston because Defendant Winston has requested PWCPD provide him with an update after the welfare check was conducted.

296. During the late evening hours of March 29, 2019, Ms. Foster received a phone call from someone who identified themselves as an MPPD police officer. Upon information and belief, the caller was Defendant Winston.

297. Defendant Winston falsified and/or misrepresented information in the third administrative investigation against Officer Miller which the basis for Officer Miller's termination from his employment and the Criminal Complaint.

N.      **Dismissal of the Criminal Complaint Against Officer Miller, With Prejudice.**

298.    The private investigator's findings and report were forwarded to Attorney Scott Hook, the special prosecutor assigned to handle Officer Miller's criminal case.

299.    On June 24, 2020, Special Prosecutor Hook forwarded Defendant Dorr a copy of the email Mr. Hook received from Officer Miller's counsel which included information discovered by the private investigator. That same day, Defendant Door forwarded the email to Defendant Reinhart and Defendant Lugo. The June 24, 2020 email from Mr. Hook is attached hereto as **Exhibit 36**.

300.    Contrary to what Defendant Reinhart, Defendant Winston, and Defendant Dorr represented in the Criminal Complaint and to Mr. Hook, First Lieutenant Neil Miller of PWCPD had knowledge of the call for service for Victoria Foster on March 29, 2019.

301.    Also on June 24, 2020, Defendant Reinhart forwarded Defendant Dorr an email thread which dated back to the September 12, 2019 email exchange between Defendant Winston and PWCPD. Upon information and belief, the email from Mr. Hook unnerved Defendant Dorr and made him realize that the Defendants' scheme was unraveling. Defendant Dorr had conversations with Defendant Reinhart whereby Defendant Reinhart told Defendant Dorr he needed to maintain the fabricated story included in the Criminal Complaint. Defendant Reinhart then sent Defendant Dorr the June 24, 2020 email to reinforce certain parts of the false narrative. The June 24, 2020 email from Defendant Reinhart is attached hereto as **Exhibit 37**.

302.    On June 25, 2020, Defendant Reinhart emailed PWCPD to follow-up on the information exonerating Officer Miller. In an email thread between members of the PWCPD, Lieutenant Neil Miller confirmed that there was a call for service for Victoria Foster by PWCPD on March 29, 2019, but PWCPD could previously not find any information related to Victoria

Foster because MPPD framed the matter specifically as a homicide investigation. The email thread, beginning on June 25, 2020, is attached hereto as **Exhibit 38**.

303.    On June 29, 2020, First Sergeant J.M. Westerman of PWCPD emailed Defendant Reinhart a copy of the Incident-Detail Report for the March 29, 2019 Victoria Foster call for service. The Incident-Detail Report includes several references to Defendant Winston's active participation in the Victoria Foster call. Further, in the June 29th email, Sergeant Westerman states that on March 29, 2019, PWCPD received the call from phone number (xxx) zzz-1136. That phone number is Defendant Winston's phone number; it is included as his phone number in both his email signature block and as his LInX administrator contact phone number. The June 29, 2020 email thread is attached hereto as **Exhibit 39**, the Incident-Detail Report attached to the June 29, 2020 email is attached as **Exhibit 14**.

304.    Upon information and belief, Defendant Reinhart notified Defendant Lugo, Defendant Winston and Defendant Dorr that evidence existed of Defendant Winston's involvement in the March 29, 2019 query searches.

305.    Understanding that discovery of the evidence and the Defendants' improper scheme was imminent, Defendant Lugo, Defendant Reinhart, Defendant Winston, and Defendant Dorr decided to conceal their involvement by controlling the messaging to Mr. Hook and suggesting that the Criminal Complaint be dismissed. Further, the Defendants conspired to attack Officer Miller through the on-going appeals/grievances filed by Officer Miller. Specifically, the Defendants conspired to preemptively impose discipline on Officer Miller in the form of demotion and reduction in pay, thereby punishing Officer Miller for asserting his rights and almost exposing their scheme.

306.    On June 29, 2020, Defendant Reinhart emailed Mr. Hook. In the email, Defendant Reinhart represented that he was answering on behalf of Defendant Dorr and that he "spoke" to Sergeant Westerman "regarding the matter." Defendant Reinhart then falsely represented that MPPD did not have any record of a call from Michael Taylor or conducting a phone ping on Victoria Foster's phone. The June 29, 2020 email to Mr. Hook is attached hereto as **Exhibit 40**.

307.    Nowhere in his email to Mr. Hook did Defendant Reinhart mention Defendant Winston's involvement in the March 29, 2019 call, and despite being sent a copy of the Incident-Detail Report, Defendant Reinhart did not forward that document to Mr. Hook.

308.    Upon information and belief, Defendant Reinhart falsely represented that he had a conversation with Sergeant Westerman and did so to avoid forwarding the email and Incident-Detail Report to Mr. Hook which would have exposed Defendant Winston's involvement and Defendant Reinhart's knowledge of Defendant Winston's involvement.

309.    On July 2, 2020, Mr. Hook dismissed the criminal charges against Officer Miller with prejudice, thus indicating that the Special Prosecutor believed there was no evidence to support the charge levied against Officer Miller.

310.    At no time was Victoria Foster contacted by a representative of MPPD for matters related to the investigations or allegations against Officer Miller.

**O.    Retaliatory Actions Against Officer Miller and Denial of Due Process Rights.**

311.    On July 10, 2020, prior to Officer Miller being afforded his right to his panel hearing and before Officer Miller was notified of his reinstatement, Defendant Lugo drafted a Disciplinary Action letter which preemptively imposed discipline on Officer Miller. Defendant Lugo's discipline letter imposed discipline in the form of demotion and a decrease in salary. The July 13, 2020 email is attached hereto as **Exhibit 41**, the Discipline Letter, attached to the July 13, 2020 email and dated July 10, 2020 is attached hereto as **Exhibit 42**.

312.     The July 10, 2020 Discipline Letter was a continuation of the third Internal Affairs investigation against Officer Miller, which began on August 12, 2019.

313.     Defendant Lugo's articulated justification for Officer Miller's demotion and decrease in salary were based on false information and/or new facts that were not part of the original claims against Officer Miller and which Officer Miller had no opportunity to defend himself against, including reference to the 2012 LInX queries related to the Skiles and Rams investigations.

314.     The July 10, 2020 Discipline Letter also wrongfully cites Officer Miller for "[failure] to properly, document the alleged crime reported the justification for the exigent circumstance cell phone "PING", and the mutual aid request to the Prince William County Police Department to conduct a welfare check in this case." Defendant Lugo cited Officer Miller for the aforementioned violations despite knowing and having evidence that Defendant Winston sent the cell phone ping request and contacted PWCPD on March 29, 2019 and related to Victoria Foster. *See* **Ex. 42**, p. 2.

315.     Defendant Lugo's also improperly factored in the employee counseling forms dated March 6, 2019 and August 2, 2019[7]; however, the employee counseling forms are expressly <u>NOT</u> a disciplinary action and are not to be used if a supervisor determines that a situation exists which requires disciplinary action. *See* **Exs. 2, 5 and 42**.

316.     On July 13, 2020, Defendant Lugo emailed the July 10, 2020 Discipline Letter to Defendant Reinhart for review and comment. On that same day, Defendant Reinhart responded to Defendant Lugo with suggested revisions to the letter.

---

[7] Although the form is dated August 2, 2019, Officer Miller was not provided a copy until August 12, 2019.

317.    Upon information and belief, on or about July 13, 2020 Defendant Lugo shared the July 10, 2020 Discipline Letter with Defendant Palko. Defendant Palko was aware and complacent with the fact that Defendant Lugo planned to impose discipline on Officer Miller without affording Officer Miller his panel hearing.

318.    On July 15, 2020, Officer Miller was notified of his reinstatement through a letter from Defendant Palko (the "Exoneration Letter"). The Exoneration Letter is attached hereto as **Exhibit 43**.

319.    The Exoneration Letter absolved Officer Miller of wrongdoing related to Allegation #2, (the Foster incident). However, Defendant Palko stated that his findings related to Allegation #1 (the Josh incident) were being sent back to Defendant Lugo for discipline. *See* **Ex. 43**, p. 2.

320.    The Exoneration Letter was issued without Officer Miller being given the opportunity to resume the panel hearing he filed for in January 2020 and related to the findings included in the City Letter.

321.    The actions of Defendant Palko and Defendant Lugo prematurely and without justification extinguished Officer Miller's right to a panel hearing.

322.    Defendant Palko issued the Exoneration Letter despite knowing that Defendant Lugo had already decided on Officer Miller's discipline.

323.    Defendant Palko, as City Manager, is vested with the power to make disciplinary decisions and the decision to return his findings to Defendant Lugo do not conform with the requirements of General Order 109.

324.     In the Exoneration Letter, Defendant Palko falsely claimed that the private investigator hired by Officer Miller's counsel made "negative remarks against [Defendant Lugo] and threat[ned] his position." *See* **Ex. 43**.

325.     Upon information and belief, prior to sending the Exoneration Letter, Defendant Palko, Defendant Lugo, and Defendant Reinhart collectively agreed to preemptively demote Officer Miller in order to harm his reputation and keep him in limbo while the Defendants waited to formally submit the July 10, 2020 Discipline Letter to Officer Miller.

326.     As a result of the unsubstantiated allegations, Officer Miller was denied the opportunity to return to the position he held with MPPD prior to his termination.

327.     Instead of returning to his position, Officer Miller was ordered to report to "security detail" at City Hall where he would be under the direction and control of Defendant Palko. *See* **Ex. 43**, p. 2.

328.     Security detail at City Hall does not carry the job responsibilities, benefits, or privileges of an MPPD Lieutenant. Such an assignment altered Officer Miller's position classification status and constituted a demotion.

329.     Officer Miller's demotion and unresolved threats of disciplinary action wrongfully implied that the administrative investigations, Criminal Complaint, and termination of Officer Miller's employment were warranted. Upon information and belief, Defendant Lugo, Defendant Reinhart and Defendant Palko knowingly and purposefully took this action to harm Officer Miller's professional reputation and negatively impact his standing in the law enforcement community.

330.    The Exoneration Letter imposed negative and/or progressive disciplinary measures which require the inclusion of procedural protections and safeguards in conformity with General Order 109 (X).

331.    Officer Miller was not notified of, nor was he afforded the procedural protections guaranteed by General Order 109 (X).

332.    There is no policy or law which supports Defendant Palko's decision to demote or otherwise alter Officer Miller's job function without prior notice or procedural guarantees.

333.    Upon information and belief, Defendant Palko, with the encouragement of Defendant Lugo, demoted Officer Miller in retaliation for Officer Miller asserting his rights and clearing his name, and to further harm Officer Miller's professional reputation.

334.    On July 17, 2020, Defendant Palko and Defendant Lugo notified Valarie Dingler of their intent to discipline Officer Miller, and specifically to demote him and reduce his salary.

335.    On July 20, 2020, Officer Miller and his counsel met with Defendant Lugo and Attorney Dean Crowhurst to discuss the conditions of Officer Miller's return. Attorney Dean Crowhust, on behalf of Defendant Manassas Park, offered Officer Miller six (6) months' pay but explained that Officer Miller would remain on administrative leave for those six (6) months and subject to further discipline. Further, in order to return, Officer Miller would be required to sign a non-disclosure agreement ("NDA") which effectively waived Officer Miller's right to seek redress against Defendants and in violation of his procedural guarantees.

336.    The NDA did not, however, protect Officer Miller from further retaliation from the Defendants or otherwise prohibit the Defendants from seeking or imposing further discipline against Officer Miller related to matters included in the amended August 12, 2019 letter, the August 29, 2019 letter, the Termination Letter, the City Letter, and/or the Exoneration Letter.

337.     In fact, during the meeting with Officer Miller, Defendant Lugo made it clear that he anticipated bringing additional disciplinary actions against Officer Miller upon his return, related to Allegation #1 (the Josh incident). In fact, Defendant Lugo, Defendant Reinhart and Defendant Palko had already decided on the discipline they planned to levy against Officer Miller.

338.     During the meeting, Defendant Lugo misrepresented his intent to thoroughly investigate the matters prior to imposing discipline on Officer Miller.

339.     As a result of the open and continuous threats of retaliation, including additional discipline, demotion, deception, coercion, emotional harm, and unbearable treatment, suffered at the hands of Defendants, and the refusal to resume Officer Miller's appeal related to the findings in the City Letter, Officer Miller was forced to resign on July 20, 2020.

340.     Officer Miller's concerns about retaliation were justified, as Defendant Lugo, Defendant Reinhart, and Defendant Palko had already determined that upon Officer Miller's return, they would demote him and reduce his pay.

341.     On August 12, 2020 Officer Miller notified Defendant Manassas Park of his intent to sue, in accordance with VA. CODE § 15.2-209.

**P.    Injuries to Officer Miller.**

342.     Since resigning from MPPD on July 20, 2020, Officer Miller has applied to law enforcement positions with no fewer than five (5) law enforcement departments. To date and despite Officer Miller's 20+ years of law enforcement service and low recruitment numbers nationwide, Officer Miller has not received a single offer of employment.

343.     Upon information and belief, Officer Miller's inability to find work in law enforcement is a direct and proximate result of the meritless Criminal Complaint, administrative investigations, and obstruction by the Defendants.

344.    Upon information and belief, Defendants are actively disseminating false and malicious information concerning the events which led to the dismissal of the Criminal Complaint and the facts and circumstances of the administrative investigations.

345.    The actions of the Defendants have directly caused significant damage to Officer Miller's personal and professional reputation, and specifically, Officer Miller's reputation and standing in the law enforcement community, as evidenced by the inability of Officer Miller to secure new employment in law enforcement.

346.    Since his wrongful termination, Officer Miller has lost no less than $88,276.25 in salary, $670,927.80 in retirement benefits, and $191,058.96 in Hazard Pay.

347.    To defend against the wrongful Criminal Complaint filed by the Defendants, Officer Miller accrued attorneys' fees in an amount not less than $30,000.00.

348.    Officer Miller has also accrued and will continue to accrue medical fees in an amount of not less than $10,000.00 to treat medical conditions caused by Defendants actions.

349.    In addition to the damage to Officer Miller's professional and personal reputation and his loss of income and benefits, the Defendants' actions were the direct and proximate cause of both emotional and physical injuries to Officer Miller.

350.    The Defendants' collective actions resulted in unnecessary emotional and mental stress, and job insecurity. As a result, Officer Miller developed severe anxiety and debilitating depression, and further manifested into insomnia, irrational fear and paranoia, and bouts of anger.

351.    In an attempt to cope with the untenable mental and emotional strain, Officer Miller engaged in behaviors that ultimately induced physical injury, including over-eating. Officer Miller gained thirty (30) pounds in the span of a few months, which harmed, among other things, his cardiovascular system, and placed undue stress on his joints.

352.     The trauma and stress of Defendants' actions forced Officer Miller to become more reclusive which harmed the personal relationships he had with friends and family, and specifically harmed the relationship with his wife and children. Officer Miller's focus on clearing his name in the face of false and malicious mistruths also deprived him of time with his wife and children.

353.      With encouragement from his wife, Officer Miller sought out a therapist in July 2020. Shortly thereafter, Officer Miller was diagnosed with anxiety.

354.     To diagnose and continue to treat Officer Miller's anxiety and the physical harm which has manifested as a result of the wrongful actions of the Defendants', Officer Miller has incurred costs and will continue to incur costs.

## Q.    Sovereign Immunity.

355.     Defendant Manassas Park is not entitled to the protection of sovereign immunity from liability arising out of its performance of proprietary acts. Defendant Manassas Park is entitled to immunity only in instances where the City's agents and employees are engaged in traditional governmental functions. However, the actions of the Defendants were not done in the furtherance of the health, safety, and welfare of the citizens of the City of Manassas Park.

356.     The Defendants took it upon themselves to intentionally harm the professional reputation of Officer Miller, independent of any legitimate City interest. The Defendants actions were also not a valid exercise of the City's political, discretionally, or legislative authority.

357.     The Defendants actions, behavior, conduct, and decisions were unlawful and made decidedly outside and without legitimate authority. As such, the Defendants conduct was not an exercise of any valid governmental function.

358.     Immunity is not afforded to employees of a municipality who participate in actions intended to injure or cause harm to others. Defendants are not entitled to immunity for their intentional torts or gross negligence.

359.     Defendant Manassas Park is liable for the acts and omissions of its employees, including Defendant Lugo, Defendant Reinhart, Defendant Winston, Defendant Dorr, and Defendant Palko, under the doctrine of *respondeat superior*.

## COUNT I
## MALICIOUS PROSECUTION
### (All Defendants)

360.     Officer Miller re-alleges and incorporates by reference the allegations set forth in paragraphs 1-359 of this Complaint.

361.     The elements of a malicious prosecution claim are, (1) malicious prosecution; (2) instituted by or with the cooperation of the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff. *Lewis v. Kei*, 281 Va. 715, 722, 708 S.E.2d 884, 889 (2011).

362.     On or about February 11, 2020 Defendant Dorr falsely, maliciously, and without reasonable or probable cause whatsoever, caused the issuance of an improper warrant for the arrest of Officer Miller on the charge of computer fraud (VA. CODE § 18.2-152.3), stemming from the March 29, 2019 LInX search.

363.     Upon information and belief, Defendant Lugo, Defendant Reinhart, Defendant Winston, and Defendant Palko maliciously encouraged Defendant Dorr to file the Criminal Complaint against Officer Miller, and furnished Defendant Dorr with the resources to create and file the Criminal Complaint, including copies of the administrative investigations.

364.     VA. CODE § 18.2-152.3 requires a showing that a defendant, (1) used a computer or computer network without authority, (2) with the intent to obtain property or services by false pretenses, embezzle or commit larceny, or convert the property of another.

365.    At the time the Criminal Complaint was sworn, Defendant Dorr, Defendant Lugo, Defendant Reinhart, and Defendant Palko did not have probable cause to believe, or knowledge that Officer Miller used a computer or computer network without authority. In fact, in the Criminal Complaint Defendant Dorr expressly identified that Officer Miller was one of two "agency administrators" for the LInX system. *See* **Ex. 34**, p. 5.

366.    False pretenses, embezzlement, larceny, and conversion are common law crimes which require a showing of specific intent. Specific intent is the intent to accomplish the precise criminal act that one is later charged with.

367.    At the time that the Criminal Complaint was sworn, the Defendants did not have probable cause to believe, or knowledge that Officer Miller had the requisite specific intent to commit the alleged offense.

368.    Without knowledge of Officer Miller's specific intent to commit the crime, the Defendants did not have a reasonable belief that Officer Miller was guilty of VA. CODE § 18.2-152.3 at the time the Criminal Complaint was filed.

369.    At the time that the Criminal Complaint was sworn, the Defendants did not have probable cause to believe, or knowledge that a crime in violation of VA. CODE § 18.2-152.3 had been committed.

370.    Throughout the administrative investigation, Officer Miller maintained that he conducted the March 29, 2019 LInX search for law enforcement purposes, a fact that the Defendants were aware of.

371.    Upon information and belief, the Defendants had knowledge that the LInX search inquiries conducted by Officer Miller on March 29, 2019 were for law enforcement purposes and specifically, that they were conducted at the request of Defendant Winston.

372.     The Defendants instigated and procured the prosecution of Officer Miller falsely, maliciously, with the intent to injure Officer Miller's reputation in the law enforcement community and community at large, with full knowledge that the criminal charge was without any reasonable or probable cause whatsoever.

373.     The criminal charges filed against Officer Miller were terminated in Officer Miller's favor on July 2, 2020, when the charges against Officer Miller were dismissed with prejudice by Special Prosecutor Scott Hook.

374.     As a direct and proximate result of the Defendants actions, Officer Miller has been greatly injured in his credit and reputation and has been brought into public disrepute among the members of his community; has been hindered in the practice of his profession; has been required to spend substantial time away from his profession and his family and has been forced to expend substantial sums of money to defend against the wholly frivolous criminal charge. Defendants' actions have also caused Officer Miller much anxiety and mental anguish; as Officer Miller has been made the object of public scorn, ridicule, and humiliation.

**COUNT II**
**ABUSE OF PROCESS**
**(All Defendants)**

375.     Officer Miller re-alleges and incorporates by reference the allegations set forth in paragraphs 1-374 of this Complaint.

376.     The elements of an abuse of process claim are, (1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings. *Montgomery v. McDaniel*, 271 Va. 465, 469, 628 S.E.2d 529, 531 (2006).

377.   On or about February 11, 2020, Defendant Dorr falsely, maliciously, and without reasonable or probable cause whatsoever, caused the issuance of a warrant for the arrest of Officer Miller on the charge of computer fraud (VA. CODE § 18.2-152.3).

378.   Upon information and belief, Defendant Lugo, Defendant Reinhart, Defendant Winston and Defendant Palko maliciously encouraged Defendant Dorr to file the Criminal Complaint against Officer Miller, and furnished Defendant Dorr with the resources to create and file the Criminal Complaint, including copies of the administrative investigations.

379.   Upon information and belief, the Defendants had knowledge that the search inquiries conducted by Officer Miller on March 29, 2019 were for law enforcement purposes and specifically, that they were conducted at the request of Defendant Winston, and therefore, at the time the Criminal Complaint was filed, the Defendants knew that Officer Miller had not committed computer fraud.

380.   Defendants did in fact engage in such an improper use of process by participating, assisting, encouraging, and cooperating with crafting and issuance of the Criminal Complaint against Officer Miller.

381.   Defendants undertook such action with an ulterior motive. Specifically, the Defendants maliciously used the criminal process to bolster and justify  Officer Miller's wrongful termination, to prevent Officer Miller from further exercising his procedural rights, and to harm Officer Miller's professional reputation and hurt his employment opportunities.

382.   Defendant Lugo's personal vendetta with Officer Miller dated back to the 2016 badge incident. After becoming the Chief of Police, Defendant Lugo was in a position to get retribution against Officer Miller, and sought the help and assistance of Defendant Reinhart, Defendant Dorr, Defendant Winston and Defendant Palko, to file the Criminal Complaint.

Defendant Reinhart, Defendant Dorr, Defendant Winston, and Defendant Palko were active participants in the malicious filing of the Criminal Complaint and did so for their own personal vendettas against Officer Miller, to win favor with Defendant Lugo, and/or to advance their professional standing.

383.   On several occasions, including in the City Letter, Defendants threatened to file criminal charges against Officer Miller. The threats of criminal charges began only after Officer Miller attempted to exercise his procedural rights.

384.   After initiating process, Defendants utilized the Criminal Complaint to coerce or otherwise prevent Officer Miller from exercising his procedural rights and to harm his professional reputation and prevent him from finding gainful employment with another law enforcement agency.

385.   Defendants had no legal reason to initiate the Criminal Complaint against Officer Miller and abused criminal process after it had been initiated.

386.   Defendants' actions were malicious and have caused harm to Officer Miller.

387.   The criminal charges filed against Officer Miller by Defendants were terminated in Officer Miller's favor on July 2, 2020, when the charges against Officer Miller were dismissed with prejudice by Special Prosecutor Scott Hook.

388.   As a direct and proximate result of Defendants' actions, Officer Miller has been greatly injured in his credit and reputation and has been brought into public disrepute among the members of his community; has been hindered in the practice of his profession; has been required to spend substantial time away from his profession and his family; and has been forced to expend substantial sums of money to defend against the wholly frivolous criminal charge. Defendants'

actions have also caused Officer Miller much anxiety and mental anguish; as Officer Miller has been made the object of public scorn, ridicule, and humiliation.

## COUNT III
## COMMON LAW CIVIL CONSPIRACY
### (All Defendants)

389.    Officer Miller re-alleges and incorporates by reference the allegations set forth in paragraphs 1-388 of this Complaint.

390.    The elements of civil conspiracy are, (1) a combination of two or more persons; (2) to accomplish by some concerted action; (3) some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means; and (4) resultant damage caused by the defendants' acts committed in furtherance of the conspiracy. *Almy v. Grisham*, 273 Va. 68, 639 S.E.2d 182 (2007).

391.    The Defendants worked in concert to damage Officer Miller's professional reputation and to improperly remove Officer Miller from his position with MPPD. The Defendants achieved their malicious and concerted attacks against Officer Miller through a series of unjustified measures including, the launch of baseless administrative investigations, denial of Officer Miller's procedural rights, and the malicious filing of a Criminal Complaint.

392.    All the Defendants engaged in multiple acts as part of a distinct conspiracy to damage the professional reputation of Officer Miller and facilitate his termination from MPPD.

393.    Upon information and belief, Defendant Lugo, and Defendant Palko spearheaded the malicious and coordinated attacks against Officer Miller and with the aid of Defendant Reinhart, Defendant Winston, and Defendant Dorr, conspired to stack unwarranted and trumped-up administrative investigations against Officer Miller to get him terminated from his position at MPPD and dissuade him from exercising his procedural rights. When that was unsuccessful, the Defendants filed meritless criminal charges against Officer Miller. Defendant Lugo cloaked the

other Defendants with the power to skew the investigations through the concealment of key facts which would have exonerated Officer Miller. For example, Defendant Winston was assigned the task to investigate the LInX queries Officer Miller conducted for Victoria Foster, even though Defendant Winston had knowledge that he requested the search and spoke with members of PWCPD and Victoria Foster on March 29, 2019. Not surprisingly, Defendant Winston purposefully excluded evidence to conceal his involvement in the Victoria Foster matter.

394.    Upon information and belief, the Defendants' actions were provoked because of personal vendettas each had with Officer Miller. Further, the Defendants were incentivized to participate in the conspiracy against Officer Miller through undisclosed payments, pay raises, and/or promotions.

395.    The Defendants' actions to deny Officer Miller from exercising his procedural rights were unlawful and in violation of General Order 109 and the Fourteenth Amendment. The Defendants' use of false statements in the administrative investigations and the Criminal Complaint were unlawful and in violation of VA. CODE §§ 18.2-434, 18.2-436, 18.2-461, and 18.2-462. The Defendants' retaliation against Officer Miller following disclosure of the undisclosed payments and reports of violation of his procedural rights were unlawful and in violation of VA. CODE §§ 2.2-3009 *et seq*.

396.    The acts of the Defendants were performed intentionally, purposefully, and without lawful justification with the intent to harm Officer Miller.

397.    As a result of the acts of the Defendants, Officer Miller was damaged in his personal and professional reputation, which has caused his inability to find gainful employment with another law enforcement department; was wrongfully terminated from his position with MPPD,

which has caused the loss of income, benefits, and retirement, that he would have otherwise received; and caused emotional and physical harm.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

398.    Officer Miller re-alleges and incorporates by reference the allegations set forth in paragraphs 1-397 of this Complaint.

399.    The elements of intentional infliction of emotional distress are, (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and (4) the resulting emotional distress was severe. *Supervalu, Inc. v. Johnson*, 276 Va. 356, 370, 666 S.E.2d 335, 343 (2008).

400.    Defendant Lugo's conduct throughout was intentional; it was born out of, among other things, his hatred and malice toward Officer Miller.

401.    Defendant Reinhart's conduct throughout was intentional; it was born out of, among other things, his hatred and malice towards Officer Miller, his friendship with Defendant Lugo and his desire to assist Defendant Lugo in exacting revenge on Officer Miller.

402.    Defendant Winston's conduct throughout was intentional; it was born out of, among other things, his hatred and malice towards Officer Miller, his friendship with Defendant Lugo and his desire to assist Defendant Lugo in exacting revenge on Officer Miller.

403.    Defendant Dorr's conduct throughout was intentional; it was born out of, among other things, his hatred and malice towards Officer Miller, his friendship with Defendant Lugo and his desire to assist Defendant Lugo in exacting revenge on Officer Miller.

404.    Defendant Palko's conduct throughout was intentional; it was born out of, among other things, his hatred and malice towards Officer Miller, his friendship with Defendant Lugo and his desire to assist Defendant Lugo in exacting revenge on Officer Miller.

405.    The Defendants set upon the unlawful actions outlined herein to destroy Officer Miller professionally and personally; consequently, the Defendants knew or should have known that emotional distress would likely follow.

406.    The Defendants conduct, including terminating him from his employment and filing the Criminal Complaint against Officer Miller, was extreme and outrageous beyond the bounds of decency.

407.    Officer Miller suffered severe emotional distress as a result of the Defendants conduct. Officer Miller's severe emotional distress also manifested into physical symptoms and forced him to seek assistance from a licensed therapist.

408.    The Defendants conduct was the cause of the severe emotional distress experienced by Officer Miller.

409.    As a direct and proximate result of Defendants' actions, Officer Miller has been greatly injured in his credit and reputation and has been brought into public disrepute among the members of his community; has been hindered in the practice of his profession; has been required to spend substantial time away from his profession and his family and has been forced to expend substantial sums of money to defend against the wholly frivolous criminal charge. Defendants' actions have also caused Officer Miller much anxiety and mental anguish; as Officer Miller has been made the object of public scorn, ridicule, and humiliation.

## COUNT V
## STATUTORY BUSINESS CONSPIRACY
### VA. CODE §§ 18.2-499 and 18.2-500
### (All Defendants)

410.    Officer Miller re-alleges and incorporates by reference the allegations set forth in paragraphs 1-409 of this Complaint.

411.    VA. CODE § 18.2-499 states, "A. Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500." and "B. Any person who attempts to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection A of this section shall be guilty of a violation of this section and subject to the same penalties set out in subsection A."

412.    VA. CODE § 18.2-499 states, "A. Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, 'damages' shall include loss of profits."

413.    To recover in an action under VA. CODE §§ 18.2-499 and 18.2-500, a plaintiff must plead and prove, (1) a combination of two or more persons for the purpose of willfully and

maliciously injuring plaintiff in his business; and (2) resulting in damage to the Plaintiff. *Allen Realty Corp. v. Holbert*, 227 Va. 441, 449, 318 S.E..2d 592, 596 (1984).

414.    The Defendants worked in concert to damage Officer Miller's professional reputation and to improperly remove Officer Miller from his position with MPPD. The Defendants achieved their malicious and concerted attacks against Officer Miller through a series of unjustified measures including, the launch of baseless administrative investigations, denial of Officer Miller's procedural rights, and the malicious filing of a Criminal Complaint.

415.    All the Defendants engaged in multiple acts as part of a distinct conspiracy to damage the professional reputation of Officer Miller and facilitate his termination from MPPD.

416.    Upon information and belief, Defendant Lugo and Defendant Palko spearheaded the malicious and coordinated attacks against Officer Miller and with the aid of Defendant Reinhart, Defendant Winston, and Defendant Dorr, conspired to stack unwarranted and trumped-up administrative investigations against Officer Miller to get him terminated form his position at MPPD and dissuade him from exercising his procedural rights. When that was unsuccessful, the Defendants filed meritless criminal charges against Officer Miller. Defendant Lugo cloaked the other Defendants with the power to skew the investigations through the concealment of key facts which would have exonerated Officer Miller. For example, Defendant Winston was assigned the task to investigate the LInX queries that Officer Miller conducted for Victoria Foster, even though Defendant Winston had knowledge that he requested the search and spoke with members of PWCPD and Victoria Foster on March 29, 2019. Not surprisingly, Defendant Winston purposefully excluded evidence to conceal his involvement in the Victoria Foster matter.

417.    Upon information and belief, the Defendants' actions were provoked because of personal vendettas each had with Officer Miller. Further, the Defendants were incentivized to

participate in the conspiracy against Officer Miller through undisclosed payments, pay raises, and/or promotions.

418.    The Defendants' actions to deny Officer Miller from exercising his procedural rights were unlawful and in violation of General Order 109 and the Fourteenth Amendment. The Defendants' use of false statements in the administrative investigations and the Criminal Complaint were unlawful and in violation of VA. CODE §§ 18.2-434, 18.2-436, 18.2-461, and 18.2-462. The Defendants' retaliation against Officer Miller following disclosure of the undisclosed payments and reports of violation of his procedural rights were unlawful and in violation of VA. CODE §§ 2.2-3009 *et seq*.

419.    The acts of the Defendants were performed intentionally, purposefully, and without lawful justification with the intent to harm Officer Miller.

420.    As a result of the acts of the Defendants, Officer Miller was damaged in his personal and professional reputation, which has caused his inability to find gainful employment with another law enforcement department; was wrongfully terminated from his position with MPPD, which has caused the loss of income, benefits, and retirement, that he would have otherwise received; and caused emotional and physical harm.

**COUNT VI**
**CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**
**42 U.S.C. § 1985**
**(All Defendants)**

421.    Officer Miller re-alleges and incorporates by reference the allegations set forth in paragraphs 1-420 of this Complaint.

422.    42 U.S.C. § 1985 states, "If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce

by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties; … in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

423.   The Defendants worked in concert to damage Officer Miller's professional reputation and to improperly remove Officer Miller from his position with MPPD. The Defendants achieved their malicious and concerted attacks against Officer Miller through a series of unjustified measures including, the launch of baseless administrative investigations, denial of Officer Miller's procedural rights, and the malicious filing of a Criminal Complaint.

424.   All the Defendants engaged in multiple acts as part of a distinct conspiracy to damage the professional reputation of Officer Miller and facilitate his termination from MPPD.

425.   Upon information and belief, Defendant Lugo, and Defendant Palko spearheaded the malicious and coordinated attacks against Officer Miller and with the aid of Defendant Reinhart, Defendant Winston, and Defendant Dorr, conspired to stack unwarranted and trumped-up administrative investigations against Officer Miller to get him terminated form his position at MPPD and dissuade him from exercising his procedural rights. When that was unsuccessful, the Defendants filed meritless criminal charges against Officer Miller. Defendant Lugo cloaked the

other Defendants with the power to skew the investigations through the concealment of key facts which would have exonerated Officer Miller. For example, Defendant Winston was assigned the task to investigate the LInX queries that Officer Miller conducted for Victoria Foster, even though Defendant Winston had knowledge that he requested the search and spoke with members of PWCPD and Victoria Foster on March 29, 2019. Not surprisingly, Defendant Winston purposefully excluded evidence to conceal his involvement in the Victoria Foster matter.

426.   Upon information and belief, the Defendants' actions were provoked because of personal vendettas each had with Officer Miller. Further, the Defendants were incentivized to participate in the conspiracy against Officer Miller through undisclosed payments, pay raises, and/or promotions.

427.   Defendants' (a) actions to deny Officer Miller from exercising his procedural rights; (b) Defendants' use of false statements in the administrative investigations and the Criminal Complaint; and (c) Defendants' retaliation against Officer Miller following disclosure of the undisclosed payments and reports of violation of his procedural rights were unlawful and in violation of 42 U.S.C. § 1985.

428.   The acts of the Defendants were performed intentionally, purposefully, and without lawful justification with the intent to harm Officer Miller.

429.   As a result of the acts of the Defendants, Officer Miller was damaged in his personal and professional reputation, which has caused his inability to find gainful employment with another law enforcement department; was wrongfully terminated from his position with MPPD, which has caused the loss of income, benefits, and retirement, that he would have otherwise received; and caused emotional and physical harm.

**COUNT VII**
**VIOLATION OF 4TH AMENDMENT, ILLEGAL SEARCH AND SEIZURE**
**(All Defendants)**

430.   Officer Miller re-alleges and incorporates by reference the allegations set forth in paragraphs 1-429 of this Complaint.

431.   Officer Miller has a constitutional right to be free from prosecution without probable cause.

432.   Violation of rights secured by the Amendments to the U.S. Constitution are enforced through 42 U.S.C. § 1983.

433.   On or about February 11, 2020 Defendant Dorr falsely, maliciously, and without reasonable or probable cause whatsoever, caused the issuance of a warrant for the arrest of Officer Miller on the charge of computer fraud (VA. CODE § 18.2-152.3), stemming from the March 29, 2019 LInX searches.

434.   Upon information and belief, the Defendants maliciously encouraged Defendant Dorr to file the Criminal Complaint against Officer Miller, and furnished Defendant Dorr with the resources to create and file the Criminal Complaint, including copies of the administrative investigations.

435.   VA. CODE § 18.2-152.3 requires a showing that a defendant, (1) used a computer or computer network without authority, (2) with the intent to obtain property or services by false pretenses, embezzle or commit larceny, or convert the property of another.

436.   At the time the Criminal Complaint was sworn, the Defendants did not have probable cause to believe, or knowledge that Officer Miller used a computer or computer network without authority.

437.   At the time the Criminal Complaint was sworn, Officer Miller was an agency administrator and authorized by MPPD to access LInX.

438.    False pretenses, embezzlement, larceny, and conversion are common law crimes which require a showing of specific intent. Specific intent is the intent to accomplish the precise criminal act that one is later charged with.

439.    At the time that the Criminal Complaint was sworn, the Defendants did not have probable cause to believe, or knowledge that Officer Miller had the requisite specific intent to commit the alleged offense.

440.    Without knowledge of Officer Miller's specific intent to commit the crime, the Defendants did not have a reasonable belief that Officer Miller was guilty of VA. CODE § 18.2-152.3 at the time the Criminal Complaint was filed.

441.    At the time that the Criminal Complaint was sworn, the Defendants did not have probable cause to believe, or knowledge that a crime in violation of VA. CODE § 18.2-152.3 had been committed.

442.    Throughout the administrative investigation, Officer Miller maintained that he conducted the March 29, 2019 search for law enforcement purposes, a fact that the Defendants were aware of.

443.    Upon information and belief, the Defendants had knowledge that the search inquiries conducted by Officer Miller on March 29, 2019 were for law enforcement purposes and specifically, that they were conducted at the request of Defendant Winston.

444.    The Defendants instigated, procured, and caused the prosecution of Officer Miller falsely, maliciously, with the intent to injure Officer Miller's reputation in the law enforcement community and community at large, with full knowledge that the criminal charge was without any reasonable or probable cause whatsoever.

445.     The Defendants caused an improper seizure of Officer Miller pursuant to legal process which was unsupported by probable cause as required by the Fourth Amendment.

446.     If not for the intervening acts of the Defendants, Officer Miller would not have been subjected to prosecution.

447.     The Criminal Complaint was purposefully incomplete, included false and/or misleading information, and the Defendants failed to disclose exculpatory evidence. Further, the criminal charges were obtained only after repeated wrongful attempts were made by the Defendants to persuade the Commonwealth Attorney to prosecute the matter.

448.     The criminal charge filed against Officer Miller was different from the criminal charge approved by the Commonwealth Attorney on February 4, 2020.

449.     The criminal charge filed against Officer Miller were terminated in Officer Miller's favor on July 2, 2020, when the charges against Officer Miller were dismissed with prejudice by Special Prosecutor Scott Hook.

450.     As a direct and proximate result of the Defendants actions, Officer Miller has been greatly injured in his credit and reputation and has been brought into public disrepute among the members of his community; has been hindered in the practice of his profession; has been required to spend substantial time away from his profession and his family and has been forced to expend substantial sums of money to defend against the wholly frivolous criminal charge. Defendants' actions have also caused Officer Miller much anxiety and mental anguish; as Officer Miller has been made the object of public scorn, ridicule and humiliation.

451.     At all times material hereto, Defendants violated Officer Miller's constitutional rights intentionally and/or with reckless indifference, and they knew or should have known that their actions violated federal law, so as to support an award of liquidated and/or punitive damages.

452.    The Constitutional rights of Officer Miller at issue in this matter were clearly established, and, therefore, Defendants cannot avail themselves of qualified immunity.

## COUNT VIII
## VIOLATION OF 14TH AMENDMENT, LIBERTY INTEREST
### (All Defendants)

453.    Officer Miller re-alleges and incorporates by reference the allegations set forth in paragraphs 1-452 of this Complaint.

454.    Officer Miller has a constitutional right to be free from deprivation of a protected liberty interest.

455.    Violation of rights secured by the Amendments to the U.S. Constitution are enforced through 42 U.S.C. § 1983.

456.    The Defendants acted under the color of law.

457.    The Defendants' above-described conduct, including but not limited to the concealment, suppression, and/or failure to turn over exculpatory evidence; conspiracy to participate and assist in and effectuate Officer Miller's arrest and malicious prosecution for crimes he did not commit; activating process with the intent to harm Officer Miller without economic or social excuse or justification; and deprive Officer Miller of his procedural due process rights, and their intimidation, threats, coercion, and deceit, engaged in under the color of law, violated rights, privileges and immunities secured to Officer Miller by the Fourteenth Amendment of the Constitution of the United States of America.

458.    Defendants' behavior was outrageous, intolerable, and intentional.

459.    As a direct and proximate result of the Defendants actions, Officer Miller has been greatly injured in his credit and reputation and has been brought into public disrepute among the members of his community; has been hindered in the practice of his profession; has been required

- 76 -

to spend substantial time away from his profession and his family and has been forced to expend substantial sums of money to defend against the wholly frivolous criminal charge. Defendants' actions have also caused Officer Miller much anxiety and mental anguish; as Officer Miller has been made the object of public scorn, ridicule and humiliation.

460.   At all times material hereto, Defendants violated Officer Miller's constitutional rights intentionally and/or with reckless indifference, and they knew or should have known that their actions violated federal law, so as to support an award of liquidated and/or punitive damages.

461.   The Constitutional rights of Officer Miller at issue in this matter were clearly established, and, therefore, Defendants cannot avail themselves of qualified immunity.

## PRAYER FOR RELIEF

WHEREFORE, Officer Miller prays for judgment on its Complaint herein, for:

a.   Compensatory damages, jointly and severally, in an amount of no less than nine hundred and ninety thousand, two hundred and sixty-three dollars and one cent ($990,263.01);

b.   Treble damages in accordance with VA. CODE § 18.2-500, in an amount of no less than two million, nine hundred and seventy thousand, seven hundred and eighty-nine dollars and three cents ($2,970,789.03);

c.   Punitive damages in an amount of no less than two and a half million dollars ($2,500,000.00);

d.   An award of all direct and consequential damages suffered by Officer Miller as a result of Defendants actions;

e.   An award of attorneys' fees, interest, costs, and disbursements incurred to prosecute this action, including all fees and costs available under VA. CODE § 18.2-500; and

f.      Such other and further relief as the Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff Regan Miller demands a trial by jury.


Respectfully submitted,


Date: April 14, 2021                            /s/ Clyde E. Findley
                                                Clyde E. Findley, Esq. (VSB #48277)
                                                 cfindley@berenzweiglaw.com
                                                Andrew J. Smith, Esq. (VSB #81538)
                                                 dsmith@berenzweiglaw.com
                                                BERENZWEIG LEONARD, LLP
                                                8300 Greensboro Drive, Suite 1250
                                                McLean, Virginia 22102
                                                (703) 760-0402 (telephone)
                                                (703) 462-8674 (facsimile)
                                                *Counsel for Regan Miller*