1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
- - - - - - - - - - - - x
                              :
REGAN MILLER,                 :
                              :
          Plaintiff,          :
                              :
     -vs-                     : Case No. 1:21-cv-00456
                              :
CITY OF MANASSAS PARK,        :
MARIO LUGO, FRANK WINSTON,    :
TREVOR REINHART, CARL DORR, and :
LASZLO PALKO,                 :
                              :
          Defendants.         :
                              :
- - - - - - - - - - - - x
```

                         Fairfax, Virginia
                         Wednesday, November 17, 2021

Deposition of

REGAN MILLER

the Plaintiff, called for examination by counsel on behalf

of the City of Manassas Park, Mario Lugo, Frank Winston,

Trevor Reinhart, Carl Dorr, and Laszlo Palko, Defendants,

pursuant to notice, taken in the Law Offices of Bancroft,

McGavin, Horvath & Judkins, P.C., 9900 Fairfax Boulevard,

Suite 400, Fairfax, Virginia, beginning at 9:55 o'clock

a.m., before Peter P. Bloom, a Verbatim Reporter and

Notary Public in and for the State of Virginia, at large,

when there were present on behalf of the respective

parties:

2

APPEARANCES:

    On Behalf of the Plaintiff:

        Clyde E. Findley, Esquire
        BERENZWEIG LEONARD, LLP
        8300 Greensboro Drive
        Suite 1250
        McLean, Virginia 22102
        (703) 760-0402
        cfindley@berenzweiglaw.com

    On Behalf of the Defendants:

        Heather K. Bardot, Esquire
        BANCROFT McGAVIN HORVATH & JUDKINS, PC
        9990 Fairfax Boulevard
        Suite 400
        Fairfax, Virginia 22030
        (703) 385-1000
        hbardot@bmhjlaw.com

    Also present:

        Mario Lugo, Defendant

        Trevor Reinhart, Defendant

        Frank Winston, Defendant

        Carl Dorr, Defendant

        Laszlo Palko, Defendant

8

```
1        A      From the Annandale Campus, yes, ma'am.

2        Q      And did you have any area of focus at that

3   time?

4        A      It was criminal justice, or administration of

5   justice.

6        Q      Did you continue your education thereafter?

7        A      I actually transferred to George Mason

8   University.

9        Q      Here in Fairfax?

10       A      Yes, ma'am.

11       Q      Did you start there in '94?

12       A      I did, August 1994.

13       Q      And did you get a degree from GMU?

14       A      I got a bachelor's of science degree.

15       Q      When?

16       A      It was December 1996 or January 1997.

17       Q      And what was your degree in?

18       A      Administration of justice.

19       Q      Did you have further education thereafter?

20       A      No, ma'am.  Well, I had police academy

21   instructions, but nothing from a university or a college.

22       Q      When did you have police academy instruction?

23       A      My first one was 1998.
```

9

1    Q    And where was that?

2    A    That was at the Northern Virginia Criminal

3  Justice Academy.

4    Q    How long were you there?

5    A    That particular one because it was a

6  sheriff's, more of a sheriff's academy, I think that was a

7  shortened term, which was five months maybe.

8    Q    Were you working at the time?

9    A    I was.  I had been hired by the Arlington

10  County Sheriff's Office.

11    Q    So was the schooling part of your work duties?

12    A    It was required for the -- to be certified as

13  a deputy sheriff in Virginia.  Yes, ma'am.

14    Q    And did you get so certified?

15    A    I'm sorry?

16    Q    Did you get so certified?

17    A    I did.  Yes, ma'am.

18    Q    When?

19    A    Either late 1998 or early 1999.

20    Q    And how long did you continue to work for the

21  Sheriff's Department in, did you say Arlington?

22    A    Yes, ma'am.  Arlington was until May or June

23  of 1999, so a total of about 14 months.

10

```
1        Q      Why did you leave there?

2        A      I got hired by Manassas City Police.

3        Q      As what position?

4        A      As a police officer, a road officer.

5        Q      What year was that?

6        A      1999.

7        Q      How long did you stay there?

8        A      Seven and a half years, I think.

9        Q      And then you went where?

10       A      I went to Manassas Park Police.

11       Q      And what was the position you were hired to

12   do?

13       A      Police officer, patrol officer for the road.

14       Q      When were you hired?

15       A      19 -- I'm sorry, 2008, I think it was June

16   2008.

17       Q      Who hired you?

18       A      The City of Manassas Park.  It was under Chief

19   Evans at the time, Chief John Evans.

20       Q      Did you know him before you came on there?

21       A      I did not know him.  I knew of him.

22       Q      Did you know any of the officers at the

23   Manassas Park Police Department before you were hired in
```

11

1    June of 2008?

2         A     I knew -- I knew one well and I knew a couple

3    just through because the jurisdiction next door, Manassas

4    City bumped up to Manassas Park whether it be backed up on

5    traffic stops just through interacting with them.

6         Q     Who did you know well?

7         A     Chief Lugo.

8         Q     And how did you know him well?

9         A     We used to work out together.  We used to just

10   bump into each other.  I was actually a resident of

11   Manassas Park on Denver Drive.  And we had just become

12   friends through mutual acquaintances and then ran into

13   each other at work a couple times when he was on a vice

14   narcotics task force.  We just happened to -- we just

15   became friends at some point.

16        Q     You said you would work out together?

17        A     Yes, ma'am.

18        Q     Where did you do that?

19        A     Gold's Gym.

20        Q     Which location?

21        A     It was Prince William County.

22        Q     And during what time frame did you Lugo work

23   out together?

1       A       It was just before my first daughter was born

2    in '06, so it was, I'd say, '04 to '0 -- no, I'm sorry,

3    hold on -- '04 to '06, it was probably a couple of years.

4       Q       And why did that stop?

5       A       When I had a daughter, I couldn't really -- it

6    was my first daughter, I had no life.  I did what I could

7    to do to get to the gym.  And I think Chief Lugo moved.

8    He -- I think he was local, but he had moved out farther

9    and then we just, the timing just wasn't right.

10      Q       Do you know what role, if any, Chief Lugo had

11   in helping you obtain employment with the Manassas Park

12   Police Department?

13      A       I can only assume, ma'am, I don't have exact

14   knowledge.

15      Q       What would you assume?

16      A       Well, being that Chief Lugo and I were pretty

17   good friends back then and hung out and did the gym.  We

18   had -- we did have discussions about moving to each

19   other's jurisdiction just through small talk and I had

20   explained to him that I was looking to move.

21              And then when it was time to apply, I could

22   only assume that he made a positive, I guess, not

23   commendation, but a positive interaction with Chief Evans

15

1      A     I went to the Detective Bureau.

2      Q     How long were you there?

3      A     Just over four years, four and a half years.

4      Q     Who was or were your supervisors during that

5 time?

6      A     My initial supervisor would be, I think it was

7 a captain or a major, Dean Goodwin initially and then I

8 think he left.  And then it ended up being Major Mark

9 Matthews and then I think he retired.  And then it became

10 Chief Evans.  And then -- and then I remember Major Trevor

11 Reinhart came up I believe as a sergeant at some point.

12      Q     So at some point when you were in the

13 Detective Bureau, it's your recollection that you would

14 have reported to Reinhart?

15      A     Yes, ma'am.

16      Q     Do you know what year that would have been or

17 approximately what year that would have been?

18      A     I would be -- maybe 2010, 2011.  I'm not --

19 I'm not sure.

20      Q     Since that time, 2010 or 2011, up until the

21 time you left Manassas Park Police Department in July of

22 2020, did Reinhart remain a superior to you at all times?

23      A     Yes.

16

1      Q      Was he a supervisor of yours from the time you

2  were in the Detective Bureau up until the time you left in

3  July of 2020?

4      A      Not a direct supervisor.  He was a -- he was

5  my supervisor.  He got promoted at -- I think he got

6  promoted as a sergeant to lieutenant and then there was

7  some transition with some upper echelon retiring or

8  leaving.

9            He then became -- I think it became a captain

10  during that time or it was he was about to go to the

11  F.B.I. National Academy and I had just been promoted to

12  sergeant in November, I believe, of 2012.

13      Q      Prior to 2019, did you ever have any

14  difficulties with Reinhart, any run-ins, feel like he

15  mistreated you prior to 2019?

16      A      Can you define "mistreat"?

17      Q      I guess that's subjective; right?  So --

18      A      It is.

19      Q      -- I don't know what you might feel would

20  constitute mistreatment.  I'm just trying to figure out

21  what your relationship with Reinhart was leading up to

22  2019.

23      A      Reference Major Reinhart and I, when we were

17

1    in -- when we worked together in the Detective Bureau, we

2    would sometimes butt heads, but when it came down to

3    working an investigation together, me and him would feed

4    off each other.  We knew -- we knew what was needed, what

5    to ask, how to ask.  And this was before we had even

6    really had a chance to meet and really understand each

7    other.

8            I'm not saying we're both aggressive, but we

9    both are very confident in our ability to interview or

10   work an investigation.  He had a skill set when it came to

11   the Gang Task Force.  He knew everything in and out of

12   that.  I relied on him for certain investigatory skills

13   and he relied on me, as well, I believe.

14           There were some decisions made while he was --

15   while he was at a chief's conference I remember and an

16   email came in where we had gone from, not casual clothes,

17   but we were allowed to wear -- when he first came up, we

18   were allowed to wear sort of like a BDU-style pants and

19   then he got some of the detectives polo shirts.  And I

20   remained initially in a suit and tie, but then I became --

21   again, it's not a casual, but was a little more relaxed

22   but still in a professional dress.

23           And while he was there at the chief's

18

1    conference, I like said, an email came in, all of the

2    sudden it said that all detectives are to become strictly

3    shirt and tie except for special units, and I was the only

4    one at that at the time would have been affected by that.

5         Q     Why did you tell me that?

6         A     You asked about any sort of I guess feelings

7    of mistreatment.

8         Q     And somehow asking you to dress in a shirt and

9    tie, you took offense to that?

10        A     It was only associated to me.  So I just, I

11   found that after several months of us being on the same

12   page with BDUs and polos, and then only I was affected by

13   that decision, he continued to remain in the BDUs and

14   polos.

15        Q     When did this occur?

16        A     It could have been -- it was after the first

17   chief's conference, I'm thinking fall of 2011 maybe.  I

18   don't have the exact date.

19        Q     Did you raise any issue with respect to that

20   with Reinhart?

21        A     Not with him, no.  I just dealt with it.

22        Q     You said, "Not with him."

23              Did you raise an issue with respect to having

19

1  to wear a shirt and tie with someone else?

2       A     Mostly likely.  I think that there was

3  sergeant up there at the time.  I'm not 100 percent sure.

4  It was more off the just discussing it with them.  I also

5  discussed it, the fact that at the time Vice and -- which

6  is normal, Vice wouldn't have to be shirt and tie, but it

7  was only me that was affected by that decision.

8       Q     Anything else that happened with respect to

9  Reinhart in particular prior to 2019 which made you feel

10 mistreated in any way?

11      A     The -- off the top of my head right now, no,

12 ma'am.

13      Q     I'm going to hand you some exhibits today and

14 I will likely not go in order.  So it's not going to have

15 any effect on you, but I'm just letting everybody know.

16           I'm going to show you one that I'm going to

17 mark 133.

18                          (The document referred to

19                          above was marked Miller

20                          Deposition Exhibit No. 133,

21                          for identification.)

22           (Ms. Bardot handed the witness, Mr. Findley,

23 and the police officers a document.)

20

1          MR. FINDLEY:  Any reason why we're starting at

2     133?

3          MS. BARDOT:  Because I had already -- I just

4     told you, I'm going to go out of order likely because --

5          MR. FINDLEY:  Okay.  You had them --

6          MS. BARDOT:  -- I've already numbered --

7          MR. FINDLEY:  -- already numbered.

8          MS. BARDOT:  -- a bunch of stuff.  I have a

9     system.

10          MR. FINDLEY:  I got it.

11          MS. BARDOT:  It might not be a system you

12     like, but it's the system I'm going to use.

13          (Laughter.)

14          MR. FINDLEY:  Okay.  That's fine.

15          BY MS. BARDOT:

16     Q     Do you recognize the document that I've handed

17     to you as Exhibit 133?

18     A     It is my employee evaluation from Captain

19     Reinhart.

20     Q     And this would have been the review date that

21     covered July 1, 2015, to June 30, 2016; correct?

22     A     Yes, ma'am.

23     Q     And at that time then, as I understand from

21

1    this document, your supervisor would have been Captain

2    Reinhart; correct?

3         A    Yes.

4         Q    At this time your rating was a 3.45; correct?

5         A    Yes, ma'am.

6         Q    And that would be at the higher end of meets

7    expectations; correct?

8         A    Yes, ma'am.

9         Q    And you didn't write any employee comments on

10   this; correct?

11        A    I did not.

12        Q    And did you feel like this was a fair

13   evaluation?

14        A    Yes, ma'am.

15        Q    And did you feel at this time that Captain

16   Reinhart treated you fairly?

17        A    Yes, ma'am.

18        Q    I'm going to show you what I'm going to mark

19   as 134.

20                         (The document referred to

21                          above was marked Miller

22                          Deposition Exhibit No. 134,

23                          for identification.)

22

1              (Ms. Bardot handed the witness, Mr. Findley,

2     and the police officers a document.)

3              BY MS. BARDOT:

4         Q    Tell me when you've had an opportunity to look

5     over that?

6              (Pause.)

7         A    Okay.

8         Q    And do you recognize this document?

9         A    I do.  It's the -- it's the year after, same

10    employee evaluation form by Captain Trevor Reinhart.

11        Q    And so this would have covered the period July

12    2016 to July 2017; correct?

13        A    Yes, ma'am.

14        Q    And at that time Trevor Reinhart would have

15    been a captain and your supervisor; correct?

16        A    He was a captain, yes.  I don't know -- if he

17    did the sup -- if he did the evaluation, he would have

18    been my supervisor, I believe.

19        Q    And at this point you again got a 3.45 rating,

20    which was at the higher end of meets expectations;

21    correct?

22        A    Yes.

23        Q    And the manager's comments would be those of

23

1    Trevor Reinhart; correct?

2          A     Yes, ma'am.

3          Q     And it says here, "Lieutenant Miller is a

4    well-rounded supervisor who demonstrates a solid working

5    knowledge of criminal/traffic code and Department

6    Policies.  He completes all additional duties and

7    assignments thoroughly with few errors and usually before

8    the completion deadline."

9                Did I read that right?

10         A     Yes, ma'am.

11         Q     And did you find that comment to be favorable?

12         A     I did.  It was the same comment from the year

13   before, but, yes, it's -- he did a favorable evaluation on

14   me.  Yes, ma'am.

15         Q     And you didn't write any comments or take any

16   issue with that evaluation; correct?

17         A     Correct, no issues.

18         Q     And you thought Trevor Reinhart treated you

19   fairly?

20         A     Yes.

21         Q     I'll show you what I'm going to mark as 135.

22

23

31

1    negative remarks?

2         A    I don't have direct knowledge of that.  No,

3    ma'am.

4         Q    So you can't say whether that occurred or not;

5    correct?

6         A    What occurred, that someone else was pulled

7    in?

8         Q    Yes, sir.

9         A    I cannot say.  No, ma'am.

10        Q    And you would agree that if a supervisor at

11   any level hears of a subordinate making negative comments

12   about another officer of the Department, it's their job to

13   follow up on that, would you agree with that?

14             MR. FINDLEY:  Objection; form.

15             THE WITNESS:  If they're talking negatively?

16             BY MS. BARDOT:

17        Q    Yes, sir.

18        A    Yes, they would.

19        Q    Looking at 136 again, this would have been the

20   last review you had by Trevor Reinhart before the

21   developments which bring us together; correct?

22        A    Yes, ma'am.

23        Q    This is actually signed off on by you, August

32

1    12th, 2019; correct?

2         A    Yes, ma'am.

3         Q    And at this point your average rating is a

4    3.15; correct?

5         A    Yes, ma'am.

6         Q    Still meets expectations; correct?

7         A    Yes, ma'am.

8         Q    And did you feel that this was a favorable

9    review?

10        A    I did.

11        Q    And you put no employee comments; correct?

12        A    I did not have time to put employee comments.

13   No, ma'am, I did not.

14        Q    What do you mean you did not have time?

15        A    This was handed to me by Captain Frank Winston

16   on August 12th.  I did not talk with anybody about this.

17   And a couple minutes later, I was provided the document

18   which brings us here today, so my mind was focused on that

19   versus the evaluation, which at the time was fair.

20             And I had been -- if you see on 1341, the

21   leadership evaluation, Number 2, that was -- it was a 2,

22   even though I still thought it was a 3.  And I believe

23   that the reason it went to a 2 was the prior oral

33

1    conference forms, the oral reprimands that I had received.

2          Q    And on what basis do you say that?  Did you

3    speak with Trevor Reinhart to ask him why it went to a 2?

4          A    I did not.  No, ma'am.

5          Q    So that's your speculation as to why it went

6    to a 2; correct?

7          A    Correct.

8          Q    And you said you didn't have time.

9          Nobody limited your ability to make comments,

10   did they?

11         A    No, ma'am.

12         Q    So when you say you didn't have time, it's

13   because you, as you indicated, became preoccupied by the

14   other matters that came about at the same time; correct?

15         A    Yes, ma'am.

16         Q    If you had had time to submit comments, were

17   there comments you believe you would have submitted?

18         A    I would have normally just went to Major

19   Reinhart's office and had a sit down with him and

20   discussed it more of an in person, but the focus was based

21   on why we're here today.

22         Q    And did you ever ask for a sit down with

23   Reinhart with respect to Exhibit Number 136?

34

```
 1          A      No, ma'am.

 2          Q      Let me back up a little bit.

 3                 Are you married?

 4          A      Yes, ma'am.

 5          Q      When were you married?

 6          A      2003.

 7          Q      Have you been married more than once?

 8          A      No, ma'am.

 9          Q      What's your wife's name?

10          A      Nicole.

11          Q      With an H or without?

12          A      Without.

13          Q      What's her maiden name?

14          A      McClintock.

15          Q      M-C-C-L-I-N-T-O-C-K?

16          A      Yes, ma'am.  Hold on.

17                 (Laughter.)

18          A      M-C-C -- yes.

19          Q      And was Lugo in your wedding?

20          A      He was at the wedding.  He was not in it, but

21     he was at it.

22          Q      Anybody else who's a defendant here, were they

23     at your wedding?
```

46

1    about the Nancy Climaco allegations in which I had alleged

2    talking about her and inquiring about why Ms. Climaco had

3    left Manassas City to be hired by Manassas Park Police.

4         Q     You deny that; correct?

5         A     I'm sorry?

6         Q     You deny that you made those inquiries of him;

7    is that correct?

8         A     Correct.  Yes, ma'am.

9         Q     But you understand that Nancy Climaco reported

10   that you made those inquiries, do you not?

11        A     I do know that, yes.

12        Q     And certainly if Nancy Climaco was reporting

13   that you were snooping into her private life when you were

14   her supervisor, it would be appropriate for Reinhart to

15   follow up on that complaint, would it not?

16             MR. FINDLEY:  Objection; form.

17             THE WITNESS:  The complaint I had heard was

18   prior to me being a supervisor.  I was not her supervisor.

19   This was I believe when she was still in training.

20             BY MS. BARDOT:

21        Q     All right.  So let's back up.

22             If you weren't her supervisor and you were

23   just a coworker --

47

```
 1        A      Correct.

 2        Q      -- and you were inquiring and trying to find

 3   out personnel information about her from another

 4   department and she made a complaint of it to Reinhart, it

 5   would be appropriate, would it not, for him to look into

 6   that?

 7        A      Yes.

 8        Q      And to look into that he would have to talk to

 9   the person Climaco identified as the source, that being

10   Dillard; correct?

11        A      No.  She accused me of doing it.

12        Q      Right.  She accused you of asking Dillard;

13   correct?

14        A      No.

15        Q      Who did she accuse you of asking about her

16   background at the City of Manassas?

17        A      I don't recall her ask -- I don't recall her

18   telling me I had asked anybody, specifically.

19               MS. BARDOT:  You can go off the record,

20   please.  This is going to take me a minute.

21               (Pause.)

22               (Back on the record.)

23               BY MS. BARDOT:
```

67

1       Q       And in one of the sets of answers to

2    interrogatories, you actually suggest that the Badge

3    Incident was sort of the downfall of your relationship

4    with Lugo, is that a fair characterization of your

5    opinion?

6               MR. FINDLEY:  Objection; form and foundation.

7               THE WITNESS:  I do.

8               BY MS. BARDOT:

9       Q       And it's your contention that from the time

10   this Badge Incident occurred in 2016 all the way through

11   the time you left the Department that Lugo harbored some

12   ill will or malice towards you because of this badge

13   incident?

14      A       That was the beginning of it.  Yes, ma'am.

15      Q       And it's your belief that he never let go of

16   that; correct?

17      A       Correct.

18      Q       And is that simply based on what you've been

19   told, allegedly, by Reinhart and Hampton or is there

20   something else you base that opinion upon?

21      A       There was another conversation I had with

22   Jimmy Roberts when I had -- I think Jimmy Roberts emailed

23   me and said Captain Lugo states that a lieutenant badge

76

1    the month of January 2017 in place of your regular

2    official badges; correct?

3        A     I think they were going to be worn of six

4    months, but, yes, they were -- they were for official use.

5    Correct.

6        Q     I mean, there not the types of -- they're not

7    decorative badges, can we agree on that?  Like a football

8    player would wear a patch on his sleeve, they're not

9    decorative.

10       A     You mean like fake?

11       Q     Like just a decoration, like a patch that a

12   soccer player would get.

13             They're official badges; right?

14       A     They're official badges.  Yes, ma'am.

15       Q     I mean, you wouldn't want the badges in the

16   hands of somebody not authorized to wear them; correct?

17       A     Well, I mean, people collect them, so I don't

18   know if you're -- I mean, I wouldn't want -- I wouldn't

19   want a criminal to have them, no.  Correct.

20       Q     You go on to say here that you ordered the

21   badges after you were approved; correct?

22       A     Yes.

23       Q     I'm going to show you 87.

1                              (The document referred to

2                              above was marked Miller

3                              Deposition Exhibit No. 87,

4                              for identification.)

5              (Ms. Bardot handed the witness, Mr. Findley,

6     and the police officers a document.)

7              BY MS. BARDOT:

8         Q    Do you recognize what I've handed you as

9     Exhibit 87?

10        A    Yes, ma'am.

11        Q    What is this?

12        A    This is the order form invoice for the 50

13    badges that Chief Evans approved in order to get the price

14    down.  And then I told -- I had written specifics on what

15    rank for these particular badges and then for my notes, I

16    put down next to the rank and position, the officers'

17    names to verify that we had enough and that everyone was

18    going to get one.

19        Q    And this order form or invoice, that's the

20    front page of Exhibit Number 87, does not include the

21    badges which you ordered for yourself; is that accurate?

22        A    Correct.  This is for the -- this is for the

23    50 Department badges.  There was a separate six-badge

78

1    invoice with my credit card.

2         Q    Was there actually an invoice related to that?

3         A    Yes, ma'am.

4         Q    It goes on to say at Paragraph 20 of your

5    complaint that, "To memorialize his achievement, Officer

6    Miller ordered an extra set of badges to display in his

7    home," do you see that?

8         A    Yes, ma'am.

9         Q    Did you, prior to ordering that extra set of

10   badges, request permission from Chief Evans to order

11   those?

12        A    I did not.

13        Q    Did you have an understanding that you had

14   some authority to order official badges without getting

15   preapproval from the Chief?

16        A    Yes, ma'am.

17        Q    And on what basis did you think you had the

18   authority without getting approval from the Chief to order

19   official police badges?

20        A    Well, I wasn't -- I wasn't using those badges

21   for official use, it was just for display and being that I

22   had dealt with Mr. Collinson on prior occasions and we had

23   a work relationship, I had asked him.

79

1      Q      Right.  But is there some general order, rule,

2  policy, regulation, anything you can rely upon to support

3  your belief that you had authority to hire -- to buy

4  official police badges without getting preapproval from

5  the Chief?

6      A      There -- I don't think there was a general

7  order saying I couldn't and being that Mr. Collinson owned

8  the outright federal copyright of the design, he is

9  allowed to sell them to anybody, to include me.

10     Q      And how did you know that he held the official

11 copyright on the design?

12     A      He told me.

13     Q      Other than him telling you, you don't have any

14 information to indicate that's accurate, do you?

15     A      Yeah.  There is a -- it's not attached to

16 this, but there's the design I showed Chief Evans, or I

17 think it was two designs, and the design we came to

18 approval with, on the bottom of that page, it says,

19 "Copyright owner."

20     Q      The badges you ordered had on them the

21 notation, "Chief, Captain, Sergeant, Detective, Patrol

22 Officer, and Lieutenant"; is that correct?

23     A      It's the six ranks at the time.  Yes, ma'am.

80

1       Q      And so you would then have been in possession

2   of official badges for positions you did not hold; is that

3   correct?

4       A      For Manassas Park?  Correct.

5       Q      Yes.  Okay.

6              Then it goes in your complaint to say, at

7   Paragraph 22, "One month before the inauguration, on

8   December 16, 2016, and while on vacation leave in Florida,

9   Officer Miller received a phone call from Defendant Lugo,

10  who at the time was serving as Captain and was Officer

11  Miller's superior, Defendant Lugo demanded that Officer

12  Miller turn over the inauguration badges he had purchased

13  for himself," do you see that?

14      A      Yes, ma'am.

15      Q      And did that in fact occur?

16      A      He did call me.  Yes, ma'am.

17      Q      And do you know how it was that Lugo learned

18  that you had purchased the badges?

19      A      If I recall, he had to order -- there may have

20  been a promotion or a move and I think he had to order

21  some more.  So he or Captain Boorman reached out to

22  Collinson Enterprises to order more and that's either when

23  Mr. Collinson or the secretary may have said, "There's six

81

1    more, why don't you use one of those?"  Again, I was not

2    part of that conversation, but I think that's what is, to

3    my knowledge.

4                And then he realized that those six were not

5    part of these 50 or in any sort of property, that's when

6    he reached out to me.

7        Q    And how did you hear about this conversation

8    you believed occurred?

9        A    It was either when I had a conversation with

10   Chief Evans or a conversation I had with Mr. Collinson.  I

11   don't know.

12       Q    Do you know who instructed Lugo to call you

13   and request that you return the inauguration badges?

14       A    I don't know.  I didn't ask him.

15       Q    Do you know whether it was Chief Evans himself

16   who instructed Lugo to contact you and demand that you

17   return the badges?

18               MR. FINDLEY:  Objection; form.

19               THE WITNESS:  I do not know.

20               BY MS. BARDOT:

21       Q    You go on to say in Paragraph 22, the last

22   sentence, "Defendant Lugo offered no response to Officer

23   Miller's queries," which were what policy or law your

82

1    actions had violated, and then you say, "and in subsequent

2    text messages falsely stated that Officer Miller was not

3    authorized to own the badges," do you see that?

4         A    Yes, ma'am.

5         Q    I'll show you Exhibit Number 88.

6                        (The document referred to

7                        above was marked Miller

8                        Deposition Exhibit No. 88,

9                        for identification.)

10             (Ms. Bardot handed the witness, Mr. Findley,

11   and the police officers a document.)

12             BY MS. BARDOT:

13        Q    Are these the text messages to which you

14   refer?

15        A    Yes, ma'am.

16        Q    Can you tell me where in this set of text

17   messages you indicate that Lugo told you you were not

18   authorized to own the badges?

19        A    There's nothing in text.

20        Q    But your lawsuit says in text messages, he

21   falsely state you were not authorized to own the badges.

22             Are there some other text messages to which

23   you're referring that you have not produced?

83

1      A      No, ma'am.  I didn't produce this.  No, ma'am.

2      Q      I know you didn't produce this.

3             You didn't produce any text messages, but this

4    is the series of text messages you were referring to;

5    correct?

6      A      Yes, ma'am.

7      Q      And are the badges on the final page, which

8    has a "5" at the bottom, the badges we're talking about?

9      A      The ones in the shadow box.  Yes, ma'am.

10     Q      And is that the shadow box that you had put

11   the badges into?

12     A      Yes, ma'am.

13     Q      And it is true that as of December 16, 2016,

14   no one had authorized you to purchase these badges;

15   correct?

16     A      I'm not sure there was a required

17   authorization, but there was no specific authorization,

18   correct.  Yes, ma'am.

19     Q      And in fact, you hadn't even told anybody at

20   the Police Department that you had purchased the badges,

21   had you?

22     A      I had not.

23     Q      I'm going to turn you to Page 6 of your

99

1    going to be a good conversation, so I said, "Okay.  Let me

2    just -- let me take care of some family issues and then

3    we'll discuss it."  And that was -- I didn't realize it

4    was going to escalate to where it did.

5         Q    I'll show Exhibit Number 90.

6                        (The document referred to

7                        above was marked Miller

8                        Deposition Exhibit No. 90,

9                        for identification.)

10            (Ms. Bardot handed the witness, Mr. Findley,

11    and the police officers a document.)

12            BY MS. BARDOT:

13       Q    Do you recognize this document?

14       A    I do.  That looks like the memo I wrote after

15    having a discussion with Chief Evans about the badges.

16       Q    So this is a memo to Chief Evans from you

17    dated April 8, 2017, with respect to the inaugural badges;

18    correct?

19       A    Yes, ma'am.

20       Q    And this was basically a request to him to

21    allow you to buy the badges, correct, and sort of

22    explaining what you were going to be doing with them?

23       A    From Chief Evans?

100

1    Q    Yes.

2    A    Yeah.  After our conversation, he said, "Just

3    put it in writing."

4    Q    And that's because you didn't have permission

5    from him beforehand; correct?

6         MR. FINDLEY:  Objection; foundation, form.

7         THE WITNESS:  I didn't -- I did not have -- I

8    didn't request permission.

9         BY MS. BARDOT:

10   Q    You what?

11   A    I didn't request permission.

12   Q    Right.  Nor did you advise Chief Evans that

13   you intended to buy these for yourself before Lugo asked

14   you to return them; correct?

15   A    Correct.

16   Q    Did Chief Evans respond to this memo in any

17   way by sending you an email or a text or anything else

18   indicating he approved of you going forward and buying the

19   badges referenced in the memo?

20   A    I want to say he verbally told me end of April

21   or early May 2017, like I want to say April for some

22   reason because I had asked him, I think I said I had

23   emailed him and said, "Hey, listen, I talked to Captain

120

1      Q     February 23, 2007, the City of Manassas issued

2   you a due process notice of intent to discipline for

3   unreasonable search and seizure, improper stop, illegal

4   strip search, improper evidence documentation, do you

5   recall this?

6      A     Yes, ma'am.

7      Q     And it was recommended on the fifth page that

8   you be terminated; correct?

9      A     Yes, ma'am.

10     Q     And on the fourth page, one of the things that

11  the Chief of Police took into account was your prior

12  disciplinary history; correct?

13     A     Yes, ma'am.

14     Q     And what would have included the incidents

15  from 2003; correct?

16     A     Yes, ma'am.

17     Q     Let me show you 81.

18                          (The document referred to

19                          above was marked Miller

20                          Deposition Exhibit No. 81,

21                          for identification.)

22          (Ms. Bardot handed the witness, Mr. Findley,

23  and the police officers a document.)

121

1          BY MS. BARDOT:

2     Q     This is a document dated March 22, 2007, Final

3   Due Process Notice of Intent to Discipline from John J.

4   Skinner, Chief of Police, City of Manassas, to you.

5          Does that bear your signature on the last

6   page?

7     A     Yes, ma'am.

8     Q     And, again, the recommendation on the last

9   page was for termination from the City of Manassas Police

10  Department; correct?

11    A     Yes, ma'am.

12    Q     I'll show you this last document, 82.

13                         (The document referred to

14                         above was marked Miller

15                         Deposition Exhibit No. 82,

16                         for identification.)

17          (Ms. Bardot handed the witness, Mr. Findley,

18  and the police officers a document.)

19          BY MS. BARDOT:

20    Q     Have you seen this document before?

21    A     I don't recall it.

22    Q     This reflects:  "To whom it may concern:

23  Regan Miller terminated employment with the City of

122

1    Manassas effective March 30, 2007," do you see that?

2        A    I do.  Yes, ma'am.

3        Q    And do you recall that being accurate

4    approximate time that you were terminated from that

5    employment?

6        A    No.  I thought it was April.  I thought I had

7    gotten something in the mail.

8        Q    Did you grieve this termination?

9        A    Yes, ma'am, I did.

10       Q    Did you go through the panel hearing?

11       A    I went through the panel hearing.  Yes, ma'am.

12       Q    And did the panel hearing uphold the

13   recommendation for termination?

14       A    They did.  There may have been some changes,

15   but I think they -- they ultimately did.

16       Q    And did you file any sort of lawsuit against

17   the City following that termination?

18       A    Following the termination, it was a lawsuit,

19   yes.

20       Q    Where did you file that lawsuit?

21       A    Through the state courts in Prince William

22   County.

23       Q    And what happened with that suit?

127

1  July 2020 have spoken with the City of Manassas Police

2  Department or HR to seek any information with respect to

3  you?

4       A    I don't know.

5       Q    Would it be fair to say that you don't know

6  what, if any, impact the discipline or your termination

7  from the City of Manassas has had on your ability to find

8  work as a police officer since July 20, 2020?

9       A    Wait.  Can you ask that again?

10      Q    Sure.  Would it be fair to say that you don't

11 have any knowledge what impact the discipline and

12 termination from the City of Manassas has had on your

13 ability to find work since July 2020?

14      A    I would have no knowledge.

15      Q    You have indicated that since leaving the City

16 of Manassas Park that you have sought employment with five

17 police departments; correct?

18      A    Five separate departments.  Yes, ma'am.

19      Q    And one of those was the Fairfax City Police;

20 correct?

21      A    Yes, ma'am.

22      Q    And from your answers to Carl Dorr's

23 Interrogatory 22, you indicated that you applied on August

128

1    7, 2020, and were denied August 31, 2020; is that

2    accurate?

3          A     Yes.  It was August 2020.  If those dates --

4    those dates have to be on the paperwork, correct.

5          Q     I'm going to hand you a document, just for

6    your reference.  I'm not going to make this an exhibit

7    because I don't think it's fair to ask you to remember

8    dates off the top of your head, necessarily.

9                (Ms. Bardot handed the witness a document.)

10         Q     So I'm just handing you "Regan Miller's

11   Objections and Responses to Defendant Carl Dorr's First

12   Set of Interrogatories."  I'm going to ask you to the

13   extent you need to, to refer to 28, which about the

14   employment you've sought since you left --

15         A     Paragraph 28?

16         Q     -- Manassas Park.

17               Yes, right there (indicating).  Okay.

18               You don't have any facts to suggest that the

19   Fairfax City Police spoke with anyone at Manassas Park

20   Police Department or Manassas Park and received any

21   information which led them not to hire you, do you?

22         A     I do not.

23         Q     You don't have any information to suggest that

129

1    the Fairfax City Police reviewed any file, which related

2    to you that the Manassas Park Police Department or HR has,

3    do you?

4         A    No, ma'am, I do not.

5         Q    I'll show you Exhibit Number 83.

6                              (The document referred to

7                              above was marked Miller

8                              Deposition Exhibit No. 83,

9                              for identification.)

10            (Ms. Bardot handed the witness, Mr. Findley,

11   and the police officers a document.)

12            BY MS. BARDOT:

13       Q    This is a letter to you dated August 31, 2020,

14   from Captain Jeffrey Hunt, Criminal Investigation

15   Division, City of Fairfax Police Department.

16            You recognize this document; correct?

17       A    Yes, ma'am.

18       Q    And this would be the letter that you received

19   from the City of Fairfax declining to provide you with

20   employment; correct?

21       A    Correct.

22       Q    And it says in the second paragraph, "After

23   reviewing your application and all other information

130

1   developed during the pre-employment process, you have been

2   classified as 'Qualified.'  Unfortunately, due to the

3   number of more competitive candidates who were placed in

4   the highly qualified category, you will not be considered

5   for selection as a Police Officer at this time," do you

6   see that?

7          A     Yes, ma'am.

8          Q     You don't have any facts available to you to

9   contradict that that was the reason they did not hire you,

10  do you?

11         A     No, ma'am.

12         Q     And the next paragraph says, "Your interest in

13  employment with the City of Fairfax Police Department is

14  appreciated.  You are eligible to reapply for the position

15  of Police Officer one year from the date of this letter,"

16  do you see that?

17         A     Yes, ma'am.

18         Q     And one year from the date of this letter

19  would have been August 31, 2021; correct?

20         A     Correct.  Yes, ma'am.

21         Q     Have you reapplied?

22         A     I have not, ma'am.

23         Q     Why not?

132

1    with the family.  I can't control it.

2              But knowing how important it is, it would not

3    be fair to any new employer if I were to get hired to say,

4    "Hey, listen, I know I'm new, I don't know what's going to

5    happen with this.  I don't know if there's going to be a

6    trial or if there's going to be anything down the road.  I

7    don't have those time lines."  So it would not be fair to

8    them or my family to set there and go, "Hey, thanks new

9    job.  Can I take off X, Y, Z amount of hours that I

10   haven't earned yet, respectfully?"

11        Q    So on September 16, 2020, you applied with

12   George Mason University; is that correct?

13        A    I did.

14        Q    And that's still pending.

15        A    I never heard back from them.  I actually had

16   to -- when I applied, it was an online forum and I think I

17   reached out to one of the majors up there.  And I said,

18   "Hey, I did this," and I think hand-delivered my -- like a

19   background, like FYI, here's what I got.

20        Q    But as it pertains to the September 16, 2020,

21   application, nobody told you you were denied, did they?

22        A    Not on that particular one, no.

23        Q    And then on October 23rd, 2020, you applied to

133

1    the Herndon Police Department; is that correct?

2         A     Yes, ma'am.

3         Q     And at some point you found out that that

4    position had been closed without you hearing back on your

5    application; is that correct?

6         A     Yes.

7         Q     And so you reapplied December 8, 2020?

8         A     I did.

9         Q     And when you reapplied on December 8, 2020,

10   you indicate in your answers to Interrogatory 22, to

11   Dorr's Interrogatory that you provided Corporal Frazier,

12   F-R-A-S-I-E-R, a quote, "Cliff Note version of a possible

13   lawsuit and he said that would usually cause a problem,"

14   end quote.

15             Did you do that?

16        A     I gave him a Cliff Note version of what I had

17   just gone through and I was looking at potential lawsuit

18   and didn't know if that would affect any sort of potential

19   application with them.

20        Q     Well, in your answer to interrogatory, you say

21   you actually gave him a Cliff Note version of a possible

22   lawsuit; correct?  That's what it says.

23        A     Correct.

134

1      Q      Why would you do that?

2      A      I wanted to make sure that if my criminal

3   charge that was still yet to be expunged and everything

4   that had just gone on, if I'm still looking at any

5   potential lawsuit, I wanted to make sure that this would

6   not be a problem with Herndon.

7      Q      Why didn't you just tell him about what

8   happened like you did on some of your other applications

9   where you said, "I had these charges.  I was exonerated,"

10  I mean, why would you give him a Cliff Note version of

11  your lawsuit?

12     A      Well, it wasn't a -- since the lawsuit hadn't

13  been filed, it was no really Cliff Note version, it was

14  more of like if I potentially go down the road, is this

15  going to cause any sort of issue if I were to be afforded

16  the job.

17     Q      Well, am I reading that wrong?  Those are your

18  answer to interrogatories.  Doesn't it say, "I gave him a

19  Cliff Note version of a possible lawsuit"?

20     A      Right.  Possible lawsuit, correct.

21     Q      Did you think any employer would want to hire

22  you if you're giving them a Cliff Note version of a

23  lawsuit against a different employer?

135

1      A      I don't know what they would do, ma'am.

2      Q      And that application is still pending, as

3   well?

4      A      I haven't heard anything from them.

5      Q      Well, they didn't decline you, did they?

6      A      Correct, but they're applying online.  Yeah.

7      Q      With respect to both George Mason University

8   and Herndon, do you have any facts to suggest that they

9   spoke with anyone at the Manassas Park Police Department

10  or Manassas Park and received any adverse information

11  about you which led to their decision not to hire you?

12     A      I do not, ma'am.

13     Q      Do you have any information to suggest that

14  anybody from George Mason University or Herndon reviewed

15  any file pertaining to you that is in the possession of

16  Manassas Park Police Department or HR?

17     A      No, I do not, ma'am.

18     Q      Then on November 13, 2020, you applied with

19  Prince William County; is that correct?

20     A      Correct.

21     Q      And they provided you a denial on December

22  15th, 2020; correct?

23     A      Yes.

136

1          Q     Do you have any facts to suggest that anybody

2     at Prince William County spoke with anyone at Manassas

3     Park Police Department or Manassas Park and received any

4     adverse information about you which let them not to hire

5     you?

6          A     I do not.

7          Q     Do you have any information to suggest that

8     anybody at Prince William County looked at any file

9     pertaining to you that is in the possession of Manassas

10    Park Police Department or HR?

11         A     I do not, ma'am.

12         Q     I'm going to show you Exhibit 84.

13                              (The document referred to

14                              above was marked Miller

15                              Deposition Exhibit No. 84,

16                              for identification.)

17              (Ms. Bardot handed the witness, Mr. Findley,

18    and the police officers a document.)

19              BY MS. BARDOT:

20         Q     Is this an email that you received from Prince

21    William County Police Department where your application

22    was denied?

23         A     Yes, ma'am.

137

1      Q      And it says here in the second paragraph, "The

2   hiring and selection of new police officers is a highly

3   competitive process and we receive hundreds of application

4   for a limited number of positions," do you see that?

5      A      I do.

6      Q      And then it goes on to say, "Unfortunately,

7   based on a review of applications received, yours was not

8   one selected for processing at this time," do you see

9   that?

10     A      I do.

11     Q      Do you have any reason to doubt the veracity

12   of what is stated there?

13     A      Whatever they put there, I don't understand

14   why they did that.

15     Q      What do you mean you don't understand why they

16   did that?

17     A      That's their decision.  I can't answer for why

18   they made that decision, ma'am.

19     Q      Do you have any information to suggest that

20   it's not true that they receive hundreds of applications

21   for a limited number of positions?

22     A      Well, because I know they're down 150

23   positions and they're still -- they're still asking for

138

1    officers to apply there.

2         Q    Well, did you reach back out to them and

3    question them about this email?

4         A    I did not, ma'am.

5         Q    It says, "We encourage you to reapply in one

6    year," which would be December of this year; correct?

7         A    Correct.

8         Q    Is it your intent to do that?

9         A    At this point, I don't know, ma'am.

10        Q    And why don't you know?

11        A    I'm still focused on this.  This lawsuit, I'm

12   sorry.  I just don't know.  I may or may not, I just don't

13   know.

14        Q    You don't have any facts to suggest that

15   Prince William County spoke with anybody at Manassas Park

16   Police Department or at Manassas Park and received any

17   adverse information about you which led them not to hire

18   you, do you?

19        A    I do not.

20        Q    And do you have any information to suggest

21   that anybody at Prince William County Police Department

22   reviewed any file that's maintained regarding you by

23   Manassas Park Police Department or Manassas Park HR?

139

1      A      I do not.  No, ma'am.

2      Q      And then in your answer to interrogatory, it

3  appears that you also applied to Fairfax County January

4  13, 2021, and got a denial April 27, 2021; is that

5  accurate?

6      A      Yes, ma'am.

7      Q      Were you called in by Fairfax County to take a

8  polygraph?

9      A      I was.  Yes, ma'am.

10      Q      And did you in fact go in and take it?

11      A      I did.

12      Q      And do you know whether you passed or what the

13  results were?

14      A      I do not know.

15      Q      Do you have any information as to why Fairfax

16  County denied your application for employment?

17      A      I do not have -- I think it said the same

18  thing, maybe, "Unfortunately, there was more competitive

19  candidates," I don't know.  I got an email.  I don't know.

20      Q      Do you have any information to suggest that

21  anybody at Fairfax County spoke with anyone at the

22  Manassas Park Police Department or Manassas Park HR and

23  received information which led them not to hire you?

140

1        A      No, ma'am.

2        Q      Do you have any information to suggest that

3   anybody at Fairfax County reviewed any file that the

4   Police Department in Manassas Park or the HR Department

5   has pertaining to you?

6        A      No, ma'am.

7        Q      You reapplied at GMU January 20, 2021; is that

8   correct?

9        A      Yes, ma'am.

10       Q      And then it says you took a paper application

11  in again February 26, 2021, is that correct?

12       A      I did.  I was supposed to actually meet with

13  the Major.  She got tied up on something, so I just hand-

14  delivered it.

15       Q      That's still pending?

16       A      There was a -- there was like a Zoom meeting

17  with, I don't know, 10 or 12 applicants for both dispatch

18  and officer.  They had certain -- I think it was more like

19  an answer -- question/answer session.  And I may have

20  reached out to her to say, "What's the process?" but I

21  have yet to receive anything further.

22       Q      Have you withdrawn that application?

23       A      I have not withdrawn the application.

156

1          A      I'm not 100 percent sure.

2          Q      So would it be sure that you're not 100

3     percent sure if you were the on-duty supervisor on the

4     date of the accident?

5          A      Correct.

6          Q      And regardless of whether you were the on-duty

7     supervisor or not, if Winston had been in a significant

8     car accident and reached out to the Chief rather than the

9     on-duty supervisor, do you believe that violates some

10    policy?

11         A      No.  I mean, it's his right to do so.  I'm not

12    sure about a certain policy, but if we're -- if we're

13    going based on the chain of command with policy as we are

14    for everything else, I mean, that alone would also be

15    another policy to follow.

16              And I do -- I've had car accidents on duty and

17    been pulled into Major Reinhart's office for car

18    accidents, making sure that everything was sort of

19    followed within guidelines and policy.

20         Q      And do you have any knowledge who Winston

21    reported the accident to?

22         A      I think during your -- one of your oppositions

23    maybe, he called Lugo.  I'm not 100 percent sure.

157

```
1       Q     Right.  And you don't know whether it in fact
2   happened or not.  You weren't privy to that --
3       A     Correct.
4       Q     -- correct?
5       A     Yes, ma'am.
6       Q     And because this was none of your business
7   whether it was handled internally correctly or not, you
8   wouldn't have that information either, would you?
9             MR. FINDLEY:  Objection; form.
10            THE WITNESS:  I would not have any information
11   on who he called, correct.  Yeah.
12            BY MS. BARDOT:
13      Q     And you wouldn't have any information on what
14   instructions he was given or by whom after the accident,
15   would you?
16      A     Correct.
17      Q     And you wouldn't have any information on
18   whether he was sent for drug testing or anything along
19   those lines either, would you?
20      A     I would not, no.  Correct.
21      Q     And you do know that he was on his way home
22   from a shift at the station when this accident happened,
23   that's your understanding, as you've pled; correct?
```

160

```
1    with a tarp placed over it.

2              Was that significant?  Is there some reason

3    you've included that here?

4         A    That's what I was told.

5         Q    You're not trying to suggest that that was

6    some effort by somebody to hide the car, are you?

7         A    That would be for Finish Line Towing.  I

8    couldn't tell you, ma'am.

9         Q    And you don't know who made the decision, if

10   this in fact true, to place it in a locked garage with a

11   tarp over it, do you?

12        A    Correct.

13        Q    It says in Paragraph 36, "Promptly after

14   learning about the automobile accident, Officer Miller

15   made an inquiry to FLEET about Defendant Winston's

16   unreported accident," do you see that?

17        A    Yes, ma'am.

18        Q    And when you refer to "FLEET" there, are you

19   talking about Quesenberry?

20        A    Yeah, Officer William Quesenberry.  Yes.  We

21   called him "FLEET."

22        Q    And you called it an "unreported accident,"

23   but you have no information an to whether Winston had
```

161

```
 1    reported the accident or not, do you?

 2         A    Correct.

 3         Q    It goes on to say, "FLEET attempted to find

 4    the destroyed squad car but were unable to locate it," do

 5    you see that?

 6         A    Yes.

 7         Q    And who told you that?

 8         A    Officer William Quesenberry told me that.

 9         Q    And in fact, you went over to the yard to try

10    to find the car, did you not?

11         A    No, ma'am.

12         Q    You pled so in your interrogatory answers that

13    you never went there.

14         A    Correct.

15         Q    That's not true, is it?

16         A    That's absolutely true.

17         Q    Do you know that somebody at Fleet called

18    Chief Lugo and told him that you were over there at the

19    yard looking for the vehicle and that's how he became

20    aware of your involvement in this?

21         A    I was never, ma'am. That --

22         Q    That's no --

23         A    -- would be William Quesenberry.  I have no
```

163

```
 1   accident and it was my information to him when he learned
 2   about it.
 3        Q    It goes on in Paragraph 37, "After making the
 4   inquiry, Lugo called Officer Miller and demanded to know
 5   he had learned about Winston's accident and who else knew
 6   about it," and then it says, "Upon information and belief,
 7   Lugo helped Winston cover up the accident and was
 8   concerned about his own exposure."
 9             What's the factual basis for you believing
10   Lugo was helping Winston cover up the accident?
11        A    Well, like I said earlier that with a small
12   city, everyone talks when anytime something minor happened
13   or big, stuff would spread like wildfire, and there was no
14   information whatsoever about Frank's car accident and then
15   -- with Chief Lugo's call to me along with Captain
16   Winston's disclosure to me at the Christmas party and then
17   pulling up the -- and his statement to me saying that
18   "Lugo told me to keep quiet about it," and it was actually
19   Captain Winston who told me he didn't feel comfortable
20   with it because obviously word was out, that's what I'm
21   basing that information, ma'am.
22        Q    Are you saying in this lawsuit that Winston
23   was trying to cover up the accident?
```

164

1      A     No.  I'm telling you that Captain Winston told

2   me that Mario Lugo told him to be quiet about the

3   accident.

4      Q     Did he tell him, "We need to cover this up"?

5      A     Those are not words that came out of his

6   mouth, correct.

7      Q     Did he tell you why Lugo said if he did that

8   he shouldn't be talking about the accident?

9      A     I don't recall that part of the conversation.

10  No, ma'am.

11     Q     So this part of your complaint that says,

12  "Defendant Lugo helped Defendant Winston cover up the

13  accident," that's a conclusion you drew based on

14  information you got from Winston.

15     A     From the entire situation.  Yes, ma'am.

16     Q     As you've described to me.

17     A     Yes, ma'am.

18     Q     And it says, "Lugo was concerned about his own

19  exposure," what do you mean?

20     A     Well, if he's -- if he's in fact protecting

21  Captain Winston on a car accident that he had no -- he

22  wasn't at fault at, it just seems -- it just seems very

23  weird that such -- for him to be quiet about it and not

165

1   say, you know, and tell him, "Hey, don't be discussing it.

2   Don't disclose anything," it just felt very protective, if

3   that makes sense.

4        Q    Was he protecting Winston for some reason, do

5   you have any knowledge?

6        A    For this, I don't know, ma'am.  I don't know.

7        Q    And I think I read somewhere in your answers

8   to interrogatories that you have since learned that the

9   accident did not happen as Winston has indicated.

10            Did I read that somewhere?

11       A    Yes, ma'am.

12       Q    When do you think you learned something

13  different than what Winston reported?

14       A    It was after this -- it was after the lawsuit

15  was filed.  I don't have the date, but I thought someone

16  told me that there was a rumor going around the Police

17  Department that he was not going home or it was on the --

18  it was on the other side of the highway, but again, I

19  wasn't -- it wasn't a concern of mine, it was just

20  volunteered to me after they read it.

21       Q    By whom?

22       A    Officer Matt Rector.

23       Q    And how would he have any factual information

166

1    about the accident, do you know?

2        A    I do not know, ma'am.

3        Q    And let's assume for the sake of argument that

4    Winston wasn't going home or he was on the other side of

5    the highway, do you have any factual information to

6    suggest regardless of where he was that the accident

7    didn't happen in the manner that he described it?

8        A    Oh, I don't know, ma'am.

9        Q    When you learned about the accident, you were

10   mad that you weren't in the loop about it, weren't you?

11       A    No, ma'am.

12       Q    I mean, as the on-duty supervisor, you wanted

13   to be in the loop, did you not?

14       A    Well, if I'm on-duty, I'm required to be sort

15   of --

16       Q    But you wanted to be; right?

17       A    What's that?

18       Q    I mean, you wanted to be, you like to be in

19   the middle of these things; is that fair?

20       A    In the middle of what things?

21       Q    Knowing what's going on and being involved.

22       A    To have full knowledge of what's going on for

23   your squad, absolutely.  Yes, ma'am.

167

```
 1        Q      And when you learned of the accident, again,
 2   nobody assigned you to investigate it; correct?
 3        A      Correct.
 4        Q      There was IA opened; correct?
 5        A      That I don't know.
 6        Q      You didn't ask for one to be opened or suggest
 7   that one should be opened, did you?
 8        A      I did not.  No, ma'am.
 9        Q      And you weren't tasked with doing anything
10   related to the accident at all; correct?
11        A      Correct.
12        Q      But you investigated it; right?
13        A      I didn't investigate it.  No, ma'am.
14        Q      Well, let's see, you talked to Quesenberry to
15   find out about it; correct?
16        A      Right.
17        Q      For no reason other than curiosity; correct?
18        A      Correct.  Well, he was in charge of Fleet, so
19   it was I just happened to ask him, "Hey, what's up with
20   Frank's car?" and he had no clue.  That's what he told me.
21        Q      All right.  I'm going to show you a document,
22   Exhibit 92.
23
```

168

```
 1                              (The document referred to

 2                              above was marked Miller

 3                              Deposition Exhibit No. 92,

 4                              for identification.)

 5              (Ms. Bardot handed the witness, Mr. Findley,

 6      and the police officers a document.)

 7              MR. FINDLEY:  This is 92?

 8              MS. BARDOT:  Yes, sir.

 9              BY MS. BARDOT:

10       Q      This is a series of emails from your cell

11      phone, not produced by you, but in my possession.

12              Do you recognize this series of text messages?

13       A      Is this to Quesenberry?

14       Q      I'll ask you to tell me who it's to.  Take a

15      moment and read through the whole sequence.

16       A      Okay.

17              (Pause.)

18       A      Okay.

19       Q      Do you recognize this series of text messages?

20       A      I recognize portions of it.  This appears to

21      be -- this is probably between myself and Officer

22      Quesenberry.

23       Q      And this has to do with looking for, at least
```

169

1    in part, Winston's car; correct?

2        A    Yes, ma'am.

3        Q    And your text message is on the right in the

4    gray; correct?

5        A    No, ma'am.  I'm on the left side.

6        Q    Okay.  So let's work through this.

7             So at the top of this, it says, "Certainly

8    hope I still get car.  Hmmmmm," do you see that?

9        A    I do.

10       Q    What are you referring to?

11       A    This might be -- if this is December 2017 -

12   there's no date on here - this could be the new car that

13   had come in, the new SUV.

14       Q    And it says, "I haven't heard any crickets."

15   And then you say, "Crickets x 100000.  Actually crickets x

16   34."

17            What does that mean?

18       A    I have no clue.

19       Q    Apparently --

20       A    Oh, hold on.  If -- that may have been Frank

21   Winston's badge back then.

22       Q    And then it goes on to say, "Damn LaClair."

23            Who's LaClair?

170

1       A       Matt LaClair was an officer at Manassas Park

2   Police.

3       Q       Do you know why Quesenberry would be saying

4   that to you there in the text of this conversation?

5       A       I don't.

6       Q       And then you say, "It's being hush hush.  And

7   CS" -- is that Command Staff?

8       A       Yes, ma'am.

9       Q       -- "is being super quiet about cars for a very

10  specific reason.  Don't ask them yet.  I'll tell ya soon,"

11  do you see that?

12      A       I do.

13      Q       Do you remember what you were referring to

14  there?

15      A       Probably the car accident.  Frank Winston's

16  car.

17      Q       And then you go on to say, "U pass by FLT on

18  way home?  Asking for 'friend,'" do you see that?

19      A       Correct.

20      Q       Friend is in quotes?

21      A       Yes.

22      Q       And does that mean you wanted him to go by for

23  yourself?

171

1      A      "Friend" would be for me.

2      Q      That's what I assumed.

3             And then it says, "New shop?"  And you say,

4    "Yes.  In city."  And then this person says, "I can.  What

5    u needin"; right?

6      A      Correct.

7      Q      And then it says, "Not for me.  Figured u may

8    want to stop by and look under tarp.  Shhhhhhhhh"; right?

9      A      Correct.

10     Q      And then he says, "Ok.  Am I gonna be..."  And

11   you say, "Shhhhhhhh."  And then it says, "Kopy."

12            So are you asking Quesenberry to go over there

13   to the yard and snoop around for Frank's car?

14     A      No.  From what I understand our conversation

15   in the building was he was, "I'll go and look" and then

16   the text messages correlated to that.

17     Q      Well, if he told you that when he was in the

18   building, why would you write to him, "U pass by FLT on

19   the way home?  Asking for 'friend'"?  If he already told

20   you he was going to go that doesn't make much sense to me.

21     A      Well, to make sure I guess it's on the way

22   home.  I don't know.

23     Q      But what you're asking him to do is to search

172

```
 1   for Frank's car; correct?

 2        A    Yes.

 3        Q    Why?

 4        A    Just to see if it's there, verify the

 5   information I had received.

 6        Q    But why?  What business of yours was it at

 7   this time?

 8        A    It's still -- at that time I had no

 9   information about the car accident.  It was to verify some

10   information.

11        Q    But for what purpose?  There was no IA; right?

12        A    I didn't know about any IA.

13        Q    You weren't tasked with doing an IA; correct?

14        A    Correct.

15        Q    Or any other investigation; right?

16        A    Correct.

17        Q    Are you doing this while you're on-duty?

18        A    I was on-duty.  Yes, ma'am.  I was working

19   that weekend, yes.

20        Q    So instead of doing your duty tasks, you're

21   busy nosing around into the Winston car accident.  Why?

22        A    Well, I was still his supervisor and I still

23   had a car accident unexplained.
```

173

1     Q    That was not your issue because it wasn't

2  assigned to you; correct?

3     A    Right.  At the time, correct.  Yes, ma'am.

4     Q    It never got assigned to you, did it?

5     A    No, ma'am, it did not.

6     Q    And then on the next page, it says, "Send me

7  pic wen dun.  So I can compare.  This is to squash rumors.

8  Etc."

9           What does that mean?

10     A    Well, the rumor that it was under a tarp in a

11  locked car -- in a locked garage.

12     Q    And why did you need a picture?

13     A    Just to send a picture.

14     Q    For what purpose?

15     A    Just a conversation that Ques and I had.

16     Q    And then there's a picture that comes across.

17           What is that picture of?

18     A    I have no idea.  I didn't take it.  It looks

19  like it could be the entrance.  I don't know.

20     Q    And then it says, "Car under tarp?" and

21  there's another picture.

22           Do you know what that picture is supposed to

23  be of?

174

```
1        A    It looks like a tow truck hauling something.
2   I don't know.
3        Q    Do you know who that person is that's
4   partially shown there?
5        A    Without a face, no.  I mean, it could be Mr.
6   George.  He's got a whole bunch of -- unless it's a black
7   and white issue, some oil on his pants or something.  I
8   couldn't tell you without a photo, ma'am.
9        Q    Yeah, no worries.
10            Then it says, "No cruiser?  White unmarked?"
11  Quesenberry says, "Hunting.  Hunting."  Then you say,
12  "Hmmmmmm.  Maybe 'someone' moved it to repair shop?
13  Without saying anything?  Again all rumor."
14            Who's the, quote, "someone" that you're
15  referring to there?
16       A    I don't know.
17       Q    Did you have somebody particular in mind since
18  you put it in quotes?
19       A    No, ma'am.
20       Q    I'm sorry?
21       A    No, ma'am.
22       Q    It says, "Again all rumor."
23            What rumors were going around at this time?
```

175

```
 1        A       Just the same rumor I had discussed earlier

 2   that -- from Officer William Bombara that there was a car

 3   accident involving Frank and had been sent to a shop under

 4   a tarp and that it was just -- it was locked up in a

 5   garage.  That's it.

 6        Q       And then the pictures that are shown there, do

 7   you know what those depict or is that the lot?  Can you

 8   tell?

 9        A       I couldn't tell you, ma'am.  I don't know.

10        Q       The next page says, "Hmmmmmm.  Interesting.

11   Ok.  Eric didn't ask y u were there?" do you see that?

12        A       I do.

13        Q       And who is the Eric that you were referring

14   to?

15        A       Eric George is the son of -- son of the owner,

16   I forget his first name, Mr. George.

17        Q       Why were you asking him if Eric had asked why

18   Quesenberry was there?

19        A       Probably just a simple question being that it

20   -- I guess it was on a weekend.  Why would Fleet be there

21   on a weekend?  I don't know.

22        Q       It goes on to say, he says, "He's next door at

23   Manassas town hall."  And you say, "Ok.  Let me do some
```

176

1    digging.  Thx for checking.  Just heard some interesting

2    stuff and figured u would know."

3              What digging were you planning to do?

4        A    Just because of the rumor.  I don't know what

5    -- I have no clue why I put that in there.

6        Q    But you were going to continue digging into

7    the Winston car accident issue?  Is that was this is

8    referring to?

9        A    It could be.  Yes, ma'am.

10       Q    And do you remember the "interesting stuff"

11   you had heard?

12       A    Well, just the fact that it was a car accident

13   and the later on there was information that the seatbelt

14   was cut on purpose to make it appear used or something

15   like that.

16       Q    Who told you that?

17       A    Again, Officer William Bombara.

18       Q    Do you know whether he ever saw the car after

19   it was wrecked?

20       A    If who saw the car?

21       Q    Bombara.

22       A    Oh, I don't know, ma'am.

23       Q    Do you know whether the seatbelt may have been

1   cut to get Officer Winston out of his upside down car?

2       A    I don't know, ma'am.  Again, that's why I put

3   in these are just rumors.

4       Q    And you don't know whether the seatbelt was

5   cut or the purpose for which it was cut if it was, do you?

6       A    No, ma'am.

7       Q    And you say, "Oh.  Where is 924?  Blue Vic."

8       What are you referring to there?

9       A    It could be a spare cruiser.  That could be

10  the one that Frank Winston was using in lieu of the -- his

11  assigned car.

12      Q    You go on on the second to last page talking

13  about Winston's vehicle to say, "It's being hidden for

14  reasons not to be talked about.  Oh well.  Not my

15  problem," do you see that?

16      A    Yes, up top.  Yes, ma'am.

17      Q    And when you say, "It's being hidden for

18  reasons not to be talked about," what is your factual

19  basis for asserting that the vehicle was hidden or it was

20  not to be talked about?

21      A    That was the conversation we had between

22  myself and Officer Quesenberry.

23      Q    Well, did you have any factual basis to say to

178

1    him that the vehicle was being hidden at this time?

2         A    Well, if it was in a locked garage under a

3    tarp and then now he can't find it, I just -- I put in

4    that it was obviously hidden.

5         Q    Are you suggesting that somebody at the

6    Manassas Park Police Department was involved in hiding the

7    vehicle?

8         A    I had no knowledge of any of that, ma'am.  No,

9    ma'am.

10        Q    And you say it was not to be talked about.

11             Had anybody at the Police Department, as of

12   the time that you were speaking about this incident to

13   Quesenberry, said, "Don't talk about it"?

14        A    I'm sorry, can you ask that again?

15        Q    Yeah.  At the time that you're this email

16   communication or this text message communication with

17   Quesenberry, had somebody or had you heard a rumor that

18   somebody had said, "Don't talk about the Winston

19   accident"?

20        A    No.  That was just common knowledge, ma'am,

21   that you don't -- there were certain things that you would

22   not discuss or bring up so you weren't brought in and, you

23   know, accused of false allegations and stuff like that.

179

 1    It was more like just let's not discuss it.

 2         Q      And it says, "Did u ask TDawg or Kevin today."

 3                Who's TDawg?

 4         A      That's Major Reinhart.

 5         Q      TDawg, is that his nickname?

 6         A      That's his nickname that --

 7                MS. BARDOT:  I'll call you TDawg from now on.

 8                (Laughter.)

 9                MR. REINHART:  Thanks.

10                THE WITNESS:  Sorry.

11                BY MS. BARDOT:

12         Q      And who's Kevin?

13         A      That would be Kevin Hampton.

14         Q      And so it appears that he's asking you whether

15    you asked from of those two about the accident?  Did you

16    read it that way?

17         A      I don't know, it was a weekend.  It could be

18    anything.  I don't know.

19         Q      Well, did you ask Reinhart about the accident?

20         A      I don't think I did.

21         Q      Did you ask Hampton?

22         A      I don't recall.

23         Q      Probably would --

180

```
 1        A     Well, not at that time, I don't think I did.

 2        Q     He probably would have told you to butt out,

 3   don't you think?

 4              MR. FINDLEY:  Objection; foundation, form.

 5              THE WITNESS:  I can't answer for them.

 6              BY MS. BARDOT:

 7        Q     Then it says, "Nope for a certain reason."  So

 8   he says, "Did u ask TDawg or Kevin today."  And you said,

 9   "Nope for a certain reason."

10              What did you mean by that?

11        A     It was probably reference to the accident.

12        Q     Well, you're answering the question, "Did you

13   u ask TDawg or Kevin today."  And you say, "Nope for a

14   certain reason."

15              What was the certain reason you didn't ask

16   them?

17        A     Specifically, I can't -- I have no

18   recollection.  I could only think that because it involved

19   Frank Winston.  I don't know.

20        Q     You say, "I don't get involved in all that.

21   No one knows I have all the details and I'm not getting

22   involved.  His problem not mine," that's what you wrote

23   then?
```

181

1       A       Correct.

2       Q       And it goes on to say, "He's ur buddy."

3               Who are you referring to?

4       A       Officer William Quesenberry and Captain Frank

5    Winston.

6       Q       Well, you're talking to Quesenberry.  So when

7    you say, "He's ur" -- oh.  You're talking about the two of

8    them, "He's ur buddy," Quesen --

9       A       Yes, ma'am.

10      Q       Yeah.  Okay.

11      A       Sorry.

12      Q       And you say, "But he's been told to keep

13   quiet."

14      A       What basis on the day that you're searching

15   for the vehicle did you say to Quesenberry that Winston

16   was told to keep quiet?

17      A       I don't know.  I don't know what -- I don't

18   know if this is before or after I talked to Frank.  I

19   couldn't tell you.

20      Q       All right.  That's all with that.  Thank you.

21              In your lawsuit, you also claim that Lugo

22   interfered with your ATF eTrace as a retaliatory act

23   directed at you to get you to resign, do you remember

189

1       Q      I'll show you 94.

2                              (The document referred to

3                              above was marked Miller

4                              Deposition Exhibit No. 94,

5                              for identification.)

6              (Ms. Bardot handed the witness, Mr. Findley,

7       and the police officers a document.)

8              BY MS. BARDOT:

9       Q      This is an email, February 14, 2018, at 4:26

10      p.m.  It appears to be from you.  I'm not sure where it

11      went to, but it just says, "Working on it."  And then

12      after that there's an email from Lugo to you that says,

13      "Your account is inactive, will work on it tomorrow," do

14      you see that?

15      A      I do.

16      Q      I don't have any email string prior to this.

17      This is the manner in which I received this from you.

18             Do you know what it means when it says,

19      "Working on it"?

20      A      I probably meant to put a question mark on

21      there because if this is going to Chief Lugo about --

22      Q      I see.

23      A      -- eTrace --

190

1    Q    So it would have been a subject that said,

2    "Etrace issue" and you believe you would have been like

3    working on it, like, "Are you working on?"

4    A    Yes, ma'am.

5    Q    And then he says, "Your account is inactive,

6    will work on it tomorrow," do you see that?

7    A    Yes.  That's -- yes.

8    Q    You have indicated either in your answers -- I

9    think in your answers to interrogatories that you

10   contacted ATF with respect to this account; is that

11   accurate?

12   A    I did a couple times.

13   Q    First of all, explain to me what the eTrace

14   database, for lack of a word - I don't know if that's the

15   right word - is?

16   A    Well, it's been several years, but from what I

17   recall it's where any firearm that comes into, well, I'll

18   just say, our, you know, our Police Department was to be

19   documented through this eTrace and you're putting in any

20   information you possibly can whether it be serial number,

21   color, make, model, how you got it, where you got it, if

22   it was a crime, who you got it from, all the information

23   that ATF requires.

193

1          A      Get certain individuals access to eTrace so we

2   can properly run guns for investigations.

3          Q      What was your job title or position at this

4   time, February 2018?  Were you a detective?

5          A      No, I was a first lieutenant on patrol, day

6   shift, I don't know, night shift.  Maybe night shift based

7   on that email time.

8          Q      If this woman told you that Lugo inactivated

9   it on February 6, 2018, do you know whether that would

10  have occurred automatically due to lack of use by you?

11         A      You mean for the -- you mean to be inactive?

12         Q      Yes.

13         A      That I don't have knowledge of.  No, ma'am.

14         Q      When is the last time prior to February 14,

15  2018, that you had used the eTrace system?

16         A      Off the top of my head, I can't tell, ma'am.

17         Q      Do you know if it was a year?  Two years?  Ten

18  years?  Can you give me any idea whatsoever?

19         A      I want to say within that year.  We had

20  collected a couple guns off the street at least for our

21  squad.  And as a squad lieutenant, because I had access to

22  it, I was able to assist any squad member to do this.

23         Q      And did you actually use it during that year?

194

1      A     Yeah.  If I had used it, I would have a return

2   from ATF and that would be in their system and I would be

3   able to provide that document to the officer who recovered

4   that weapon.

5      Q     And do you know if you become inactive by non-

6   use of the system?

7      A     I don't know.  I'm not familiar with how the

8   system works.  I just have access to the system to run the

9   necessary weapon checks.

10     Q     You go on to say in your lawsuit that Lugo

11  waited until March 6, 2018, to restored you eTrace

12  account.

13            Do you know what he had to do in order to get

14  you restored?

15     A     I don't have any clue as to what he had to do.

16  It's just based on the lady said that only Mario Lugo can

17  reactivate me.  So I don't know -- I don't know what he

18  had to do.

19     Q     Do you know if he had to speak with anybody?

20     A     I don't know, ma'am.

21     Q     Do you know if he had to submit paperwork?

22     A     I don't know, ma'am.

23     Q     Do you know if there was any delay on the

195

 1    other side, the eTrace side after Lugo started the

 2    activation process?

 3         A    I'm not sure of the question.  You mean --

 4         Q    Yes.  He eventually activated you, you've

 5    indicated.

 6         A    Yeah.  He reactivated me in March, correct.

 7         Q    Right.  Do you know once he requested that you

 8    be activated whether there was any delay on the eTrace

 9    side in getting you activated?

10         A    I don't know any of that, ma'am.  No, ma'am.

11         Q    Do you know what else he had on his plate,

12    meaning Lugo, between February 14th and March 6?

13         A    Off the top of my head, I don't know, ma'am.

14         Q    And you indicated in your lawsuit that on

15    February 14, 2018, that you had an urgent need to use

16    eTrace; correct?

17         A    Correct.

18         Q    And once you were not able to get in on that

19    day, did your urgent need go away?

20         A    No.  It'd still be -- if was reference to

21    eTrace?

22         Q    Yes.

23         A    Whoever I'm helping, I think it was Detective

196

1    Koglin, K-O-G-L-I-N, and I think I told him, "Listen, I

2    don't have access.  Please you're going to have to reach

3    out to somebody else."

4         Q    So this was not your case?

5         A    No.  Detective Koglin -- I thought it was

6    Detective Koglin had a weapon or somebody and I was -- it

7    was requested they come to me.  So because I had -- there

8    was only a select number of us that had this access for

9    eTrace, and if I'm working nights and he was working late

10   one night, maybe that's why he came to me.

11              Off the top of my head, I don't why he came to

12   me, specifically, but he did.  And when I didn't have

13   access to it, I told him, "You're going to have to find

14   somebody else.  Mario's working on it, he said."

15        Q    And did you think it as unreasonable the

16   response that you got from Chief Lugo when you asked him

17   to activate your eTrace account?

18        A    The response, you mean this response

19   (indicating) right here?

20        Q    Yeah.  Did you think anything he did the

21   process to get you reactivated was unreasonable?

22        A    Well, being that he inactivated my account, I

23   figured that he was taking his time as more a -- another

197

1    little jab at me.

2         Q     Well, that's a conclusion you drew, but you

3    don't have any facts to support that, do you?

4         A     No, ma'am.

5         Q     And you don't even know that he inactivated

6    your account, you've never seen any documentation to

7    support that; correct?

8         A     It's just based on what the lady told me.

9         Q     Right.  But first you got two calls in where

10   they're just saying your account is inactive; correct?

11        A     Correct.

12        Q     They didn't tell you that Lugo inactivated it,

13   did they?

14        A     They did not.

15        Q     And you've not seen any documentation, you

16   don't have any emails that reflect that Lugo actually took

17   some affirmative action to inactivate your eTrace account,

18   have you?

19        A     I don't have that, no.

20        Q     And as the point of contact on that account,

21   if you lapsed, let's say for lack of use, do you know

22   whether their system would reflect "Inactivated by point

23   of contact" or something else?  Do you have any

200

1    any more issues.  I was just trying to get my job done,

2    but document certain things on the back side.

3        Q    Well, you're talking about being retaliated

4    against by "these people," being command staff, you've

5    mentioned Lugo and your belief that he was upset with you

6    about the badges and you've mentioned the eTrace account

7    and the Winston car accident.

8             I haven't heard you mention anybody else that

9    you thought was retaliating against you prior to February

10   2018 who's a defendant in this case.

11            Is there someone else who you believe prior to

12   February of 2018, who's sitting at this table, retaliated

13   against you?

14       A    No, ma'am.

15       Q    And when you say, "retaliated against you,"

16   had Lugo up, until February of 2018, changed your job

17   position?

18       A    No, ma'am.

19       Q    In the form of a demotion?

20       A    No, ma'am.

21       Q    Had he affected your pay negatively?

22       A    No, ma'am.

23       Q    And he transferred you to a position outside

201

1    the Police Force?

2          A      No, ma'am.

3          Q      And if Lugo had suspended your eTrace on

4    February 6, the time that you went to use it wasn't even

5    for your own case, correct, it was to assist this Koglin?

6          A      I think it was Detective Koglin.  Yes, ma'am.

7          Q      And so that was his case and he could get that

8    information from someone else; correct?

9          A      Get what information?

10         Q      Whatever he needed to get through eTrace.

11         A      No.  At the time there was, I think it was

12   myself, I think Captain Winston had access.  I'm not sure

13   if Major Reinhart had access still, I'm not sure of who

14   anybody in the Detective Bureau had access, but I know I

15   had access and he had asked me, so I was going to help

16   him.

17         Q      Well, do you know if Koglin went to Winston or

18   Reinhart or anybody else who had eTrace capability to get

19   whatever help he needed?

20         A      After?  I don't know, but before February 6,

21   obviously he did not, that's why he came to me.

22         Q      And your inability to run a search through

23   eTrace on February 14, 2018, didn't interfere with any

202

1    case you were working; correct?

2         A    Correct.

3         Q    You've also talked about being placed in a

4    vehicle that you thought was too small for you, do you

5    remember this complaint?

6         A    Yes, ma'am.

7         Q    What sort of vehicle were you placed in?

8         A    It was a Ford, I think they called them "the

9    Five Hundreds," I think.  It was a Ford Five Hundred,

10   which is an old -- I forget the style of car, but it was a

11   -- almost like a small Taurus.

12        Q    What did you have prior that car?

13        A    I had an SUV.  I forget which -- what brand it

14   was.

15        Q    And who moved you from the SUV to the Ford

16   Five Hundred?

17        A    I was told Lugo.

18        Q    Told by whom?

19        A    Officer William Quesenberry.

20        Q    You weren't involved in that; correct?

21        A    Involved in the change?

22        Q    Yes.

23        A    Just --

204

1        A       No.  It was a -- I think it was an unmarked

2     silver one.

3        Q       Were you unhappy about that change in vehicles

4     immediately?

5        A       Oh, yes.

6        Q       Did you ask to keep the old one?

7        A       I want to say I went to Trevor, but I don't

8     have that -- I don't have that recollection.

9        Q       At the time the person who was in charge of

10    vehicle assignments was Captain Hampton; isn't that true?

11       A       For vehicle assignments?

12       Q       Yes.

13       A       I don't think so.  No, ma'am.  I think it was

14    -- well, Quesenberry's name was on it, but he wasn't

15    really in charge of Fleet, that was just his job

16    description, but everyone knew that command staff, which

17    included Kevin Hampton, really made those decisions.

18       Q       Right.  And do you know whether or not Hampton

19    was the one who had the ultimate authority to make that

20    decision without any approval by Lugo or Reinhart, do you

21    know?

22       A       I don't know.

23       Q       Were you ever moved from the Ford Five Hundred

205

1    that you didn't care for to another vehicle?

2         A     Yes, three or four months later.  Yes, I was.

3         Q     And what were you moved to?

4         A     I was moved to a marked Denali, I think.

5         Q     And how was it that you came to be moved to

6    that vehicle, do you have an understanding?

7         A     Just one day I was told that the vehicles were

8    changing.

9         Q     And do you know who made that decision?

10   Without speculating.

11        A     I don't have, I mean, it was just posted from

12   -- it was posted on the day when I arrived at work.

13        Q     And where would that be posted?

14        A     Downstairs in the patrol area.

15        Q     Downstairs in the patrol area.

16              Is that when you --

17        A     First floor.

18        Q     -- first walk through the door in the big

19   room?  Is that what you call the patrol area?

20        A     No.  If you walk in the front, you've got

21   command staff area with roll call and then the bottom is

22   where the firearms range and all the patrol officers sit.

23        Q     Gotcha.

208

1    Q    And you also claim in your lawsuit that on May

2    21, 2018, that Lugo denied you access to an Accurint

3    account, do you remember that?

4    A    Yes, ma'am.

5    Q    What is an Accurint account?  What does that

6    do?

7    A    Accurint just it's another database where you

8    can -- you can utilize for investigations when it comes to

9    a thorough background on people whether it be where

10   they've lived, who they've been married to, almost like an

11   ancestry sort of thing depending on what you're looking

12   for, but I had not -- when I used it as a detective, it

13   was very thorough.

14        I know it was a -- I think it was a paid

15   account.  I'm not sure.  I think Ms. Barton told me it was

16   a paid account, but only when you needed it, I think or

17   printed something.  I forget, but, of course, that was

18   months, or that was years prior.

19        But it's just another police database just to

20   assist you.  And I know that a lot of the detectives that

21   came out of the Detective Bureau, who were either promoted

22   or just went back to the street as slick sleeves, they

23   still had access to it and utilized it for whatever

209

1   purposes they needed it for.

2        Q     Does the Accurint, or back then did the

3   Accurint account provide you different information than

4   you could get through LInX?  LInX is L-i-N-X.

5             MR. FINDLEY:  No, it's --

6             BY MS. BARDOT:

7        Q     No.  L-I-n-X.

8        A     I could not tell the different between what

9   you'd return with Accurint and LInX queries.  I couldn't

10  tell you.

11       Q     And back in this time frame, May of 2018, you

12  had access to LInX; correct?

13       A     Yes, ma'am.

14       Q     And would you agree that back in this time

15  frame, May of 2018, that Chief Lugo had discretion to

16  decide who would have access to which different databases?

17       A     Oh, that was clear.  I mean, that's what the

18  email said, I think.

19       Q     I'll show this Exhibit 95.

20                           (The document referred to

21                           above was marked Miller

22                           Deposition Exhibit No. 95,

23                           for identification.)

210

1              (Ms. Bardot handed the witness, Mr. Findley,

2    and the police officers a document.)

3              BY MS. BARDOT:

4         Q    Do you recognize this Exhibit 95, which is an

5    email from you to Karen Barton, May 20, 2018, at 3:41 and

6    her response to you, May 21, 2018, at 10:59 a.m.?

7         A    Yes, ma'am.

8         Q    Who is Karen Barton?

9         A    She was the Chief's secretary at the time,

10   Executive or Division Chief, which is a secretary.  I

11   can't think of the professional name.  Sorry.

12        Q    It's all right.

13        A    Executive Assistant.

14        Q    And so you reached out to her on this

15   particular date and said, "Haven't" -- "Subject Accurint.

16   Haven't needed in years but can you restart my account

17   please.  Great tool for some cases," do you see that?

18        A    Yes, ma'am.

19        Q    Did you have a particular case that you were

20   working on that you needed this system for on this date?

21        A    I must have, otherwise I wouldn't probably

22   have sent it.  I can't recall, ma'am.

23        Q    And she goes on to say, "Re-activation

211

1      requires authorization from Captain Lugo.  He didn't give

2      it when I forwarded your email.  You may need to work on

3      him yourself," do you see that?

4              A      Yes, ma'am.

5              Q      How did you interpret that email from her to

6      you?

7              A      That Lugo said, "no."

8              Q      But it doesn't say that, does it?

9              A      It just says, "He didn't give it when I

10     forwarded your email."  You asked my interpretation.

11     That's just my in -- that Lugo said, "no."

12             Q      That could also mean he didn't reply, could it

13     not?

14             A      Could be.  Yes, ma'am.

15             Q      You've not seen any email from him where he

16     responded to her email or responded to her in writing,

17     have you?

18             A      I have not.  That would not normally be

19     something Ms. Barton would forward.  I think she would

20     just phrase it in her way to describe the response.

21             Q      And you did not speak with Lugo regarding your

22     request that you be given access to Accurint around this

23     May 21, 2018, time frame, did you?

212

```
 1        A       I never talked to Chief Lugo, no.

 2        Q       Was this account ever restored for you?

 3        A       No, ma'am.

 4        Q       And you were able to do your job without it,

 5   were you not?

 6        A       I was.  Yes, ma'am.

 7        Q       And did you at this time in May of 2018

 8   believe that the failure to restore your Accurint account

 9   was retaliatory?

10        A       That's why document it, ma'am.  Yes.

11        Q       Did you make a complaint with respect to it?

12        A       I did not.

13        Q       Why not?

14        A       The complaint would go nowhere, ma'am.

15        Q       Well, you keep saying that, but what's the

16   basis for that?

17        A       Just the fact that there was prior issues

18   documented even before the badge incident, say in 2016,

19   that sort of fell on deaf ears.

20        Q       Okay.  Tell me about those.

21                What incident or incidents are you referring

22   to?

23        A       Well, there were incidents involving credit
```

233

1    relationship with Reinhart for him to confide these things

2    in you.

3        A    I actually did.

4        Q    And did that remain the case through July of

5    2019?

6        A    Until August of 2019, I guess.  Or October.

7        Q    So let me just follow this line of questioning

8    for a minute.  We talked a lot about Lugo and the issues

9    you have with him and we'll about some more of those.

10            You've told me that up until August or October

11   of 2019 you had a good working relationship with Reinhart.

12            Up until that same time frame, did you have a

13   good working relationship with Carl Dorr?

14       A    I did.  I had no issues with Carl Dorr,

15   Lieutenant Carl Dorr.

16       Q    And up until that time frame, August or

17   October of 2019, did you have any issues with Winston?

18       A    I didn't have any particular work issues with

19   Captain Frank Winston, it more of the knowing that he can

20   say or do whatever he wanted and it appeared that even if

21   he got pulled in like I did to say, "Hey, stop that," he

22   would continue.  But then there were times with Captain

23   Frank Winston that we'd have a great fun time, like we

238

| | | |
|---|---|---|
| 1 | A | Off the top of my head, I can't recall, ma'am. |
| 2 | Q | So turning back to Exhibit 85 -- |
| 3 | A | Is that the big one? |
| 4 | Q | It is. |

5        On Page 11 of Paragraph 59, you say, "On

6  October 30, 2018, Defendant Lugo publicly accosted Officer

7  Miller after Defendant Lugo learned that Officer Miller

8  helped to support a law enforcement officer in a

9  neighboring jurisdiction with a grievance appeal and a

10  FOIA request," do you see that?

11        A    Yes, ma'am.

12        Q    Who is the law enforcement officer to whom you

13  refer?

14        A    That would be -- I think she's a lieutenant,

15  Stephanie, I think it's Morbeto, M-O-R-B-E-T-O.  I'm not

16  sure if that's still her last name, though.

17        Q    And you say he publicly accosted you, explain

18  to me what you mean.

19        A    When -- when I was in his office, we had just

20  completed, I think it was myself, Major Reinhart and Chief

21  Lugo, they were captains and this was a -- this was in

22  Chief Lugo's office upstairs in the Detective Bureau.  We

23  had just I think completed an investigation on a

239

1   supervisor for something that they had asked me to do.  So

2   I had talked to them about sort of like how my findings

3   were, how my memo was going to make sure it read okay for

4   them.

5              And when we were kind of done, as I was

6   leaving, he says, "Hey, Regan, I got a question for you."

7   And I said, "What's up?"  And he said, "Why are you

8   helping" or "Are you helping Stephanie in a FOIA request?"

9   And I kind of paused.  It caught me off guard because I

10  was -- I knew it was legal, but I didn't know like if

11  there was -- if I was going to be in trouble for helping.

12             And when I said, "Well, I have an attorney

13  that said it was okay to help her because of the FOIA

14  background that I had a little," and he goes, "Well, it's

15  not illegal, so I guess it's okay.

16       Q     And that was an accostation?

17       A     As his rank of captain, absolutely, ma'am.  It

18  was an intimidation factor.  I felt very -- I felt as if I

19  was about to be yet accused of something and under

20  investigation for another thing that I was just trying to

21  help with.

22       Q     Do you know why it was that he asked you that

23  question?

240

1     A     Well, being that I helped another

2  jurisdiction, I could only -- I could only think that it

3  was Chief Keen from Manassas City Police had inquired or

4  made a phone call to Lugo.  I don't know all of that.

5  That's just me trying to put two and two together.

6     Q     Did Lugo scream at you when he asked you this

7  question?

8     A     There was no screaming, ma'am.  No, ma'am.

9     Q     Did he raise his voice?

10    A     I can't say he raised his voice, but there was

11 a definitive tone of command presence, if that makes

12 sense.

13    Q     Did he get in your face?

14    A     No.  There was a desk, there was no -- did not

15 get in my face.  No, ma'am.

16    Q     Did he threaten you?

17    A     There was no threat.

18    Q     So was Reinhart still there?

19    A     I think he had just left.  I don't -- I don't

20 believe he was there.

21    Q     So what do you mean by "publicly" then?

22 You're in his office, it's just the two of you, what does

23 that mean "publicly accosted" you?

241

1          A     That's just something that was in there,

2     ma'am.

3          Q     So really he privately questioned you, would

4     that be more accurate?

5          A     He privately, I guess you could say questioned

6     with a little more authoritative question in nature.

7          Q     Does he usually act authoritative when he

8     questions you?

9          A     If Chief Lugo is mad, he will -- he has a way

10    of asking that's not in a very polite manner and he had

11    already done that prior with me.

12         Q     When?

13         A     Well, for the car accident issue with Frank

14    Winston.

15         Q     Was it your impression that when he asked you

16    this question about Stephanie Morbeto on October 30 that

17    Lugo was mad?

18         A     I could tell he was not happy.

19         Q     How?

20         A     Just the tone in his voice, the way his

21    question it, you know, and I guess why he questioned.  You

22    know, if I'm assisting a friend in the jurisdiction next

23    door through just a simple FOIA request, that's all I was

242

1  doing.

2          For he him to question me on that was kind of

3  -- it kind of caught me off guard, if that makes sense,

4  almost like, well, "Why are you helping?"  And --

5      Q    Well, he didn't ask you why you were helping,

6  did he?

7      A    No.  He asked if I was the one that was -- if

8  I was the one that helped, something to that effect where

9  he knew I had assisted Officer Morbeto in the FOIA

10  paperwork.

11      Q    Right.  And that was pretty much the extent of

12  the conversation:  "Are you assisting her?"  "Yes."

13  "Okay.  It's not illegal."  I mean, that's what you pled.

14          Is that the gist of the whole conversation?

15      A    That's what I pled, but had it been in that

16  sort of tone that we're in now then I would not have had a

17  big issue about it.

18      Q    But this was a big issue?

19      A    It's an issue, yeah.

20      Q    You said you wouldn't have had a big issue

21  with it.

22          Is this a big issue?

23      A    In the totality of everything, yes, ma'am.

243

1    Q    He didn't direct you to stop helping Stephanie

2    Morbeto, did he?

3        A    No, ma'am.

4        Q    He didn't suggest to you that there would be

5    any discipline for what you had done, did he?

6        A    No.  I did mention I had an attorney, more of

7    to make sure that he knew that everything I was doing was

8    sort of okay because it was that FOIA is a civil issue,

9    and I was kind of like I'm just trying to help her out.

10   You know, that was all I was trying to do.

11       Q    You like to throw the attorney reference out,

12   don't you?

13            MR. FINDLEY:  Objection.

14            BY MS. BARDOT:

15       Q    I mean, you did that --

16       A    Well, because --

17       Q    -- with the badges, too, did you not?

18       A    I did.  I felt that if there's going to be in

19   sort of potential disciplinary action, I'm going to

20   protect myself, ma'am.

21       Q    And you know that once you throw out attorney

22   reference that it causes Lugo and the others to have to

23   back off because once you have an attorney they can't talk

244

1    with you about these issues directly, do you not?

2                    MR. FINDLEY:  Objection.

3                    THE WITNESS:  I think that's incorrect, ma'am.

4                    BY MS. BARDOT:

5        Q     And on what basis do you think that's

6    incorrect?

7        A     Just the mentioning that I have an attorney

8    does not mean they can't question me.

9        Q     And what do you base that on, your own belief?

10       A     Yeah.  You can still question somebody if it's

11   for a work-related issue.

12       Q     Then you go on to say on Page 11 at Paragraph

13   61, right before that, "Retaliatory Acts Directed at

14   Officer Miller - Publicly Accused of Being of a 'Rat.'"

15   Do you see that?

16       A     Yes, ma'am.

17       Q     You say, "Shortly thereafter, in November

18   2018, Defendant Lugo improperly, and without a factual

19   basis, announced to several MPPD officers that Officer

20   Miller had 'ratted' on one of his fellow officers.

21   Specifically, Officer Miller was falsely accused of

22   reporting an officer's use of an MPPD van for a personal

23   vacation to Florida," do you see that?

245

| | | |
|---|---|---|
| 1 | A | Yes, ma'am. |

2    Q    Were you present somewhere where Lugo

3 allegedly said that you had ratted on a fellow officer?

4    A    I was not.

5    Q    So you didn't hear that.

6    A    Not from Lugo, no.

7    Q    And you've never seen it writing, have you?

8    A    That Lugo called me a "rat"?

9    Q    Yes, sir.

10    A    No, ma'am.

11    Q    And so who was it that told you that Lugo said

12 you had ratted out one of your fellow officers?

13    A    It was Officer Ben Dillard.

14    Q    And is that the word he used, "ratted out"?

15    A    No.  That's just more of term I think we use

16 for anyone who sort of --

17    Q    So what did Dillard tell you then if he didn't

18 use the term "ratted out"?

19    A    Oh, just that my name was mentioned.  Him and

20 Kevin Hampton told me that me name was mentioned in

21 closed-door meetings when that information about the

22 personal trip to Disney somehow got out.

23    Q    Do you know who this refers to?

246

1      A     I'm sorry?

2      Q     Do you know who this refers to?

3      A     The van trip?

4      Q     Yes.

5      A     It would be Captain Melissa Boorman.

6      Q     And were you aware of her using an MPPD van

7   for a personal vacation to Florida?

8      A     I had no knowledge of that, ma'am, at the

9   time.

10      Q     And who did these closed-door meetings

11   purportedly occur with where you say Ben Dillard told you

12   that your name came up?

13      A     The closed-door meetings would have been from

14   Kevin Hampton, but the Ben Dillard would have been just

15   from him passing through the Patrol Division.

16      Q     Who did Kevin Hampton say he had closed-door

17   meetings with where your name came up?

18      A     He didn't say specifically who the closed-door

19   meetings is with.  I could only think that would be during

20   their weekly command staff, I guess, meetings that they

21   would have about the Police Department and the ongoings

22   and what's needed.

23      Q     And exactly what did Kevin Hampton tell you

247

1    Lugo said about you when your name came up?

2         A    Just that my name was being mentioned, thrown

3    around in the conversation along with a couple others that

4    this information got through some social media.  And was

5    not until after a staff meeting that I was finally

6    provided any information about that.  And I had no

7    knowledge of it even prior.

8         Q    Right.  So I'm just trying to figure out when

9    your name came up, was it -- is it your understanding that

10   it was like, "Hey, could it have been Regan Miller who

11   said something about it?  Could it have been X, Y, and Z?"

12   What exactly did he say was said when your name came up?

13        A    Exact words, I could not tell you, ma'am.

14        Q    Can you give me the general content of what he

15   said other than your name came up?

16        A    Just that my name would be mentioned along

17   with others, that obviously people were mad that

18   information like that got out because of what was said on

19   I guess some website and it looked -- it reflected badly

20   on Manassas Park.  And it did, but without knowing the

21   context of that, I guess that post, it could have been

22   incorrect, but I did not see that post until after the

23   staff meeting.

248

1      Q      So did either Ben Dillard or Kevin Hampton

2   tell you that Lugo had expressly announced, as you've

3   indicated, that you ratted out one of your fellow

4   officers?

5      A      Those were not the exact words, ma'am.

6   Correct.

7      Q      And did either of them tell you that Lugo had

8   even said that you were the one who were spreading a rumor

9   about Boorman and the use of the van?

10     A      You mean that I specifically said it?

11     Q      Yes.

12     A      All I was told that my name was bounced

13   around, thrown around in conversation that I was the leak,

14   that I told this person about the trip.  And I had zero

15   knowledge of the trip until after all these accusations

16   came out.

17     Q      So did Dillard tell you that that's the

18   context in which your name was mentioned, that Lugo said

19   you the leak of the information?

20     A      No.

21     Q      Or just that your name was mentioned in the

22   conversation?

23     A      Sorry.  Those conversations would be with

249

1  Kevin Hampton.  I'm sorry.  The Ben Dillard was after he

2  was confronted, he told that he had heard my name

3  throughout the patrol area along with a couple others,

4  that because apparently there was an investigation going

5  on that they wanted to find out who told this person about

6  this trip because it did -- it reflected poorly on the

7  Department.

8       Q     Right.  And that's what I'm trying to drill

9  down to.  I'm not trying to be different with you.

10           I'm just trying to figure out did your name

11  come up on the conversation or did somebody tell you that

12  it was more than that and Lugo actually said something to

13  the effect of you were the person responsible for leaking

14  the information?

15      A     It'd be your first one.  It was my name was

16  mentioned.  It was the thought alone that if my name is

17  mentioned then they're going to find out.

18      Q     I want to fast forward a little bit.  In your

19  complaint you mention three, what you phrase as "Failed

20  administrative investigations"; correct?

21      A     Correct.

22      Q     Let's start with the one that's Letter H:

23  "The First Failed Administrative Investigation Against

252

1    2019, Officer Miller was approached by Defendant Reinhart

2    (one of Officer Miller's superiors) and was questioned

3    about an alleged complaint lodged against a sergeant under

4    Officer Miller's command," do you see that?

5         A    Yes, ma'am.

6         Q    And that occurred?

7         A    That's correct.

8         Q    And he told you at that time he was going to

9    start an investigation into this matter; correct?

10        A    I don't know if he was -- if he was starting

11   an investigation or if he had just questioned me

12   immediately.  I don't recall.  It could've been after.

13        Q    And it says, "In response to Defendant

14   Reinhart's investigatory questions, Officer Miller

15   acknowledged that on or about November 7, 2018, an officer

16   reported witnessing the Sergeant," who would have been

17   under your command, "make a rude comment to a driver

18   during a traffic stop.  In response, Officer Miller said

19   he would look into the matter," do you see that?

20        A    Yes, ma'am.

21        Q    And did that in fact happen that in November

22   you had been approached about this incident?

23        A    Apparently, yes.

253

1    Q    And two months had gone by before Reinhart

2    approached you and you had done nothing with respect to

3    that; correct?

4    A    Yes, ma'am.

5    Q    And you admitted that; correct?

6    A    I did.

7    Q    And you said, "At the time, Officer Miller's

8    unit was understaffed and overworked."

9         That is what you've pled; correct?

10   A    Correct.

11   Q    And what was going on that you were

12   understaffed and overworked?

13   A    If I recall, I think I had -- I had just been

14   transferred to another shift.  I'm not 100 percent sure on

15   that.  And there was an issue with -- there was an issue

16   with a DWI report, a Driving While Intoxicated report with

17   Officer Bussell.  And for some reason, I got assigned

18   that, but he was not my sergeant at the time of that

19   report I believe and I was trying to somehow correct some

20   things, but being that I had just transferred and was

21   trying to figure that out and make sure that what Major

22   Reinhart wanted was completed for the Officer Bussell DWI,

23   I think that was at the time.

254

1    Q    So that assistance on the Bussell matter is

2    what made you overworked?

3    A    No.  It was just on top of just the every day

4    Lieutenant requirements still working, but I had sat there

5    and I, you know, I told Major Reinhart immediately, I was

6    like, "You know it slipped my mind.  I completely screwed

7    up.  I apologize."

8    Q    It says in this Paragraph 66, you readily

9    admitted your mistake.

10        And what mistake was that that you readily

11   admitted?

12   A    That I did not go back to Paragraph 65 and

13   look at the video from that -- from that complaint.  I

14   think it was Officer Whetsell made a complaint about

15   Sergeant Fallon making some rude, dumb comment during a

16   traffic stop.  And shortly thereafter there was the --

17   there was the switch I think, I just don't know when, and

18   it completely just slipped my mind.

19   Q    And it says, continuing in Paragraph 66 that

20   you admitted your mistake "and inquired as to the nature

21   of the complaint.  Defendant Reinhart refused to give

22   Officer Miller any further details," do you see that?

23   A    Yes, ma'am.

256

1   Whetsell was -- Officer Whetsell was about the insensitive

2   comments and then -- it says I was not on-duty.  Okay.

3            So I -- again, it slipped my mind, but in here

4   there's just no -- there's no specific as to what the

5   comment was.  I was trying to find out what the -- what

6   the comment was.

7        Q    Well, it says right here on the third

8   paragraph, "January 9, 2019, Lieutenant Miller confirmed

9   Officer Whetsell came to him regarding concerns related to

10  Sergeant Fallon's actions during a traffic stop on

11  November 4, 2018.  When asked what if any action did he

12  take on this matter, Lieutenant Miller stated, 'I did not

13  review anything','...'it just slipped my mind.''He said

14  something about you shouldn't be in the country or

15  something like that.'

16       A    Okay.

17       Q    So this provides you generally the substance

18  of the comment that you didn't investigate, does it not?

19       A    Yes.  It's still not specific because it says,

20  "something like that."  And I remember having a

21  conversation with Chief Evans during the appeals process

22  that I said, "Well, what was the actual issue at hand?"

23  And Chief Evans goes, "It was nothing crazy.  It was

257

1    nothing big." And it was --

2         Q    All right. But --

3         A    So that --

4         Q    I'm sorry, go ahead.

5         A    No. So when Chief Evans said that, I didn't

6    know if it was more of the it's Fallon being Fallon sort

7    of off the cuff with no filter versus Chief Evans kind of

8    diminishing Fallon's actions.

9         Q    But you say in Paragraph 67 of your complaint

10   that you were given a written reprimand and that despite

11   demand, you were never presented with evidence of the

12   alleged wrongful conduct, it's not true, is it, because

13   it's contained on Paragraph 2 of 96?

14        A    Well, if that one sentence is the evidence,

15   then, yes, ma'am, I received some evidence. It just

16   wasn't -- I remember I kind of wanted to see the actual

17   video, even though I knew that Detective -- not Detective

18   Reinhart -- Major Reinhart had already said he was going

19   to look into that matter and deal with it himself. And I

20   was like, "Okay. That's fine, whatever."

21        Q    It goes on in Paragraph 68 of your complaint

22   to say, "Based upon Officer Miller's knowledge of prior

23   policy violations committed by other MPPD officers, the

1   investigation and written reprimand was unusually harsh

2   and out of line with normal disciplinary practice," do you

3   see that?

4        A     Yes, ma'am.

5        Q     What prior policy violations are you referring

6   to in that paragraph?

7        A     I mean, I'd go back to the Quesenberry issue.

8        Q     Which we've established you have no facts

9   about.

10        A     Correct, ma'am.

11        Q     Okay.  What else?

12        A     There was -- off the top of my head, I can't

13   recall specifics.  I apologize, ma'am.  Nothing off the

14   top of my head right now.

15        Q     Well, was there anything that was off the top

16   of your head when this lawsuit was filed in April that

17   supported that allegation?

18        A     Well, there must have been.

19        Q     And you can't think of it now?

20        A     Not at this moment, ma'am.  No, ma'am.

21        Q     And you said the written reprimand was

22   unusually harsh compared to those prior things you can't

23   recall?

259

1       A     Yes.  And in general, just a written reprimand

2   for forgetting to review a video, I thought was harsh.

3       Q     But certainly it would have been within the

4   discretion that Reinhart had; correct?

5       A     Yes.  And when I asked him if he can reduce it

6   when he -- when he handed it to me, just without having to

7   go through the grievance form, he just says, "I just

8   can't."  So I was like, "Okay.  Well" -- that's then I

9   reached out to Chief Evans.  And I acknowledged that and

10  respected his decision and moved on.

11      Q     And you then grieved it, is that what you're

12  telling me?

13      A     I did, ma'am.  Yes.

14      Q     And what happened with respect to that?

15      A     Well, I had to -- I did have to talk with

16  Chief Evans first to make sure that there were -- that the

17  city policy guidelines were met with time lines.

18            And so when we sat down, Chief Evans said,

19  "I'm not sure of exactly when to submit it, but let's call

20  Ms. Dingler."  So he called from his office, left a

21  message with Valerie Dingler, the HR Director, and just

22  said, "Hey, want to make sure that if anyone files a

23  grievance" - I don't think he mentioned my name - "but if

260

1    anyone files a grievance, there's certain paperwork within

2    a certain time frame," because I was coming up I believe

3    on the 10th or 20th day of filing a grievance through the

4    -- through the guidelines.

5              And so once Chief Evans came to me and said,

6    "You need to submit that," the grievance form, I did so.

7         Q    And what happened?

8         A    I was pulled in shortly thereafter and Major

9    Reinhart lowered the written reprimand to the oral

10   reprimand.

11        Q    He issued you a record of employee conference

12   following that; correct?

13        A    Yeah.  Oral reprimand is the same as the oral

14   conferencing form.  Yes, ma'am.

15        Q    Let me show this, 97.

16                             (The document referred to

17                             above was marked Miller

18                             Deposition Exhibit No. 97,

19                             for identification.)

20             (Ms. Bardot handed the witness, Mr. Findley,

21   and the police officers a document.)

22             BY MS. BARDOT:

23        Q    And ask you if that's what you're referring

264

1      Q      Did you reach out to anybody at Manassas Park

2   when you saw and say, "Hey, you know, could you remove

3   that?  It shouldn't be there"?

4      A      I was already gone, ma'am.

5      Q      Well, you seem to have some concern that that

6   written reprimand is in your file and available for people

7   to look at.

8             So my question is if that's the case, which

9   you've certainly pled, did you reach out to Manassas Park

10  and say, "Hey, look, could you take that out?  It

11  shouldn't be there"?

12     A      No.  That was just something I disclosed to my

13  attorneys.

14     Q      And do you know whether your attorneys have

15  ever reached out to Manassas Park and said, "Hey, I think

16  that's shouldn't be in there.  Could you remove it?"

17     A      To what extent they -- their interaction with

18  City Hall and that removal, I could not tell, ma'am.

19     Q      And as you sit here today, you don't know

20  whether the written reprimand, which is Exhibit 96, is in

21  your personnel file at Manassas Park or not, do you?

22     A      I hope not, but I don't know.

23     Q      You go on to state in Paragraph 74, "Upon

1    information and belief, the Written Reprimand has been

2    wrongly submitted to background investigators who have

3    requested Officer Miller's file."

4              You don't have any information to support

5    that, do you?

6          A    Not direct, ma'am.

7          Q    How about indirect?

8          A    Just based on my -- how I did backgrounds.  So

9    I don't have -- I don't have exact knowledge or a name of

10   who would call, but just how backgrounds were done when I

11   was there.

12         Q    Right.  But you don't even know that anybody

13   outside of Manassas Park has asked to look at your file,

14   do you?

15         A    Correct, I do not know.

16         Q    You go on to say, "Such action was done

17   purposefully by Defendant Palko, Defendant Lugo, and

18   Defendant Reinhart in order to negatively impact Officer

19   Miller's ability to find gainful employment with another

20   law enforcement agency," do you see that?

21         A    Yes, ma'am.

22         Q    "Such action," are you referring to putting

23   the written reprimand in your personnel file?

266

1     A    Not necessarily putting, but keeping it in

2    there versus pulling it out after the oral reprimand was

3    -- I guess once it was reduced, it would have to be

4    removed from the personnel file.

5     Q    Do you know whether Palko is aware that the

6    written reprimand has ever been in your personnel file?

7     A    That I don't know, ma'am.

8     Q    So how did he purposefully do that then?

9     A    Well, whether it's purposely or vicariously,

10    since he's the HR boss, if it's in the personnel file

11    that's located at City Hall, I could only put the fact

12    that Mr. Palko would be in charge of -- still be

13    overseeing all that and in charge of that.

14     Q    But that's not what you've pled.  You said he

15    purposefully had it placed in your file to impact your

16    ability to find gainful employment.

17         Do you have any facts to support that?

18     A    No, ma'am.

19     Q    Do you have any facts to support your

20    allegation that Lugo purposefully placed or caused the

21    written reprimand to remain in your personnel file to

22    impact your ability to find gainful employment?

23     A    No, ma'am.

267

1      Q      And do you have any facts to support your

2   allegation that Defendant Reinhart placed or caused the

3   written reprimand to remain in your file in order to harm

4   you in any way or to impact your ability to find gainful

5   employment?

6      A      To answer your question, it's more of a

7   responsive -- the responsibility for Major Reinhart to

8   inform HR, "Listen, Lieutenant Miller grieved it.  We've

9   got to pull it."  It would fall on him to replace it.  And

10  whether or not that was done, I do not know, ma'am.  It's

11  more of an action that he should've taken and met with Ms.

12  Dingler to make sure it was removed.

13     Q      And whether he did that or not, you don't

14  know, do you?

15     A      Correct.  Yes, ma'am.

16     Q      So when you had this document filed in April

17  of 2021 and alleged that Reinhart purposefully placed the

18  written reprimand in your file or allowed it to remain

19  there, you didn't have any facts to support that

20  allegation, did you?

21         MR. FINDLEY:  Objection; misstates what it

22  says.  I haven't been able to see "placed" anywhere.

23         Does it say, "placed"?

268

```
1            BY MS. BARDOT:

2       Q    I'll just read it to you.

3            "Despite issuing Officer Miller a notice for

4   corrective action, the Written Reprimand remained in

5   Officer Miller's personnel file and upon information and

6   belief, had been wrongfully submitted to background

7   investigators who have requested Officer Miller's file.

8   Such action," allowing it to remain, I suppose, "was done

9   purposefully by Palko, Lugo, Reinhart in order to

10  negatively impact Officer Miller's ability to find gainful

11  employment with another law enforcement agency."

12           When this was filed in April of 2021, did you

13  have any facts to support your allegation that either of

14  those three defendants purposefully had the written

15  reprimand remain in your file to cause you the harm that

16  you've alleged?

17      A    I guess not, ma'am.

18      Q    I want to go to Page 15.  Well, let me back

19  up, I'm sorry, to these undisclosed pay raises.

20           It says here, "In 2018," Paragraph 75, "MMPD

21  officers were notified that an annual pay increase was not

22  approved by Defendant Manassas Park," do you see that?

23      A    Yes, ma'am.
```

269

1      Q     Was that at a council meeting?

2      A     I want to say it was a council meeting since

3   it was posted online.  It could be a governing body

4   meeting.

5      Q     And was it, as of 2018, the case that there

6   was been a lot of years without pay raises for the Police

7   Department and other employees of Manassas Park?

8      A     When I first joined, I want to say we went

9   seven years without a raise.  And then we got a couple

10  here and there.  And 2018, it was zero, but I want to say

11  2017, it was .5, and then 2016, it was 1.5.  I could be

12  wrong, but it was -- it was enough to offset the cost of

13  our health insurance going up.

14     Q     And then you say, "However, Officer Miller

15  learned that certain MPPD officers and personnel loyal to

16  Defendant Lugo had in fact received discreet salary

17  increases," do you see that?

18     A     Yes, ma'am.

19     Q     How did you learn that information?

20     A     How did I learn about the pay raises?

21     Q     Correct, in Paragraph 75.  This is before your

22  FOIA request.

23            How did you learn of this?

270

```
 1        A    I think it was Kevin Hampton who told me that
 2   there was -- there was a raise for select individuals.
 3        Q    And who were they?
 4        A    It would have been, I think Koglin got it, I
 5   think Detective Dustin Walker got it, I think Lieutenant
 6   Joseph Johnson got it, and I think two others.
 7        Q    Who are they?
 8        A    Either Brian Sproule, K-9 Officer Brian
 9   Sproule, and I think that's when Major Reinhart got a
10   small bump to equal out his pay with Chief Lugo, but there
11   were, I want to say, five individuals that ended up
12   getting it.
13        Q    And were these all persons that you would
14   classify as "loyal" to Defendant Lugo?
15        A    Well, they're under his umbrella for
16   responsibility.
17        Q    Did that make them loyal to him, as you've
18   described them?
19        A    Yes.
20        Q    Was everybody under his umbrella loyal to him
21   as far as you know?
22        A    I mean, he kept them, so I would assume that
23   they were.  I mean --
```

271

1      Q     And do you know whether there were personnel

2   in other departments at this time who also received pay

3   raises?

4      A     No one else in Manassas Park got a -- from

5   Manassas Park Police got a raise.

6      Q     I'm not asking about Manassas Park Police,

7   anybody else at Manassas Park who was an employee at this

8   time who received a pay raise, do you know?

9      A     Oh, I do not -- I do not know.  I did not FOIA

10  that specific -- any other departments but Police

11  Department.

12     Q     And do you know who it was that made the

13  decision to give these salary increases at this time

14  referenced in Paragraph 75 of your complaint?

15     A     Who approved them?

16     Q     Who made the decision in the first instance to

17  give the raises, do you know?

18     A     I don't have specific information.  No, ma'am.

19     Q     And you don't have any information to suggest

20  that it was Lugo who identified who deserved raises, do

21  you?

22     A     Who deserved it?  No, ma'am.

23     Q     Or who would get the raises, you don't have

272

1    any information to suggest that it was Lugo that made that

2    decision, do you?

3         A    For the specific officers that got it?

4         Q    Yes.

5         A    Well, that'd have to come from somebody in

6    command staff.  They're not just going to pick five names

7    out of a hat.  They're going to specifically go to them

8    for a particular reason.

9         Q    Well, you don't know that, do you?  I mean, do

10   you know if Palko made the decision who should get pay

11   increases?

12        A    For the officers that got it?  I --

13        Q    Yes.

14        A    -- I don't know, ma'am.

15        Q    You say in Paragraph 76 that your coworkers

16   expressed anger and resentment but were afraid to speak up

17   out of fear of reprisal.

18             Who are you referring to?

19        A    Several of them, I guess.

20        Q    Who?

21        A    If a -- anyone on my squad.

22        Q    I need a name; who?

23        A    It would be, I guess any newer ones, Officer

273

1    Kellogg, I think it would be at the time, Andrew Shumate,

2    maybe Andy Bussell.

3        Q    I don't want maybes, I just want to know who

4    you recollect indicated to you that they were angry and

5    had resentment and were afraid to speak up out of fear of

6    reprisal.

7            Did Kellogg say those things to you?

8        A    Not specifically.

9        Q    Okay.  I don't understand that answer.

10           Did she say it to you some other way that

11   wasn't specifically?

12       A    Well, it was more of because they knew how the

13   command staff would react to certain things, they didn't

14   want to be subject to being targeted.

15       Q    Did she say that to you?

16       A    She said that to me in a closed-door sessions

17   after another meeting, not specifically for the pay

18   raises.

19       Q    So she didn't say that.

20           So did Shumate express --

21           MR. FINDLEY:  Excuse me.  I think that

22   misstates testimony.

23           MS. BARDOT:  Well, let me be clear.

274

1          BY MS. BARDOT:

2          Q      Kellogg never said to you that she had anger

3     and resentment and was afraid to speak up out of reprisal

4     with respect to the pay raises; is that correct?

5          A      I can't say yes or no, ma'am.  I just can't

6     recall specifically when or if it was another matter.

7          Q      Did Shumate ever say to you that he had anger

8     and resentment and was afraid to speak up out of reprisal

9     about the pay raises?

10         A      I can't recall if he was angry or had

11    resentment.  We were -- we were talking and I think I he

12    had just told me that he had talked to Lugo about that.

13         Q      So he actually went to Lugo about the pay

14    raise issue.

15         A      Because they're a rumor mill.  I think he went

16    to talk with Chief Lugo more of like an inquiry, like,

17    "Hey, are these rumors true?  And if so, why?"  Because

18    the scuttlebutt was if we're not going to get a raise and

19    then we're hearing that a couple other people did, like

20    why them but not us?

21         Q      And so who then came to you that's referenced

22    in Paragraph 76 and expressed anger and resentment and

23    indicated they were afraid to speak up about the pay

275

1  raises out of fear of reprisal?

2       A    I can't recall, ma'am.

3       Q    Paragraph 78 says, "The FOIA request," which

4  would be your FOIA request for pay information, "was

5  submitted to Defendant Manassas Park, who reported the

6  substance of the request to Defendant Lugo and other

7  members of MPPD's command staff and also identified

8  Officer Miller as the requesting party," did I read that

9  right?

10      A    That I requested it and then they responded

11 with it.  Yeah, they put --

12      Q    I'm just asking if I read this right.

13           "The FOIA request was submitted to Defendant

14 Manassas Park, who reported the substance of the request

15 to Defendant Lugo and other members of MPPD's command

16 staff and also identified Officer Miller as the requesting

17 party," did I read that right?

18      A    You read -- that's how it's typed.  Yes,

19 ma'am.

20      Q    What facts do you have -- let's take a break

21 for a minute.  I just have a tickle in my throat.

22           (Recess.)

23           (Back on the record.)

276

1              MS. BARDOT:  All right.  Back on the record.

2              BY MS. BARDOT:

3       Q     Looking at Paragraph 78, what facts do you

4    have to support your contention that Lugo was told the

5    substance of the FOIA request?

6       A     I don't.  I thought there was an email,

7    though, but I could be wrong.  I thought there was an

8    email from Ms. Borang (ph) to me and someone was CC'ed on

9    it, but I don't have it in front of me.

10      Q     What facts do you have to support the

11   contention that other members of MPPD's command staff were

12   told about the substance of the FOIA request related to

13   the pay raises?

14      A     I don't have any specific, ma'am.

15            Want one of these (indicating)?  It's a Halls.

16      Q     Oh, thanks.  I might take you up on that.

17            Do you have any information as to what the

18   rationale was as to why certain people would get pay

19   raises and others would not?

20      A     I think I was told it was like a retention

21   bump.

22      Q     Were you told that it was to bridge some pay

23   gaps?

1        A      It could've been both.  I think could've been

2    a retention bump because we had been losing people, but

3    there was -- there was a pay gap.  And I think a pay study

4    had been completed where several officers were -- well,

5    everyone, to include majors and captains, were well below

6    the standard of Northern Virginia agencies.  So that

7    could've been part of it with -- to get a select few up.

8        Q      And on Page 15, Paragraph 80, it says, "At the

9    time, the ISD and K-9 divisions were under the control of

10   Defendant Lugo, and upon information and belief, Defendant

11   Lugo was responsible for making the request for

12   distribution of the undisclosed pay raises," do you see

13   that?

14       A      Yes, ma'am.

15       Q      You don't have any facts to support that claim

16   that Lugo was the one responsible for making the request

17   for the distribution of the undisclosed pay raises, do

18   you?

19       A      That second part, correct.

20       Q      Eighty-one says, "Defendant Lugo's request was

21   submitted to Defendant Palko for approval."

22              Again, you don't have any facts to support

23   that that's the way that worked, do you?

1        A      Correct.

2        Q      It says, "Without justification, Defendant

3   Palko approved the undisclosed pay request and the payroll

4   change forms were processed," do you see that?

5        A      I do, ma'am.

6        Q      What is the factual basis for your contention

7   that what Palko did was without justification?

8        A      I don't have any specific proof about the

9   justification, it was more the overall -- the overall

10  individuals who received it under Chief Lugo's command,

11  the statements made to me about people trying to be, you

12  know, told to be quiet about it, and then just finding out

13  about the FOIA.

14       Q      Who was told to be quiet about the pay raises?

15       A      When Detective Walker walked up to Chief

16  Evans, apparently Chief Evans said, "You're to keep your

17  mouth shut about that."  And that was informed -- that was

18  told to me by Kevin Hampton.

19       Q      Walked up to Evans?

20       A      Yes.  I'm sorry.  Detective Walker --

21       Q      Right.

22       A      -- under Lugo's umbrella, went to Chief Evans,

23  inquired about this pay raise that I guess he got.

279

1    Walker's the other one, I'm sorry, unless I didn't say it.

2    And Kevin Hampton told me that he heard and witnessed

3    Chief Evans tell him to keep his mouth shut about it, but

4    obviously it got out.

5         Q    Was there some reason that you believe these

6    pay raises had to be disclosed at the time they were

7    given, in as much as you continue to refer to them as

8    "undisclosed pay raises"?

9         A    To be disclosed?

10        Q    Yeah.

11        A    Well, everyone's working hard.  I got zero-

12   dollar pay raise.

13        Q    Right.  But you had not right, if Walker was

14   going to get a pay raise for whatever reason, to be

15   advised of that, did you, at the time it occurred?

16        A    Not advised, so that's why I did a FOIA,

17   ma'am.

18        Q    You go on to say in Paragraph 82, "Officer

19   Miller's discovery of the undisclosed pay raises reflected

20   negatively upon Lugo, Palko, and Reinhart," do you see

21   that?

22        A    Yes, ma'am.

23        Q    How?  How did your discovery of these raises

280

1    reflect negatively on those three individuals?

2          A    Well, because now they knew that I had

3    information that I thought was very suspicious and

4    unwarranted and unethical.

5          Q    Why would it be unethical or unwarranted to

6    give someone a pay raise?

7          A    The other 28 officers in Manassas Park didn't

8    get a pay raise, ma'am, and these individuals got 2 to

9    $3,000 that will be collectively over years and years and

10   years a very good sum of money that I will not ever

11   receive, nor will the other 27 of us ever receive.

12         Q    So in your opinion, unless everybody got the

13   same pay raise, it's unethical, unwarranted?

14         A    I'm not saying same pay raise.  We got zero

15   pay raise.

16         Q    And you don't think whoever made that decision

17   had the discretion as to what pay raise different people

18   should get?

19         A    They had the discretion.  That's why they did

20   that.

21         Q    But you've called it "unwarranted and

22   unethical."

23         A    Yes.

281

1      Q      Even though they had the discretion.

2      A      Apparently, they had the discretion.  Yes,

3  ma'am.

4      Q      But when you say here that the discovery of

5  the undisclosed pay raises reflected negative on, let's

6  start with Lugo, you don't know that Lugo knew that you

7  knew of the undisclosed pay raises; correct?

8      A      Through FOIA?

9      Q      Yeah.

10      A      Oh, they all knew.  They talk.

11      Q      Well, without you assuming what they knew, you

12  haven't seen anything or spoken with anyone that would

13  suggest to you that Lugo knew that you had gotten that

14  information through FOIA; correct?

15      A      Correct.  Yes, ma'am.

16      Q      And even if he did know that you had received

17  that information through FOIA, how would that fact reflect

18  negatively on him?

19      A      I'm not sure negatively is -- it's more of a

20  look at like his position -- his position and how he was

21  able to get money for certain individuals only under his

22  umbrella.

23      Q      But, again, you don't know that he was the one

282

1    that instituted that; correct?

2         A    Correct.

3         Q    So with respect to Palko, again, you don't

4    know that he knew that you had obtained information about

5    undisclosed pay raises; correct?

6         A    There was no email showing that, correct.

7    Yes, ma'am.

8         Q    Or anything else; correct?

9         A    Just my years of experience there, ma'am,

10   that's all I'm basing it on.

11        Q    But years of experience don't make this a

12   fact; correct?

13        A    Not 100 percent fact.  Correct, ma'am.

14        Q    It doesn't make it a one percent fact because

15   you had no knowledge of anything to suggest that Palko

16   knew that you had received through FOIA any information

17   regarding these pay raises; correct?

18             MR. FINDLEY:  Objection; form, argumentative.

19             THE WITNESS:  Without the email in front of

20   me, I thought it went to -- I thought it went to Palko or

21   it went to HR and maybe the City Attorney, Dean Crowhurst.

22             BY MS. BARDOT:

23        Q    And then it says -- and if Palko knew that you

283

1    had received information about the undisclosed pay raises,

2    how did that reflect negatively on Palko?

3         A     If I'm correct, I think he had just been hired

4    as the City Manager.  And if his first month or decision

5    as City Manager would be to give five officers a pay raise

6    versus all 32, I mean, to me that -- it doesn't look good

7    as a supervisor, but that's just me.

8         Q     Why?

9         A     Why what?

10        Q     Why doesn't it look good?  I mean, were these

11   five officers that were underpaid, you know, as compared

12   to the other officers?  Do you have any information about

13   why those officers got bumps and other people did not

14   that's factual?

15        A     Just from what Lugo said, it was retention

16   bump.

17        Q     And if it was a retention bump for those five

18   officers, you don't have any facts to suggest that's not

19   accurate, do you?

20        A     Correct.

21        Q     And then with respect to Reinhart, if he knew

22   that you knew about undisclosed pay raises, how did that

23   reflect negatively upon him?

284

1      A      If he was part of the pay raise for that

2   particular FOIA, I don't it was the year before or the

3   year after, ma'am.  I just know that his pay raise was

4   more than what the allotted pay raise was if his was the

5   1.5 in the first year, I think.

6      Q      But if he knew you knew that, how did that

7   reflect negatively on him?

8      A      I guess because when he -- when he got that, I

9   assumed after his statement to me about him getting paid

10  less than Lugo, if he went to Chief Evans and I guess made

11  his complaint and said, "Hey, I'm not getting paid as much

12  for my equivalent," which I would do the same thing, then

13  I guess the negative part is just the fact that I have

14  knowledge of it and it doesn't look good that he got a

15  raise, but no one else did.

16     Q      Well, it's not true that no one else did;

17  correct?

18     A      Right.  It was -- I think it was five, ma'am.

19     Q      And you don't know whether other people within

20  Manassas Park also got raises as part of this same event;

21  correct?

22     A      You mean of other departments like --

23     Q      Yes.

285

1          A      -- you mentioned?  Correct.  Yes, ma'am.

2          Q      You go on in Paragraph 82 to say that,

3     "Officer Miller's exposure of the undisclosed pay raises

4     angered the Defendants and" --

5          A      I'm sorry, where are we at?

6          Q      Eighty-two.

7                 "Officer Miller's exposure of the undisclosed

8     pay raises angered the Defendants and further incited and

9     emboldened the Defendants to take more drastic action to

10    remove Officer Miller," do you see that?

11         A      Yes, ma'am.

12         Q      Did Lugo, Palko, Reinhart express any anger to

13    you with respect to your exposure of the undisclosed pay

14    raises?

15         A      They themselves did not make any specific

16    comments to me.  Correct, ma'am.

17         Q      Did anybody else relay to you any facts to

18    suggest that Lugo, Palko, or Reinhart knew that you had

19    this information about the pay raises and were angry about

20    it?

21         A      Their names were not mentioned by Dean

22    Crowhurst when I had a conversation with him, ma'am, so,

23    no.

286

1     Q     Is there a conversation you had with Crowhurst

2   with respect to these pay raises?

3     A     It was a conversation he had with me.  He

4   pulled me in at some point and he goes, "Are you going to

5   talk to the governing body tonight?  A little birdie said

6   that you were going to talk to them about pay raises and

7   disciplinary actions and what have you," and it kind of

8   caught my surprise because I was like, "I don't know what

9   you're talking about.  No.  Who's telling you this?"  I

10   just asked him, I said, "Who's telling you this, Mr.

11   Crowhurst?" in his office.  And he says, "Well, I can't

12   tell you right now, but just be careful."

13         And I was -- I was completely surprised and

14   had no clue who he was talking about because I had no

15   plans on even having any sort of discussion with the

16   governing body.  That was a -- that was a night to -- that

17   I think all of us in the room were there to celebrate

18   Chief Evans's actual retirement from City Hall.

19     Q     And assuming that conversation with Dean

20   Crowhurst occurred, he did not tell you that these little

21   birdies were Palko, Lugo, or Reinhart, did he?

22     A     No.  He wouldn't tell me.  I asked.

23     Q     You go on to say at Paragraph 84, "The

287

1    undisclosed pay raises violated the City of Manassas Park

2    Employment Policies and Practices, including Section

3    1513," do you see that?

4         A    Yes, ma'am.

5         Q    What does 1513 say?

6         A    I don't have that in front of me, ma'am.

7         Q    I can't find it.

8              So what sort of violation do you claim

9    occurred from these undisclosed pay raises?

10        A    Well, without knowing what 1513 is, it could

11   be a typo of mine, I don't know, but if in fact it's these

12   raises that were specific to just a select personnel, if I

13   recall, that to me would be unethical and it would not

14   reflect positively with the rest of the employees in the

15   entire City of Manassas Park if that were to get out.

16             And if I have that 1513 wrong, it was more or

17   less to use, I think, with what was used against me by

18   Chief Lugo in the final findings.  I was -- I was trying

19   to -- if that's correct.  It just could be a typo of mine.

20        Q    Well, this says, "The undisclosed pay raises

21   violated the City of Manassas Park Employment Policies and

22   Practices, including Section 1513."  So let's put that

23   section aside.

288

1      A      Okay.

2      Q      What policy and practice did these pay raises

3  violate?

4      A      Well, if they are in fact undisclosed or kept

5  from the rest of the people that work there, and even

6  after an announcement by the governing body that no raises

7  for anybody would happen, if there's behind the door

8  closed meetings, I don't know what they're allowances are,

9  but if it's not a policy or practice to give five

10  individuals of the Police Department and unknown people at

11  other divisions, that's where -- that's where my violation

12  would come into play, ma'am.

13      Q      But you don't know if there were behind the

14  door closed meetings, as you've just referred to; correct?

15      A      If it's a governing body reference pay,

16  there's nothing on there, so those would be closed-door

17  meetings.

18      Q      Do you know if there was any closed-door

19  meeting?

20      A      I don't know, ma'am.

21      Q      It goes on to say, "Defendant," Paragraph 85,

22  "Manassas Park had knowledge of the undisclosed pay raises

23  but upon information and belief, failed to conduct a

289

```
 1    meaningful investigation and/or failed to discipline the

 2    offender(s), including Lugo and Palko," do you see that?

 3         A    Yes, ma'am.

 4         Q    What did Lugo do with respect to these pay

 5    raises that caused you to call him an "offender" who

 6    should be investigated or disciplined?

 7         A    If only the five individuals that got raises

 8    were under his umbrella, to me he -- he was the one who

 9    requested it through Chief Evans, and through Chief Evans

10    would have to be approved by Defendant Palko.  And --

11         Q    But you've already testified you don't know if

12    he requested these raises; correct?

13         A    That if Lugo requested it?

14         Q    Yes.  You don't have any knowledge that that

15    that actually occurred.

16         A    Correct.  Yes, ma'am.

17         Q    And so if could be that Evans requested the

18    raises; correct?  He could be somebody who could do that.

19         A    Yes, ma'am.

20         Q    And it could be that Palko, as the City

21    Manager, made a determination on his own to give the

22    raises; correct?

23         A    Yes, ma'am, that's correct.
```

290

1      Q     So you don't know of any facts that would

2   suggest that Lugo should have been investigated or

3   disciplined as it pertains to these raises, do you?

4      A     I do not know.

5      Q     And you don't have any facts to suggest that

6   Palko did something that should have been investigated or

7   disciplined with respect to these raises, do you?

8      A     I don't know of any of that.

9      Q     And back when these raises were given in 2019,

10  you obviously must have been concerned about them since

11  you did a FOIA; right?

12      A     I had done a FOIA a couple times before.  It

13  was more to -- it was more to verify some of the rumors

14  that had been going through Patrol.

15      Q     And so after you received this information

16  through your FOIA, did you make a complaint?

17      A     Did I make a complaint with anybody like from

18  command staff?

19      Q     To anybody say, "Hey, look, I think there's

20  been some wrongdoing here.  I think this person should be

21  investigated"?  Did you make any complaint at all to

22  anybody?

23      A     It was no official complaint.  No, ma'am.

291

1        Q      Was there an unofficial complaint?

2        A      It was more of complaining at the patrol-

3    level, complaining that to Kevin Hampton like it's kind of

4    like -- it's kind of messed up that certain people would

5    get pay raises but the rest of us don't.  And knowing that

6    morale was gone, this was just kind of like another -- it

7    didn't sit well with a lot of us.

8               So it was no official complaint like, "I think

9    this needs to be looked into," it was more people venting

10   like, "Look at this."  And then shortly thereafter, I

11   think another officer did another FOIA.

12       Q      Who was that?

13       A      That would be Officer Andy Bussell.  He did, I

14   think, an extended one.

15       Q      Going on in your complaint on Paragraph 15,

16   there is a --

17       A      Page 15?

18              MR. FINDLEY:  Wait.

19              BY MS. BARDOT:

20       Q      Yeah.  I'm sorry, Page 15.

21              MR. FINDLEY:  And what Paragraph?

22              MS. BARDOT:  I'm getting there.  Haven't said

23   it yet.

294

1   rumor mill.

2         Q     And was Lugo's first act as Chief of Police to

3   get rid of six people?

4         A     I don't know, ma'am.

5         Q     You go on to say in Paragraph 88, "On April

6   22, 2019, MPPD officers were required to attend a

7   mandatory meeting."

8               Who called this meeting?

9         A     I think it was the City Manager.

10        Q     Was this a meeting just of police or was it a

11   meeting of other departments as well?

12        A     I think it was all departments.

13        Q     Is there a special name for these meetings?

14        A     Yes, there is.  I can't -- I can't think of

15   it, though.  It was a City Wide Staff Meeting or City Wide

16   -- it was something where we had to pick dates to go

17   because of the amount of personnel.

18        Q     Right.  And it's split were some people from

19   different departments would come on staggered dates; is

20   that right?

21        A     Yes, correct, staggered dates and it was over

22   a week or something like that.  It was to make sure that

23   we weren't crowded in there, it was to make sure that

295

1    everyone had an opportunity to be present.

2         Q     So this was called by Palko.

3         A     I think so.  I -- either -- well, Palko spoke

4    before he went to Richmond to talk about the city's

5    finances.  But I know HR was there.

6         Q     And when you say, "HR," who are you --

7         A     I'm sorry.  Ms. Valerie Dingler and then City

8    Attorney, Dean Crowhurst was there.  They talked, I think,

9    about the -- it could've been the yearly requirements for

10   certain training.

11        Q     And it says here in Paragraph 88 that, "During

12   the meeting, MPPD officers were required fill out an

13   'anonymous' survey.  The survey asked, among other things,

14   if the officer would recommend family/friends to work at

15   MPPD," do you see that?

16        A     I do.

17        Q     And was this a survey that was one that Palko

18   had created, do you know?

19        A     I don't know who created it, ma'am.

20        Q     But this wasn't a survey that was particular

21   to the police, was it, it was one that was given out to

22   whomever was at this City Wide Staff Meeting; correct?

23        A     I'm not sure if was department specific or if

296

1    it was a generalized question.  I don't know, ma'am.

2         Q     You had done this is 2018 as well, correct,

3    filled out one of these surveys?

4         A     I may have.  I don't know.

5         Q     Do you have a copy of the survey that you

6    filled out in 2019 that you're referring to here?

7         A     I do not, ma'am.

8         Q     Any reasons why you didn't maintain a copy of

9    it?

10        A     I was the last one in the -- in the building

11   at the time, and when Ms. Valerie Dingler was sort of

12   getting her papers together, I didn't want to ask to get a

13   photocopy of it and I didn't want to take a picture of it.

14   I just handed it to her, ma'am.

15        Q     Why didn't you want to take a picture of it?

16   I mean, by this time you're documenting stuff left and

17   right, so why didn't you want to take a picture of it?

18        A     I just didn't.  I didn't know if what would

19   cause her concern as to why I was doing it.  I just

20   didn't, ma'am.

21        Q     Did you ask her if you could?

22        A     I did not, ma'am, no.

23        Q     So it says in Paragraph 89, "In response to

297

1    the mandatory survey," so let me ask you about that first.

2              Was the survey mandatory?

3         A    I thought I was because you're not putting

4    your name on it, but I could be wrong.  I don't know.

5         Q    It says, "In response to the mandatory survey,

6    Officer Miller truthfully wrote that he would not

7    recommend family/friends to work for MPPD because of a

8    lack of leadership and leadership's failure to take

9    corrective action for serious and sustained violations of

10   policy.  Moreover, Officer Miller identified that MPPD was

11   plagued by incidents of hypocritical decision making,

12   nepotism, and favoritism," do you see that?

13        A    Yes, ma'am.

14        Q    Is that in fact what you wrote?

15        A    I'm not sure exactly the quote I wrote, ma'am.

16   I don't know.

17        Q    Is what you have pled here in Paragraph 89,

18   word for word?

19        A    I can't say it's word for word without seeing

20   a document.  I didn't retain a copy of it, ma'am.

21        Q    Did you document what you wrote in any way,

22   such as sending yourself a text, writing it down on a

23   piece of paper?

298

1      A     No.  It was just more from memory and that I

2   decided at the time, I just -- I didn't feel -- I didn't

3   feel as if I'd want to have family or friends there, but,

4   again, without seeing it in front of me, I can't tell if

5   that's a quote or it's just a generalized statement of

6   what was written.

7      Q     Did you put your name on the survey that you

8   completed in 2019?

9      A     I don't -- if I put something like that, I

10  don't think I would put my name it.  No, ma'am.

11     Q     You claim that after you completed the survey,

12  you delivered a response to a city HR representative who

13  quote, "marked your survey," end quote.

14           Who did you give the survey to?

15     A     That was to Ms. Valerie Dingler, the HR

16  Director at the time.

17     Q     And what marking did she put upon it when you

18  she marked it?

19     A     I don't know what mark there was.

20     Q     Well, you said she marked it.

21           So did you see her write on it or what do you

22  mean by she "marked" it?

23     A     I can't recall.

299

1        Q       Did she put your name on it?

2        A       I didn't see her put my name on it.  No,

3   ma'am.

4        Q       You go on to say in Paragraph 90, "Upon

5   information and belief, the HR representative tracked

6   Officer Miller's responses and delivered them to Defendant

7   Lugo and Defendant Palko," do you see that?

8        A       Yes, ma'am.

9        Q       What did Ms. Dingler do to track your

10   response?

11       A       I don't have anything specifically on the

12   tracking.

13       Q       And what specifically do you have factually to

14   support your contention that she delivered your response

15   to Lugo or Palko?

16       A       Delivering of the actual response, I couldn't

17   tell you, ma'am.

18       Q       So why did you say that in your complaint?

19       A       Because any time someone's going to put

20   something negative on a survey that speaks negatively of

21   the entire, not just Police Department, but the City in

22   general, if an HR Director does not respond to the head of

23   those departments, it would be I guess questionable on her

300

1   end.

2          I would absolutely go forward to the City

3   Manager and Chief Lugo and say, "We go this -- we got this

4   survey," or surveys if there was more, "and we need to see

5   if try to fix any potential issues that are being alleged

6   here."

7      Q    So you're talking about what you think could

8   happen under some circumstances, but you don't have any

9   facts to suggest that Ms. Dingler took your survey and

10  gave it to either Defendant Lugo or Palko, or even

11  discussed the content of it with them, do you?

12     A    Correct.

13     Q    So by the time you completed the survey in

14  April of 2019, is it fair to say you were feeling pretty

15  disgruntled?

16     A    I don't know about disgruntled.  I was -- I

17  was not happy with a couple things and I was just trying

18  to just kind of smoothly sail along.

19     Q    And by the time you completed the survey in

20  April of 2019, is it fair to say you were unhappy with

21  your job?

22     A    I loved my job, ma'am.

23     Q    Were you unhappy with the people you worked

301

1    with?

2           A      A select few.

3           Q      Being who?

4           A      I don't want to say about unhappy.  I was not

5    happy with knowing that I was not going to be most likely

6    promoted, I was not part of the up and coming command

7    staff.  I was really trying to only future my leadership

8    classes and knowing that I was just constantly being not

9    allowed to do so, I guess.  I was not going to be part of

10   the National Academy at the time.

11          I had, you know, they would already rumor mill

12   that I think both Melissa Boorman and Frank Winston I

13   believe were lieutenants at the time were going to be

14   shortly promoted to captain.

15          And I was really -- I knew just based what

16   people were saying and just my time there and just knowing

17   how things would work, I was not necessarily disgruntled.

18   I was more cautious, concerned, but yet I still loved the

19   hell out of my job.

20          Q      So by this time when you did the survey in

21   April of 2019, did you feel like you were being harassed

22   or mistreated or discriminated against by Lugo?

23          A      Minus the other documentations, not

302

1    necessarily harassed but I had just been documenting the

2    things here and there.

3         Q    Because you thought he was mistreating you;

4    correct?  You've told me you thought he was jabbing at

5    you?

6         A    Yeah, I did.  And I was more -- I was more

7    concerned with when he became Chief what's going to

8    happen, even though I had -- I was in full support of

9    Chief Lugo becoming Chief knowing I had known him for 20

10   years and we were friends.

11        Q    By the time you did this survey in April of

12   2019, did you feel like Reinhart, Winston, Palko, or Dorr,

13   any of those four individuals mistreated you, harassed

14   you, discriminated against you?  Any of those individuals?

15        A    Not Carl Dorr.  We didn't have a lot of -- we

16   didn't have a lot of working relationship.  He was always

17   on the separate squad.  We had a -- just like a respectful

18   comradery when we would do shift change.

19             Captain Frank Winston and I, our relationship

20   was, yes, we banter, we had some good times.  There were

21   times when I knew he can say and do things, and it was

22   just that the feeling that he was completely protected and

23   with just my knowledge, the overall knowledge in the

1    Police Department that he was -- he was being -- he was

2    being groomed for captain.  So there was not a -- there

3    was nothing specific where he had, say, verbally attacked

4    me or, what was your word --

5         Q    Harassed --

6         A    -- harassed.

7         Q    -- mistreated --

8         A    I'm sorry.

9         Q    -- discriminated.

10        A    It was more of just the overall protection

11   that he received from Chief Lugo.

12             And then when it came to Major Reinhart and I,

13   again, our relationship was rocky in the beginning, but we

14   had a very weird dynamic where we would be able to rely on

15   each other for certain things knowing how -- knowing our

16   strengths and weaknesses.

17             And we would confide with each other, but when

18   -- but when Major Reinhart would get angry or would be in

19   a bad mood, everybody, to include myself, would distance

20   themselves from him.  It was more he would -- he would do

21   a lot of, we called it "barking," not necessarily barking

22   like a dog, but barking as in just a generalized yelling,

23   kind of puffing his chest out, but it was like we were

304

```
 1    just -- we kind of just -- it was like an acceptance, if
 2    that makes sense, but that's something that Trevor
 3    Reinhart and I, we had a -- almost like a -- to say
 4    "weird" is an understatement.  We had a great work
 5    relationship because we knew each other well enough to
 6    know what we can rely on each other for.
 7              But when it came to discipline, everybody knew
 8    that it was Trevor Reinhart that would be the individual
 9    to conduct any sort of investigation when it came to, I
10    guess, patrol.
11         Q    Did you have an issue with that?
12         A    I did not because I still respected the
13    decision making with him being the Internal Affairs I
14    guess responsive party whether it was under Chief Evans or
15    even Chief Lugo.  If that's what they delegated, they
16    delegated it.
17              I think it was more with his findings were
18    always sustained and then several of us, to include
19    myself, just felt it was -- it was excessive, but when I
20    go back to the weird relationship that Trevor and I had,
21    I'd be able to talk to him like Regan and Trevor, not
22    lieutenant to captain, lieutenant to major.  It was a --
23    just a different sort of relationship we had probably
```

305

1   because of our time as detectives together.

2       Q    So when you filled out this survey in April of

3   2019, you say you truthfully wrote that you wouldn't

4   recommend family and friends to work for MPPD because of a

5   lack of leadership and leadership's failure to take

6   corrective action for serious and sustained violations of

7   policy.

8            Who's the leadership you're referring to

9   there then?

10      A    If I have to say it, it's going to be what I

11  had mentioned earlier, that Trevor's excessive findings

12  for complaints, but yet we would -- at least I

13  individually would be able to talk to him.

14           The fact that -- not that I know of, but not

15  that -- I don't know if Frank Winston was ever pulled in

16  or disciplined for his, I guess his mouth, his actions.

17  He could just talk to people and say and do whatever he

18  wanted with comments, the same comments that I'd be pulled

19  in for.

20           So it was more of the fact that there was an

21  allowance for certain people to I guess say and do versus

22  the allegations where they were unfounded where I'd be

23  pulled in and questioned even prior to this.  And, you

306

1   know, there's a couple dates where I had been pulled in

2   and it was, "Why are you doing this, why are you doing

3   that, not are you doing this?"  And I would try to ask,

4   "Well, who's saying this?" because it was not me.

5          Q     I'm going to show you Document 98.

6                              (The document referred to

7                              above was marked Miller

8                              Deposition Exhibit No. 98,

9                              for identification.)

10          (Ms. Bardot handed the witness, Mr. Findley,

11   and the police officers a document.)

12          BY MS. BARDOT:

13          Q     Do you recognize this as the 2019 survey that

14   we have been discussing?

15          A     Yes, ma'am.

16          Q     And at the top, it says, "Name:  Regan

17   Miller"; correct?

18          A     It does, yes.

19          Q     It says, "Department:  Police"; correct?

20          A     Yes, ma'am.

21          Q     And all of the handwriting on this document is

22   yours; is that correct?

23          A     Yes, ma'am, it is.

307

1                    (Discussion off the record.)

2          Q     Can you show me in this report where it

3     contains the statement that you've alleged in your lawsuit

4     that you would not recommend family/friends to work for

5     MPPD because of a lack of leadership and leadership's

6     failure to take corrective action for serious and

7     sustained violation of policy?

8                    (Pause.)

9          A     Reference the exact working that's in the

10    lawsuit, no, ma'am.  It's more or less somewhat addressed

11    in a more, I guess I'll just call it like a relaxed

12    writing, more like an insinuation with "Selective

13    discipline is also an issue that has been noticed by

14    employees, but they are afraid to speak or have been told

15    not to discuss."  And I like said, "I love my job."

16         Q     Right.  But --

17         A     With -- I'm sorry.

18         Q     -- you said in your lawsuit, in response to

19    the mandatory survey, you truthfully wrote you would not

20    recommend family/friends to work for MPPD because of a

21    lack of leadership and leadership's failure to take

22    corrective action for serious and sustained violations of

23    policy, do you see that?

308

1        A      Yes, ma'am.

2        Q      And that's not what you wrote here at all in

3    response to the question, "10. Would you refer a friend to

4    apply for a position with the City of Manassas Park?"

5    Correct?

6        A      Yeah.  I put, "No, I would not be willing to

7    recommend a friend for a position with the City of

8    Manassas Park."  And then in my comments, I put, "Only due

9    to financial issues within city structure, otherwise,

10   yes."

11       Q      And you underlined "financial."  "Only due to

12   financial issues"; correct?

13       A      Correct.

14       Q      And otherwise, you said you would recommend;

15   correct?

16       A      For City of Manassas Park, yes.

17       Q      Which is who you work for; correct?  You're

18   employed by the City of Manassas Park.

19       A      Yes, ma'am.

20       Q      And you didn't put in response to that

21   question, "No.  I'm not going to recommend it because of a

22   lack of leadership and failure to take corrective action

23   for serious and sustained violation of policy," or

309

1    anything to that effect; correct?

2         A    That quote is not in there, ma'am.

3         Q    And as you state in Paragraph 1, you indicate

4    you love this job; correct?

5         A    I did.  I love police work.

6         Q    Well, it didn't ask you if you love police

7    work.

8              You said you love this job; correct?

9         A    Correct, which was police work.

10         Q    You didn't say that.  I'm just asking you what

11    this says.

12              It says, "I love this job"; right?

13         A    Correct.  Yes, ma'am, I did.

14         Q    And in answering Question Number 9, it says,

15    "As an employee, have you felt, harassed, discriminated

16    against, or mistreated within the last year?"

17              Your response was, "No, I have not"; correct?

18         A    That's correct.

19         Q    And then at the end of this, it says, "Please

20    utilize the section below to notate anything further that

21    you would like for us to know about how your department is

22    run, your interaction with other departments, and/or the

23    City as a whole," do you see that?

310

1       A       Yes, ma'am.

2       Q       Read me what you wrote.

3       A       It says, "I love my job, my department, and

4   the guys/girls I work with.  Some perceptions of

5   unfairness/opportunities have been going on for several

6   years - lack of certain rotations and opportunities for

7   those few have been ongoing and yet I have brought this up

8   and fell on deaf ears.

9               "Selective discipline is also an issue that

10  has been noticed by all employees," and then "(new as

11  well) but they are afraid to speak or have been told not

12  to discuss."

13      Q       So when you say, "Some perceptions of

14  unfairness/opportunities have been going on for several

15  years," what are you referring to?

16      A       Anytime supervisors were rotated in patrol,

17  ma'am, the patrol supervisors would only be utilized.  And

18  there was another supervisor, Melissa Boorman, who was

19  never rotated back to patrol, and it had been inquired by

20  numerous supervisors, to include myself, as to if the

21  eight of us, the eight supervisors, sergeants, lieutenants

22  were being rotated, why is no one else being afforded the

23  position she's in to try to learn the training aspect, the

311

1    general orders, accreditation and whatever she was in

2    charge of at the time.

3         Q    So this is referring to Boorman not being

4    circulated in that rotation?

5         A    For the circulation, yes, ma'am.

6         Q    And do you know who made the decision not to

7    put her in that circulation of rotation?

8         A    It'd have to come from command staff.

9         Q    But do you know who?

10        A    Not specifically.

11        Q    And do you know why?

12        A    Do I know --

13        Q    Why she wasn't?  Without speculating.

14        A    Just from comments that I would have with

15   other command staff members.

16        Q    Which would be gossip, hearsay, rumor.

17        A    It would probably opinion based on the

18   comments made.

19        Q    And what were the comments made as to why she

20   wasn't circulated?

21        A    Because she's a liability.  We know why she's

22   not in patrol.

23        Q    Who said that?

312

1      A      Oh, probably many of us.

2      Q      Who?

3      A      I don't have that specific -- those specific

4   names, but I can tell you it would be more off the

5   discussing with my supervisor at the time.  If and when

6   this was posted, I would be like, "How come Boorman's not

7   going to be there?"  But the one particular time when I

8   did mention it in front of Chief Evans, he said that she

9   had to deal with accreditation.

10     Q      And then it says, "Selective discipline is

11  also an issue that has been" --

12     A      Noticed.

13     Q      -- "noticed by all employees but they are

14  afraid to speak up or have been told not to discuss."

15            What are you referring to when you say,

16  "Selective discipline is also an issue"?  Give me the

17  specifics which support that.

18     A      That specific -- I can't recall specifically

19  without having I guess any notes, but if I wrote it at the

20  time, it was -- I think it was right after a staff

21  meeting, I think.

22     Q      And when you refer to "They are afraid to

23  speak up," who are you referring to in particular?

313

1          A       Patrol officers, ma'am.

2          Q       Who?

3          A       I'd say at the time, it was newer employees,

4    such as, I think there were some supervisors, but mainly

5    new would be Emilie Kellogg, I think it was Amber Stevens.

6    I think she had been hired.

7                  Without those name -- without the hierarchy of

8    the Department and like the squad rundowns, I couldn't

9    tell you specifically on certain names.

10         Q       Can you tell me where on that document, Number

11   98, there was a marking by HR, as you have referred to in

12   your complaint?

13         A       No.  I don't see -- I don't see a marking on

14   here except for the staples.  I mean, it's just a

15   photocopy.  I couldn't tell you, ma'am.

16         Q       So did they mark it or not?

17         A       I don't see a marking.  No, ma'am.

18         Q       I'm going to show you 99 and then I think we

19   might call it a day.

20                                    (The document referred to

21                                    above was marked Miller

22                                    Deposition Exhibit No. 99,

23                                    for identification.)

314

1              (Ms. Bardot handed the witness, Mr. Findley,

2     and the police officers a document.)

3              BY MS. BARDOT:

4        Q     I will represent to you that this has been

5     represented to me to be your 1998 [sic] survey.

6              Is the handwriting on this survey all yours?

7              (Pause.)

8        A     That is my handwriting.  Yes, ma'am.

9        Q     And on Page 10 of this survey, you're asked,

10    "Would you refer a friend to apply for a position with the

11    City of Manassas Park?"  And your response was, "Yes, the

12    City of Manassas Park is a great place to work!"

13             And then, "Comments:  I have," do you see

14    that?

15       A     Yes.  I -- you mean when I circled "a." with

16    their statement, it's a great place to work?

17       Q     Correct.

18       A     Yes.  I put, "I have."

19             MR. FINDLEY:  Heather, earlier you said, "Page

20    10."  I think you were just referring to Number 10.

21             MS. BARDOT:  If I said, "Page 10," I meant,

22    "Question 10."

23             MR. FINDLEY:  I just want a clean record.

315

```
 1              MS. BARDOT:  All right.

 2              MR. FINDLEY:  I'm going to ask him questions.

 3              MS. BARDOT:  Okay.  I'm going to stop my

 4    questions, just for the record, there today.  And we've

 5    talked about reconvening on December the 6th.  And I will

 6    let you do that.  I think it's unconventional for you to

 7    do that now.  I think I would normally finish -- let me

 8    finish -- I think I would normally finish asking questions

 9    and then you would have an opportunity to do that, but I

10    understand that Drew will probably be coming on the 6th

11    and won't have the knowledge of what happened today, so

12    given that, I don't have any opposition to that.

13              MR. FINDLEY:  No, I agree with you.  I will

14    suspend until then.

15              MS. BARDOT:  Okay.

16              THE COURT REPORTER:  Ms. Bardot, would you

17    like to order --

18              MS. BARDOT:  I need will need to order,

19    please.

20              THE COURT REPORTER:  Would you like a copy,

21    Mr. Findley?

22              MR. FINDLEY:  Yes.

23              THE COURT REPORTER:  Is there a read or waive
```

316

1    situation?

2                    MR. FINDLEY:  Read.

3                    THE COURT REPORTER: Okay.  Thank you.

4                    Is regular delivery okay?

5                    MS. BARDOT:  That's fine with me.  Thank you.

6                    THE COURT REPORTER:  Thank you.

7                            *  *  *  *  *

8                    (Whereupon, at approximately 5:00 o'clock

9    p.m., the taking of the deposition was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23